# EXHIBIT 1

Defendant Factory Mutual Insurance Company's

Notice of Removal

Electronically Filed
6/3/2021 12:19 PM
Steven D. Grierson
CLERK OF THE COURT

1 | Patrick G. Byrne, P.C.
Nevada Bar No. 7636
2 | Michael Paretti, Esq.
Nevada Bar No. 13926
3 | SNELL & WILMER LLP
3883 Howard Hughes Parkway, Suite 1100
4 | Las Vegas, NV 89169
Telephone: (702) 784-5200
5 | Facsimile: (702) 784-5252
pbyrne@swlaw.com
6 | mparetti@swlaw.com

7 | Tyrone R. Childress, Esq.
Amanda P. Ellison, Esq.
8 | (*Pro Hac Vice Forthcoming*)
JONES DAY
9 | 555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
10 | Telephone: (213) 489-3939
Facsimile: (213) 243-2539
11 | tchildress@jonesday.com
apellison@jonesday.com
12
13 | Jason B. Lissy, Esq.
Joseph D. Vandegriff, Esq.
14 | (*Pro Hac Vice Forthcoming*)
JONES DAY
14 | 250 Vesey Street
15 | New York, NY 10281-1047
Telephone: (212) 326-3939
16 | Facsimile: (212) 755-7306
jlissy@jonesday.com
17 | jvandegriff@jonesday.com

18 | *Attorneys for Plaintiff Wynn Resorts, Limited*

**CASE NO: A-21-835683-B**
**Department 27**

19 | **DISTRICT COURT**

20 | **CLARK COUNTY, NEVADA**

| | |
|---|---|
| 21 WYNN RESORTS, LIMITED | CASE NO.: |
| 22                     Plaintiff, | DEPT NO.: |
| 23             v. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| 24 FACTORY MUTUAL INSURANCE COMPANY | **Exempt from Arbitration:** |
| 25                     Defendant. | Business Court Matter Declaratory Relief Sought and Amount in Controversy Greater Than $50,000 |
| 26 | |
| 27 | **Business Court Requested:** |
| 28 | EDCR 1.61 – Business Tort Claim / Enhanced Case Management |

1    Plaintiff Wynn Resorts, Limited ("Wynn Resorts"), by its attorneys, upon knowledge with

2  respect to its own acts and upon information and belief with respect to all other matters, complains

3  of Defendant Factory Mutual Insurance Company ("Factory Mutual") and alleges as follows:

**NATURE OF THE ACTION**

5    1.    Wynn Resorts is the world's preeminent designer, developer, and operator of

6  integrated resorts featuring luxury hotel rooms, meeting and convention facilities, an array of dining

7  and entertainment options, high-end retail space, and gaming. Since its founding in 2002, Wynn

8  Resorts has consistently been recognized by *Fortune* magazine as one of the World's Most Admired

9  Companies in the hotel, casino and resort category, and awarded more Five-Star awards from

10  *Forbes Travel Guide* than any other independent hotel company in the world.

11    2.    Among its global portfolio of luxury resorts in the United States, Wynn Resorts

12  owns and operates Wynn Las Vegas and Encore at Wynn Las Vegas, respectively the largest and

13  second largest *Forbes* Travel Guide Five-Star resorts in the world, and Encore Boston Harbor, the

14  largest private single-phase construction project in the history of the Commonwealth of

15  Massachusetts.

16    3.    Unfortunately, like many companies throughout the country, Wynn Resorts

17  sustained significant losses throughout 2020 and 2021 as a result of the COVID-19 pandemic.

18  Indeed, the hospitality and travel industries—which depend on the ability to safely travel, lodge

19  and entertain guests—were perhaps among the hardest hit by the pandemic and the staggering

20  human, property and financial losses it has caused.

21    4.    Despite its best efforts to safely address these extraordinary challenges, Wynn

22  Resorts incurred substantial property and financial losses caused by the prevalence of COVID-19

23  at its own and other nearby premises, which rendered these properties unfit for their ordinary use,

24  and required the imposition of various closures, capacity limits and other restrictions on their

25  normal operations.

26    5.    Nevertheless, at the same time that the COVID-19 pandemic brought its operations

27  to a standstill, Wynn Resorts remained committed to leading by example by continuing to pay the

28

- - 2 - -

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

full wages of its over 27,500 employees during the closures and volunteering whatever resources it could to help those in its local communities most in need.

6.   To insure against situations such as this, Wynn Resorts purchased "all risks" commercial property insurance policies from Factory Mutual in the form of Mutual Corporation Non-Assessable Policy Nos. 1048495 and 1064616 (the "Policies," true and correct copies of which are attached to the concurrently-filed appendix of exhibits as Exhibits 1 and 2).  In exchange for substantial premium, each of the Policies expressly provides $2.25 billion worth of broad protections against "all risks of physical loss or damage" to property, including the risks of pandemic-related losses.  The Policies provide such protections through multiple, distinct coverage sections, including, but not limited to, for Wynn Resorts' losses caused by:

- loss or damage to Wynn Resorts' own property;

- loss or damage to the property of Wynn Resorts' customers and suppliers;

- loss or damage to property at a location that attracts business to Wynn Resorts, which is located within 1 mile of a Wynn Resorts insured location;

- any restriction of access to Wynn Resorts' property, including where caused by the order of a civil authority issued in response to physical loss or damage to property within 5 miles of a Wynn Resorts insured location;

- the actual presence of communicable disease at Wynn Resorts' property;

- reasonable and necessary costs to temporarily protect or preserve Wynn Resorts' property; and

- extra expenses incurred to continue Wynn Resorts' business as nearly normal as practicable.

7.   Wynn Resorts has unquestionably suffered COVID-19-related losses that trigger each of these coverage sections under the Policies.  Yet, in sharp contrast to Wynn Resorts' commitment to protecting its own employees and communities throughout the pandemic, Factory Mutual has turned its back on Wynn Resorts and refused to pay even a single penny of the substantial insurance to which Wynn Resorts is entitled under the Policies.

8.   Rather than honoring its clear coverage obligations owed to Wynn Resorts under the Policies, Factory Mutual has instead made a calculated bad faith effort to dodge its contractual obligations by improperly directing Wynn Resorts' insurance claim into, at most, a claim made

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- - 3 - -

under a limited $1 million sublimit for on-site "communicable disease" coverage. In doing so, Factory Mutual has not only misrepresented the express language of the Policies to Wynn Resorts, but has remarkably even gone so far as to make objectively false factual assertions regarding Wynn Resorts' claim, including baselessly contending that "COVID-19 was not actually present at a location owned, leased or rented by Wynn Resorts."

9.  Factory Mutual's conduct is nothing more than an after-the-fact attempt to avoid paying amounts rightfully owed to its policyholder, Wynn Resorts. But Factory Mutual is no victim of the Policies it sold: all insurers take "bets" when selling insurance and deciding how much to seek in premiums for those bets. However, once they take such "bets" (in the form of entering into an insurance contract), they cannot later renege on paying their obligations, as Factory Mutual is attempting to improperly do here. Indeed, Factory Mutual's own statements prior to the COVID-19 pandemic belie the meritless positions it has taken with respect to Wynn Resorts' claim, and reveal the extent of its duplicity in seeking to avoid its contractual obligations to Wynn Resorts.

10.  Factory Mutual's refusal to honor its contractual obligations and its continuing breaches of its obligations to adjust Wynn Resorts' claim in good faith have therefore required Wynn Resorts to commence this action to enforce its rights under the Policies.

**THE PARTIES**

11.  Plaintiff Wynn Resorts is a corporation organized under the laws of the state of Nevada with its principal place of business in Las Vegas, Nevada.

12.  Upon information and belief, Defendant Factory Mutual is a company formed under the laws of Rhode Island with its principal place of business in Johnston, Rhode Island. Upon information and belief, Factory Mutual is licensed to transact, and is regularly transacting, insurance business in the state of Nevada, including at all relevant times hereto.

**JURISDICTION AND VENUE**

13.  This Court possesses jurisdiction over this matter pursuant to NRS 14.065, and the amount in dispute is in excess of $15,000.

14.  Venue and jurisdiction in this District are proper under NRS 13.010 because both Wynn Resorts and Factory Mutual transact business within this Judicial District, including insofar

- - 4 - -

as the Policies were issued to Wynn Resorts in this District and insure, among other locations, Wynn Resorts' locations within this District.

15.     Factory Mutual is subject to personal jurisdiction in Nevada, and within this District, pursuant to NRS 14.065, as Factory Mutual availed itself of opportunities to conduct business in Nevada, establishing minimum contacts with the forum, and this State and District are the locations where a substantial part of the events or omissions giving rise to the claims set forth herein occurred and where a substantial part of the losses underlying the claims occurred.

16.     Factory Mutual further agreed in the Policies' "Jurisdiction" provision, that "[a]ny disputes arising hereunder will be exclusively subject to United States of America jurisdiction."

17.     Factory Mutual is additionally subject to jurisdiction in Nevada because it committed tortious acts within this State aimed at a Nevada-based organization.

## FACTUAL ALLEGATIONS

### A.     Wynn Resorts

18.     Wynn Resorts is the world's preeminent designer, developer, and operator of integrated resorts featuring luxury hotel rooms, meeting and convention facilities, an array of dining and entertainment options, high-end retail space, and gaming, all supported by superior levels of customer service provided by more than 27,500 employees.

19.     In 2021, Wynn Resorts was once again included on *Fortune* magazine's World's Most Admired Companies list in the hotel, casino, and resort category, and ranked first overall in the category of Quality of Products / Services among all international hotel companies.

20.     Wynn Resorts has a demonstrated track record of developing and operating integrated resorts that stimulate local and regional economic activity, by attracting a wide range of customers (including domestic and high-net-worth international tourists), extending the average length of stay per visitor, complementing existing convention and meeting business with five-star accommodations and appropriately scaled meeting amenities, elevating service levels with the execution of five-star customer service, and stimulating city-wide investment and employment.

21.     In Nevada, Wynn Resorts, through its subsidiaries, owns and operates Wynn Las Vegas, which opened in 2005, and Encore Las Vegas, an expansion of Wynn Las Vegas, which

1    opened in 2008.  Wynn Las Vegas is located at the intersection of Las Vegas Boulevard and Sands

2    Avenue, and occupies approximately 215 acres of land fronting The Las Vegas Strip.  The property

3    features approximately 194,000 square feet of casino space with 209 table games and 1,737 slot

4    machines, as well as private gaming salons, a sky casino, a poker room, and a race and sports book.

5         22.     Wynn Las Vegas also features two luxury hotel towers with a total of 4,748 guest

6    rooms, suites, and villas, which offer swimming pools, private cabanas, two full-service spas and

7    salons, and a wedding chapel.  In addition, Wynn Las Vegas offers 31 food and beverage outlets,

8    approximately 152,000 square feet of high-end, brand-name retail space, approximately 513,000

9    square feet of meeting and convention space, as well as two theaters, three nightclubs, a beach club,

10   and a golf course.

11        23.     Wynn Las Vegas and Encore Las Vegas have each earned Five-Star status on the

12   2021 Forbes Travel Guide ("FTG") Star Rating list and are respectively the largest and second

13   largest FTG Five-Star resorts in the world.  Wynn Las Vegas and Encore Las Vegas collectively

14   received seven FTG Five-Star awards in 2021, the most of any resorts in North America.

15        24.     Wynn Las Vegas was also among the first resorts in the world to become Sharecare

16   Health Security VERIFIED$^{TM}$ with Forbes Travel Guide.  The comprehensive facility verification

17   helps ensure that guests can book with confidence at a resort that has consistent and robust health

18   and safety procedures in place.

19        25.     Wynn Resorts, through its subsidiaries, also owns and operates Encore Boston

20   Harbor, an integrated resort in Everett, Massachusetts, adjacent to Boston along the Mystic River,

21   which recently opened in June 2019.  As the largest private single-phase construction project in the

22   history of the Commonwealth of Massachusetts, the property consists of approximately 208,000

23   square feet of casino space with 198 table games and approximately 1,890 slot machines, private

24   and high-limit gaming areas, and a poker room.

25        26.     Encore Boston Harbor also features a luxury hotel tower with a total of 671 guest

26   rooms and suites, which offers a spa and salon.  In addition, Encore Boston Harbor offers 16 food

27   and beverage outlets and a nightclub, approximately 8,000 square feet of high-end, brand-name

28   retail space, and approximately 71,000 square feet of meeting and convention space.

Snell & Wilmer
L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

27.     Despite the widespread and unexpected business challenges presented by the COVID-19 pandemic, Wynn Resorts has remained committed to its employees and the local communities it serves.  Throughout the COVID-19 pandemic, Wynn Resorts:

- committed to pay all employees, including part-time employees, their full wages, benefits and estimated tips while its resorts were closed;

- increased the benefits and relaxed the criteria for its employees to take advantage of Wynn Resorts' Employee Lifeline Fund for those whose financial situation was adversely affected by circumstances such as layoffs of their spouses;

- voluntarily adopted an emergency leave policy to allow employees to take paid sick leave if they or any family member in their household is diagnosed with COVID-19;

- partnered with Clark County's University Medical Center to provide COVID-19 testing to its employees and exposed family members, with over 25,000 tests administered in 2020; and

- offered Wynn Las Vegas employees no-cost professionally-supervised learning centers for their children attending public school "virtually."

28.     At the same time, Wynn Resorts has also played an active role in supporting its local communities battle the COVID-19 pandemic, which has included:

- providing millions of dollars in cash and in-kind donations for COVID-19 relief efforts, including more than 245,000 N95-equivalent respirator masks, 1,775,000 surgical masks, and 640,000 pairs of medical gloves and hospital gowns to hospitals, nursing homes, and law enforcement agencies;

- assisting the Southern Nevada Health District's COVID-19 contact tracing efforts by allocating more than 100 team members from the Wynn Teleservices Call Center;

- making its on-site rapid COVID-19 testing facility available to student athletes in the Clark County Schools;

- establishing a COVID-19 vaccination center onsite at Encore Las Vegas in partnership with Clark County's University Medical Center, which vaccinated up to 1,000 people per day during its five days a week operation; and

- offering a complimentary one-night stay at Wynn Las Vegas to 10,000 front-line hospital and medical workers, police, and firefighters to show its appreciation.

**B.     The COVID-19 Pandemic**

29.     COVID-19 is a deadly communicable disease caused by an RNA virus, known as the "novel coronavirus" (or SARS-CoV-2), and recognized by the crown-like appearance of the

Snell & Wilmer
L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

-- 7 --

1  glycoprotein spikes on its envelope when viewed under an electron microscope.[1]

2      30.    The first human case of COVID-19 is believed to have occurred in or around

3  December 2019.[2]

4      31.    In response to its rapid and continued spread, on January 30, 2020, the World Health

5  Organization ("WHO") declared the COVID-19 outbreak to be a public health emergency of

6  international concern.[3]

7      32.    By February 26, 2020, the Centers for Disease Control and Prevention ("CDC")

8  advised that COVID-19 was being transmitted freely without the ability to trace the origin of new

9  infections, also known as "community spread."[4]

10     33.    Noting its "alarming levels of spread and severity," on March 11, 2020, the WHO

11 declared the COVID-19 outbreak a worldwide pandemic.[5]

12     34.    As of June 1, 2021, the WHO reports a confirmed 170 million cases of COVID-19

13 globally and over 3.5 million deaths, with the United States facing more than 32 million confirmed

14 cases and 588,596 deaths—more than any other country.[6]  Moreover, due in part to the initial

15 absence of available tests, it has been reported that, at least in the United States, the number of

16 people infected with COVID-19 may actually be up to ten times higher than officially reported.[7]

17

18 [1] Marco Cascella et al., *Features, Evaluation, and Treatment of Coronavirus (COVID-19)*, NCBI (April 20, 2021), https://www.ncbi.nlm.nih.gov/books/NBK554776/.

19
20 [2] *Coronavirus Disease 2019 (COVID-19) Situation Report – 94*, WORLD HEALTH ORG. (April 23, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200423-sitrep-94-covid-19.pdf.

21 [3] *Statement on the second meeting of the International Health Regulations (2005) Emergency Committee regarding the outbreak of novel coronavirus (2019-nCoV)*, WORLD HEALTH ORG. (January 30, 2020), https://www.who.int/news/item/30-01-2020-statement-on-the-second-meeting-of-the-international-health-
22 regulations-(2005)-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-(2019-ncov).

23 [4] *CDC Confirms Possible Instance of Community Spread of COVID-19 in U.S.*, CTRS. FOR DISEASE CONTROL AND PREVENTION (February 26, 2020), https://www.cdc.gov/media/releases/2020/s0226-Covid-19-spread.html.

24 [5] *WHO Director-General's opening remarks at the media briefing on COVID-19 – 11 March 2020*, WORLD HEALTH
25 ORG. (March 11, 2020), https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

26 [6] *WHO Coronavirus (COVID-19) Dashboard*, WORLD HEALTH ORG., https://covid19.who.int/ (last accessed on June 1, 2021).

27 [7] Fiona P. Havers et al., *Seroprevalence of Antibodies to SARS-CoV-2 in 10 Sites in the United States, March 23-May 12, 2020*, JAMA INTERNAL MEDICINE (July 21, 2020),
28 https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2768834.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- - 8 - -

35.     In addition to posing severe health risks, COVID-19 is also highly contagious and resilient. COVID-19 travels through respiratory droplets, physically transforming the air exposed to it and attaching itself to the surfaces it contacts (*i.e.*, forming a noncovalent chemical bond with the affected surface), on which it can survive for extended periods of time.[8]

36.     According to the CDC and various other sources, COVID-19 spreads most commonly when within six feet of an infected person or via contact with surfaces exposed to COVID-19, referred to as fomite transmission.[9]

37.     As reported by the *The New York Times,* "[a]n infected person talking for five minutes in a poorly ventilated space can also produce as many viral droplets as one infectious cough."[10] And, one human sneeze can expel droplets that can travel up to 27 feet at nearly a hundred miles an hour.[11]

38.     Notably, COVID-19 can be transmitted via pre-symptomatic, symptomatic, and asymptomatic infected persons (*i.e.*, those who have no sign of illness).[12]

39.     The incubation period for COVID-19, which is the time between exposure (becoming infected) and symptom onset can be up to fourteen days. During this period, known as the pre-symptomatic phase, infected persons can be contagious and therefore transmit COVID-19 before symptom onset.[13]

---

[8] Edris Joonaki et al., *Surface Chemistry Can Unlock Drivers of Surface Stability of SARS-CoV-2 in a Variety of Environmental Conditions*, CHEM (September 10, 2020), https://www.cell.com/chem/pdf/S2451-9294(20)30411-3.pdf.

[9] *How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL AND PREVENTION (updated May 13, 2021), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html; G. Kampf et al., *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, Vol. 104, J. HOSPITAL INFECTION (February 6, 2020), https://www.journalofhospitalinfection.com/article/S0195-6701(20)30046-3/fulltext; *Coronavirus Disease (COVID-19): How is it transmitted?*, WORLD HEALTH ORG. (December 13, 2020), https://www.who.int/news-room/q-a-detail/coronavirus-disease-covid-19-how-is-it-transmitted.

[10] Yuliya Pashina-Kottas et al., *This 3-D Simulation Shows Why Social Distancing Is So Important*, N.Y. TIMES (April 14, 2020), https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html.

[11] Sarah Gibbens, *See how a sneeze can launch germs much farther than 6 feet*, NATIONAL GEOGRAPHIC (April 17, 2020), https://www.nationalgeographic.com/science/article/coronavirus-covid-sneeze-fluid-dynamics-in-photos.

[12] *Coronavirus Disease 2019 (COVID-19) Situation Report -73*, WORLD HEALTH ORG. (April 2, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_6.

[13] *Id.*

Snell & Wilmer
L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

40.     In addition, studies have estimated that over 40% of infected individuals may never develop symptoms, yet still spread COVID-19 through physical droplets.[14]   Such seemingly healthy people can therefore unknowingly spread COVID-19 via speaking, breathing or touching objects.

41.     At the time that Factory Mutual received Wynn Resorts' COVID-19 claim under the Policies, numerous scientific studies and reports had already documented that COVID-19 physically alters, and can remain present in and on, premises' airspace and property for extended periods of time.  By way of example and without limitation:

- According to a study published in *The New England Journal of Medicine*, researchers from UCLA, Princeton University, the National Institute of Allergy and Infectious Diseases, and the CDC determined that COVID-19 can survive for up to 3 hours in aerosols, up to 4 hours on copper, up to 24 hours on cardboard, and up to *72 hours* on plastic and stainless steel.[15]

- Another study found that coronaviruses, such as SARS-CoV and MERS-CoV, can remain infectious on inanimate surfaces at room temperature for *up to nine days*.[16]

- A peer-reviewed article published in *Virology Journal* found that COVID-19 can survive on surfaces for *up to 28 days* at ambient temperature and humidity (20 °C [68 °F] and 50% relative humidity), concluding that COVID-19 "can remain infectious for significantly longer time periods than generally considered possible."[17]

- In its *Morbidity and Mortality Weekly Report*, on March 23, 2020, the CDC also reported that COVID-19 was identified on a variety of surfaces in the cabins of the Diamond Princess cruise ship *17 days* after the cabins had been vacated.[18]

---

[14] *See, e.g.* Erika Edwards, *Asymptomatic COVID-19 Cases May Be More Common Than Suspected*, NBC NEWS (May 27, 2020), https://www.nbcnews.com/health/health-news/asymptomatic-covid-19-cases-maybe-more-common-suspected-n1215481.

[15] Neeltje van Doremalen, Ph.D. et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, NEW ENGLAND J. MEDICINE (April 16, 2020), https://www.nejm.org/doi/pdf/10.1056/NEJMc2004973?articleTools=true (emphasis added).

[16] *See* G. Kampf et al., *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents.* Vol. 104, J. HOSPITAL INFECTION (February 6, 2020), https://www.journalofhospitalinfection.com/article/S0195-6701(20)30046-3/fulltext (emphasis added).

[17] Shane Riddell et al., *The effect of temperature on persistence of SARS-CoV-2 on common surfaces,* 17 VIROLOGY J. (October 7, 2020), https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7 (emphasis added).

[18] *Public Health Responses to COVID-19 Outbreaks on Cruise Ships – Worldwide, February – March 2020*, CTRS. FOR DISEASE CONTROL AND PREVENTION (March 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w (emphasis added).

- - 10 - -

42.    Given that infected individuals can spread COVID-19 by breathing or talking, and because infectious droplets containing COVID-19 can remain present in the air and on surfaces for numerous days, the risks posed by COVID-19 are not temporary.

**C.    The Presence of COVID-19 Causes Physical Loss or Damage to Property**

43.    By adhering to, and becoming a part of, the property that it comes into contact with (including when suspended in indoor air), the presence of COVID-19 causes physical loss and/or damage by corrupting, physically altering, and rendering such property dangerous, unsafe, unusable, uninhabitable, and unfit for its ordinary and intended use.

44.    To date, nearly 40 courts, including Nevada courts, have already found that policyholders have adequately alleged or are, in fact, entitled to coverage for COVID-19-related property damage and business interruption losses.

45.    Moreover, even before the COVID-19 pandemic, courts have repeatedly determined that the presence of hazardous substances at or on a property, including the airspace inside buildings, constitutes property damage and that there may be "physical loss" to property even if the property is not structurally damaged. By way of example and without limitation:

- *Western Fire Ins. Co. v. First Presbyterian Church*, 165 Colo. 34, 39 (1968) (determining that property had suffered a "direct physical loss" where gasoline vapors penetrated the foundation of the insured church and accumulated, rendering the building "uninhabitable, making further use of the building highly dangerous");

- *Farmers Ins. Co. v. Trutanich*, 123 Or. App. 6, 9-11 (1993) (determining that a home infiltrated by the odor produced by a methamphetamine lab had sustained "direct physical loss");

- *Arbeiter v. Cambridge Mut. Fire Ins. Co.*, 1996 WL 1250616, at *2 (Mass. Super. Ct. Mar. 15, 1996) (holding that the presence of oil fumes in a building may constitute "physical loss" to property);

- *Matzner v. Seaco Ins. Co.*, 1998 WL 566658, at *4 (Mass. Super. Ct. Aug. 12, 1998) (determining that carbon monoxide levels in an apartment building sufficient to render the building uninhabitable constituted "direct physical loss");

- *Port Authority of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) (holding that where a property's "function is nearly eliminated or destroyed" or "made useless or uninhabitable" due to the actual or imminent threat of release of asbestos fibers, the property has sustained "physical loss or damage");

- *Motorists Mut. Ins. Co. v. Hardinger*, 131 F.App'x 823, 826-27 (3d Cir. 2005) (determining that the presence of E. coli bacteria could amount to "physical loss" to a

home when "the functionality of the [] property was nearly eliminated or destroyed, or … the[] property was made useless or uninhabitable");

- *Essex Ins. Co. v. BloomSouth Flooring Corp.*, 562 F.3d 399, 406 (1st Cir. 2009) (determining that "allegations that an unwanted odor permeated the building and resulted in a loss of use of the building are reasonably susceptible to an interpretation that physical injury to property has been claimed");

- *Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.*, 406 N.J. Super. 524, 543 (App. Div. 2009) (holding that property can sustain "physical damage," without undergoing structural alteration, when rendered "physically incapable of performing" its "essential function");

- *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co.*, 2014 WL 6675934, at *5 (D.N.J. Nov. 25, 2014) (explaining that "courts considering non-structural property damage claims have found that buildings rendered uninhabitable by dangerous gases or bacteria suffered direct physical loss or damage," and determining that ammonia gas discharge that rendered packaging facility "unfit for occupancy" and "unusable" constituted "physical loss");

- *Mellin v. Northern Security Ins. Co.*, 167 N.H. 544, 550-51 (2015) (determining that the odor of cat urine inside a condominium constituted "physical loss"); and

- *Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, 2016 WL 3267247, at *9 (D. Ore. June 7, 2016) (finding that a theater had sustained "physical loss or damage to property" when wildfire smoke infiltrated the theater and "rendered it unusable for its intended purposes" and "uninhabitable").

46.     Indeed, Factory Mutual itself has previously argued in court proceedings that mold infestation in the clean room of a laboratory caused "physical loss or damage" by rendering the clean room "unfit for its intended use"—despite not causing a structural alteration of the property—and was therefore covered by property insurance. *See Factory Mut. Ins. Co. v. Federal Ins. Co.*, Case No. 1:17-cv-00760 (D.N.M. Nov. 11, 2019), ECF No. 127 (attached to the concurrently-filed appendix of exhibits as Exhibit 3) (asserting that any argument otherwise would be "*contrary to … the case law which broadly interprets the term 'physical loss or damage' in property insurance policies*" and would "*create an extreme danger of confusing and misleading the jury about what is physical loss or damage for purposes of establishing coverage*") (emphasis added).

47.     In support of its position in that case, Factory Mutual asserted that "[n]umerous courts have concluded that *loss of functionality or reliability* under similar circumstances *constitutes physical loss or damage*," citing the same case law referred to in paragraph 45 above. Additionally, Factory Mutual also argued that another insurer's failure to define "physical loss or damage" made that term "susceptible of more than one reasonable interpretation," rendered the

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

policy "ambiguous," and "must be construed against" that insurer (as the drafter of the insurance policy). Thus, in addition to the actual policy language at issue here, Factory Mutual's own prior statements confirm that Wynn Resorts' losses are covered under its Policies' language.

48.     Given that numerous courts have already determined that COVID-19 may cause "physical loss or damage" to property and Factory Mutual's prior confirmation of the same, Wynn Resorts' belief that the Policies afford coverage for its COVID-19-related losses is well-supported, notwithstanding the contrary positions that Factual Mutual cites as part of its wrongful attempt to avoid its substantial COVID-19 pandemic exposure.

**D.     COVID-19 Has Been Present at Wynn Resorts' Insured Locations and Within the Policies' Expressly Insured Five-Mile Vicinity Thereof**

49.     No fewer than 2,267 Wynn Resorts employees, guests, tenants, vendors, and other third-parties have informed Wynn Resorts that they contracted COVID-19. At least 761 of these individuals were present at Wynn Resorts' insured locations while infected with COVID-19.

50.     Moreover, given the high percentage of asymptomatic cases of COVID-19, it is statistically virtually certain that the actual number of Wynn Resorts employees, guests, tenants, vendors, and other third-parties who have contracted COVID-19 is even greater than the over 2,267 individuals Wynn Resorts was expressly informed had contracted COVID-19.

51.     In addition, it is also certain or virtually certain that COVID-19 has been present at the various "Attraction Properties" (as defined by the Policies) and other resorts, casinos, stores, restaurants, conference and event spaces, theaters, and businesses in the Policies' expressly insured five-mile vicinity of Wynn Resorts' properties.

52.     This fact is reflected not only in publicly available accounts and the statements of these businesses, but is also further confirmed with certainty or near-certainty by statistical modeling based on the known incidence of COVID-19 infection, despite the lack of commercially available tests for fomite or aerosolized COVID-19.[19]

---

[19] *See, e.g.*, Caesars Casino Complaint, ¶ 265 in the matter of *Caesars Ent. Inc. v. ACE Am. Ins. Co.*, Case No. A-21-831477-B (Dist. Ct., Clark Cnty. Mar. 19, 2021) (stating that "Caesars has confirmed that, on its Las Vegas properties alone, over *2,600* employees, guests, contractors, vendors, or third parties that had been present on the Las Vegas Covered Properties have tested or claimed to be positive for COVID-19. At least some of those employees, guests, contractors, vendors, or third parties were present on the Las Vegas Covered Properties while positive with COVID-

53.     Early in the COVID-19 pandemic, testing of individuals was generally limited and official accounts likely underreported the extent of COVID-19 infections.[20]  However, based on testing available at that time, local positivity rates demonstrate the pervasiveness of COVID-19 throughout the jurisdictions where Wynn Resorts' insured properties are located.

54.     In that regard, epidemiologists have explained that "the percent positive is a critical measure because it gives us an indication of how widespread infection is in the area where the testing is occurring[.]"[21]  The WHO explained that the percent positive for COVID-19 should remain below 5% for at least two weeks before area businesses can safely reopen.[22]

55.     As reflected below, the cities and states in which Wynn Resorts' insured properties are located were experiencing exceptionally high COVID-19 positivity rates, indicating uncontrolled community spread of COVID-19 and its certain or virtually certain presence at Wynn Resorts' insured locations and the Policies' expressly insured five-mile vicinity thereof:

- **Las Vegas:** As of April 1, 2020, Las Vegas had a daily positivity rate of over 15%.[23]
- **Nevada**: As of April 1, 2020, Nevada had a daily positivity 7-day moving positivity average of 13.8%.[24]
- **Massachusetts**: As of April 1, 2020, Massachusetts had a daily positivity 7-day moving positivity average of 18.2%.[25]

---

19.") (emphasis added); *see also* Aroon Chande et al., *Real-time, interactive website for US-county-level COVID-19 event risk assessment*, NATURE HUMAN BEHAVIOR (November 9, 2020), https://www.nature.com/articles/s41562-020-01000-9.

[20] *See, e.g.*, Benedict Carey and James Glanz, *Hidden Outbreaks Spread Through U.S. Cities Far Earlier Than Americans Knew, Estimates Say*, N.Y. TIMES (Apr. 23, 2020, updated July 6, 2020), https://www.nytimes.com/2020/04/23/us/coronavirus-early-outbreaks-cities.html.

[21] David Dowdy et al., *COVID-19 Testing: Understanding the "Percent Positive"*, JOHNS HOPKINS BLOOMBERG SCH. OF PUB. HEALTH EXPERT INSIGHTS (Aug. 10, 2020), https://www.jhsph.edu/covid-19/articles/covid-19-testing-understanding-the-percent-positive.html.

[22] *Id.*

[23] *Percent of People Receiving COVID-19 Viral Tests Who Have Positive Results in Las Vegas*, S. NEV. HEALTH DIST., https://media.southernnevadahealthdistrict.org/download/COVID-19/updates/September/city-reports/20200916-City-Report-Las-Vegas.pdf (last accessed on June 1, 2021).

[24] *Daily State-By-State Testing Trends: Nevada*, JOHNS HOPKINS UNIV. OF MED. CORONAVIRUS RESOURCE CTR., https://coronavirus.jhu.edu/testing/individual-states/nevada (last accessed on June 1, 2021).

[25] *Daily State-By-State-Testing Trends: Massachusetts*, JOHNS HOPKINS UNIV. OF MED. CORONAVIRUS RESOURCE CTR., https://coronavirus.jhu.edu/testing/individual-states/massachusetts (last accessed on June 1, 2021).

- - 14 - -

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

56.     COVID-19 accordingly, and unfortunately, became present throughout Wynn Resorts' insured locations, as well as throughout the locations within the Policies' expressly insured five-mile vicinity thereof.

57.     The actual presence of COVID-19 at Wynn Resorts' insured locations and the locations within the Policies' expressly insured five-mile vicinity thereof has caused physical loss and/or damage by corrupting, physically altering, and rendering such property dangerous, unsafe, unusable, uninhabitable, and unfit for its ordinary and intended use.

**E.     The COVID-19-Related Civil Authority Orders**

58.     In response to the COVID-19 pandemic, on March 16, 2020, the CDC and members of the national Coronavirus Task Force issued guidance to the American public, titled "30 Days to Slow the Spread," concerning measures to slow the spread of COVID-19.  The Task Force's guidance advocated for far-reaching social distancing measures, such as working from home and avoiding shopping trips and gatherings of more than 10 people.

59.     Federal, state and local governments thereafter imposed unprecedented orders prohibiting travel into the United States and suspending and/or severely curtailing the operations of non-essential businesses, including various operations of integrated resorts such as those owned, operated or managed by Wynn Resorts (the "Closure Orders").  Other contemporaneously issued orders directed citizens to stay at home except for certain limited activities (the "Stay at Home Orders").

60.     State and local authorities issued the Closure Orders and Stay at Home Orders in response to the presence of, and attendant physical loss and damage to property caused by, COVID-19 in the localities where Wynn Resorts' insured properties are located.

61.     In addition, numerous other state and local authorities throughout the country have also expressed that such orders were issued in part to mitigate the physical loss and damage to property caused by COVID-19, including, but not limited to, the following:

- On March 16, 2020, the Mayor of New York City issued an emergency executive order closing non-essential businesses in New York City and declaring, "this order is given

-- 15 --

because of the propensity of the virus to spread person to person and also because the virus *physically is causing property loss and damage*."[26]

- On March 16, 2020, the Mayor of the City of New Orleans issued an emergency order suspending large gatherings and closing certain categories of businesses, stating "there is reason to believe that COVID-19 may be spread amongst the population by various means of exposure, including the propensity to spread person to person and *the propensity to attach to surfaces for prolonged periods of time, thereby spreading from surface to person and causing property loss and damage* in certain circumstances."[27]

- On March 19, 2020, the City of Los Angeles issued its "Safer At Home" Order, "because, among other reasons, the COVID-19 virus can spread easily from person to person and it is *physically causing property loss or damage* due to its tendency to attach to surfaces for prolonged periods of time."[28]

- On March 22, 2020, Broward County, Florida issued an emergency order acknowledging that COVID-19 "is *physically causing property damage*."[29]

- On March 27, 2020, the State of North Carolina issued an executive order in response to the COVID-19 pandemic "to assure adequate protection for lives," as well as "*to assure adequate protection of … property*."[30]

- On March 31, 2020, the Sonoma County Health Officer extended its Shelter in Place Order No. C19-05, in relevant part, "because the [COVID-19] virus *physically is causing property loss or damage* due to its proclivity to stay airborne and to attach to surfaces for prolonged periods of time."

- On April 14, 2020, the City and County of San Francisco confirmed that it issued all of its COVID-19 orders "because of the propensity of the virus to spread person to person and also because the virus *physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time*."[31]

---

[26] The City of New York, Office of the Mayor, *Emergency Executive Order No. 100* (March 16, 2020) https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf (emphasis added).

[27] City of New Orleans Mayor LaToya Cantrell, *Mayoral Proclamation to Promulgate Emergency Orders During the State of Emergency Due to COVID-19* (March 16, 2020), https://nola.gov/mayor/executive-orders/emergency-declarations/03162020-mayoral-proclamation-to-promulgate-emergency-orders-during-the-state-of-emergency-due-to-co/ (emphasis added).

[28] City of Los Angeles, *Public Order Under City of Los Angeles Emergency Authority* (March 19, 2020, revised May 27, 2020), https://www.lamayor.org/sites/g/files/wph1781/files/page/file/20200527%20Mayor%20Public%20Order%20SAFER%20AT%20HOME%20ORDER%202020.03.19%20%28REV%202020.05.27%29.pdf (emphasis added).

[29] *Broward County Administrator's Emergency Order 20-01* (March 22, 2020), https://www.broward.org/CoronaVirus/Documents/BerthaHenryExecutiveOrder20-01.pdf (emphasis added).

[30] State of North Carolina Governor Roy Cooper, *Executive Order No. 121* (March 27, 2020), https://files.nc.gov/governor/documents/files/EO121-Stay-at-Home-Order-3.pdf (emphasis added).

[31] Office of the Mayor, San Francisco, *Tenth Supplement to Mayoral Proclamation Declaring the Existence of a Local Emergency Dated February 25, 2020* (April 14, 2020), https://sfmayor.org/sites/default/files/10th%20Mayoral%20Supplement_041420.pdf (emphasis added).

- On April 20, 2020, the State of Indiana issued an executive order recognizing that COVID-19 has the "propensity to *physically impact surfaces and personal property*."[32]

- On April 23, 2020, a Dallas County Judge issued an amended "Safer at Home Order" explaining that "this Emergency Order is necessary because of the propensity of the virus to spread person to person and also because the virus is *physically causing property damage due to its proclivity to attach to surfaces for prolonged periods of time*."[33]

- On April 28, 2020, the State of New Mexico issued a public health order acknowledging the "threat" COVID-19 "poses" to "*property*."[34]

### i.    The Nevada Closure and Stay at Home Orders

62.     On March 5, 2020, Clark County reported its first known case of COVID-19 in Nevada.[35] Within the next week, multiple Las Vegas casinos also reported their first documented cases of COVID-19 at their premises.

63.     On March 11, 2020, MGM Resorts International issued a press release explaining that the Southern Nevada Health District had confirmed a case of COVID-19 involving a guest of The Mirage, who had attended a conference from March 5-8, 2020.[36]

64.     In the days immediately thereafter, MGM Resorts International further reported that "several" employees had tested positive, including another employee at the Luxor Hotel & Casino.[37]

---

[32] State of Indiana, Executive Department, *Executive Order 20-22* (April 20, 2020), https://www.in.gov/sboa/files/Executive-Order-20-22-Extension-of-Stay-at-Home.pdf (emphasis added).

[33] *Amended Order of County Judge Clay Jenkins* (April 23, 2020), https://www.cityofirving.org/DocumentCenter/View/43931/04-23-2020-Dallas-County-Updated-Order (emphasis added).

[34] New Mexico Department of Health, Office of the Secretary, *Public Health Emergency Order Clarifying that Current Guidance Documents, Advisories, and Emergency Public Health Orders Remain in Effect; and Amending Prior Public Health Emergency Orders to Impose County-by-County Restrictions Due to COVID-19* (April 28, 2021), https://www.nmhealth.org/publication/view/rules/6694/ (emphasis added).

[35] *Southern Nevada Health District announces positive case of COVID-19 in a Clark County resident*, S. NEV. HEALTH DIST. (March 5, 2020), https://www.southernnevadahealthdistrict.org/news-release/southern-nevada-health-district-announces-positive-case-of-covid-19-in-a-clark-county-resident/.

[36] *MGM Resorts International Statement on COVID-19 Case Involving Guest at the Mirage*, MGM RESORTS INT'L (March 11, 2020), https://investors.mgmresorts.com/investors/news-releases/press-release-details/2020/MGM-Resorts-International-Statement-On-COVID-19-Case-Involving-Guest-At-The-Mirage/default.aspx.

[37] Carolyn Williams, *MGM Resorts letter says 'several' employees tested presumptive positive for COVID-19; layoffs, closures addressed*, LAS VEGAS 8 NEWS NOW (March 13, 2020), https://www.8newsnow.com/coronavirus/mgm-resorts-letter-says-several-employees-test-presumptive-positive-for-covid-19-addresses-layoffs/.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

65.     The Mirage is located less than half a mile away from Wynn Las Vegas and Encore Las Vegas and is within the Policies' insured vicinity.

66.     The Luxor Hotel & Casino is located approximately two miles away from Wynn Las Vegas and Encore Las Vegas and is within the Policies' insured vicinity.

67.     On March 12, 2020, Nevada Governor Steve Sisolak ("Governor Sisolak") "declare[d] an emergency and direct[ed] all state agencies to supplement the efforts of all impacted and threatened counties to save lives, *protect property*, and protect the health and safety of persons in this state."[38] By that time, Clark County had reported eight cases of COVID-19, which increased to 42 confirmed cases and one confirmed death by March 17, 2020.[39]

68.     On March 17, 2020, Governor Sisolak ordered that all casinos, bars, and restaurants close, and signed Declaration of Emergency Directive 002 on March 18, 2020.[40]

69.     Governor Sisolak's orders required the closure of all Nevada gaming operations from March 17, 2020 to May 15, 2020, during which time the Nevada Gaming Control Board also ordered all gaming operations to close.

70.     On March 31, 2020, Governor Sisolak issued the Declaration of Emergency Directive 010, ordering all Nevada residents to stay at home.[41]

71.     On April 29, 2020, Governor Sisolak issued Declaration of Emergency Directive 016, expressly acknowledging the threat that COVID-19 poses to property, stating the "*ability of the novel coronavirus that causes COVID-19 to survive on surfaces for indeterminate periods of*

---

[38] State of Nevada Executive Department, *Declaration of Emergency for COVID-19* (March 12, 2020), https://gov.nv.gov/News/Emergency_Orders/2020/2020-03-12_-_COVID-19_Declaration_of_Emergency/ (emphasis added).

[39] *Update: Clark County case numbers for March 12, 2020*, S. NEV. HEALTH DIST. (March 12, 2020), https://www.southernnevadahealthdistrict.org/news-release/update-clark-county-case-numbers-for-march-12-2020/; *March 17, 2020 – COVID-19 Update*, S. NEV. HEALTH DIST. (March 17, 2020), https://www.southernnevadahealthdistrict.org/news-release/march-17-2020-covid-19-update/.

[40] Melissa Etehad et al., *Nevada orders all casinos, bars, restaurants closed as U.S. coronavirus cases surge* (March 17, 2020), L.A. TIMES, https://www.latimes.com/world-nation/story/2020-03-17/las-vegas-to-close-all-casinos-at-midnight; State of Nevada Executive Department, *Declaration of Emergency Directive 002* (March 8, 2020), https://gov.nv.gov/News/Emergency_Orders/2020/2020-03-18_-_COVID-19_Declaration_of_Emergency_Directive_002/.

[41] State of Nevada Executive Department, *Declaration of Emergency Directive 010 Stay at Home Order* (March 31, 2020), https://gov.nv.gov/News/Emergency_Orders/2020/2020-03-31_-_COVID-19_Declaration_of_Emergency_Directive_010_-_Stay_at_Home_Order_(Attachments)/.

1    *time renders some property unusable and contributes to contamination, damage, and property*

2    *loss.*"[42]

3          72.      As part of Declaration of Emergency Directive 016, Governor Sisolak ordered that

4    "[g]aming operations, not including licensed online gaming or mobile wagering operations, shall

5    remain closed until the Nevada Gaming Control Board determines that operations may safely

6    resume."[43]

7          73.      On May 7, 2020, Governor Sisolak issued Declaration of Emergency Directive 018

8    regarding Phase One reopening, which excluded gaming operations from the Phase One reopening

9    and directed the Nevada Gaming Control board to issue guidance for the phased resumption of

10   gaming operations.[44]

11         74.      On May 28, 2020, Governor Sisolak issued Declaration of Emergency Directive 021

12   – Phase Two Reopening Plan, reiterating that the Nevada Gaming Control Board would provide

13   guidance for gaming reopening and stating that such a reopening would occur no earlier than June

14   4, 2020.[45]

15         75.      The Nevada Gaming Control Board's "Health and Safety Policy for Resumption of

16   Gaming Operations," issued on April 21, 2020 and amended on April 14, 2021 (the "NGCB

17   Policy"), set forth the requirements for casino reopenings.[46]

18         76.      Pursuant to the NGCB Policy, Wynn Resorts submitted comprehensive plans to the

19   Nevada Gaming Control Board for mitigating the spread of COVID-19 at its properties, which

20   included (among other required measures): cleaning, disinfecting, and sanitizing guidelines;

21

22   [42] State of Nevada Executive Department, *Declaration of Emergency Directive 016* (April 29, 2020), https://gov.nv.gov/News/Emergency_Orders/2020/2020-04-29_-_COVID-19_Declaration_of_Emergency_Directive_016_(Attachments)/ (emphasis added).

23   [43] *Id.*

24   [44] State of Nevada Executive Department, *Declaration of Emergency Directive 018* (May 7, 2020), https://gov.nv.gov/News/Emergency_Orders/2020/2020-05-07_-_COVID-25   19_Declaration_of_Emergency_Directive_018_-_Phase_One_Reopening_(Attachments)/.

26   [45] State of Nevada Executive Department, *Declaration of Emergency Directive 021 – Phase Two Reopening Plan* (May 28, 2020), https://gov.nv.gov/News/Emergency_Orders/2020/2020-05-28_-_COVID-27   19_Declaration_of_Emergency_Directive_021_-_Phase_Two_Reopening_Plan_(Attachments)/.

28   [46] *Health and Safety Policies for Resumption of Gaming Operations*, NEV. GAMING CONTROL BD. (April 14, 2021), https://gaming.nv.gov/modules/showdocument.aspx?documentid=16731.

limitations on the number of players at each table game and overall building occupancy; face coverings for guests; employee training on COVID-19 safety and disinfection protocols; and social distancing requirements.[47]

77.    On July 10, 2020, Governor Sisolak issued Declaration of Emergency Directive 027, which again closed bars and taverns in seven counties, including Clark County, in response to the continued spread of COVID-19 and which remained in effect until September 20, 2020.[48]

78.    On November 23, 2020, Governor Sisolak issued Declaration of Emergency Directive 035, which limited gaming areas, retail stores, restaurants and bars, non-retail venues, pools and aquatic facilities, and other establishments to 25% occupancy.[49]

79.    In February 2021, Nevada published its "Roadmap to Recovery," which set forth a timeline for the phased reopening of various businesses and social gatherings.  Consistent with the "Roadmap to Recovery," on February 14, 2021, Governor Sisolak issued Declaration of Emergency Directive 037, which eased Emergency Directive 035's restrictions on gaming floors and indoor food and beverage establishments, to allow for 35% occupancy, while also raising occupancy restrictions at retail stores, pools and aquatic facilities to 50%.[50]

80.    On March 12, 2021, Governor Sisolak issued Declaration of Emergency Directive 041, which eased certain COVID-19 mitigation protocols and increased occupancy to 50% at casinos and indoor food and beverage establishments, beginning March 15, 2021.[51]

---

[47] *Id.*

[48] State of Nevada Executive Department, *Declaration of Emergency Directive 027* (July 10, 2020), https://gov.nv.gov/News/Emergency_Orders/2020/2020-07-10_-_COVID-19_Declaration_of_Emergency_Directive_027_(Attachments)/; *COVID-19 Mitigation and Management Task Force approves Clark County and Elko County plans to reopen bars due to improved data and mitigation efforts*, STATE OF NEV.        (Sept.        17,        2020),        https://gov.nv.gov/News/Press/2020/COVID-19_Mitigation_and_Management_Task_Force_approves_Clark_County_and_Elko_County_plans_to_reopen_bars_due_to_improved_data_and_mitigation_efforts/.

[49] State of Nevada Executive Department, *Declaration of Emergency for Directive 035* (Nov. 23, 2020), https://gov.nv.gov/News/Emergency_Orders/2020/2020-11-24_-_COVID19_Emergency_Declaration_Directive_035/.

[50] State of Nevada Executive Department, *Declaration of Emergency Directive 037* (Feb. 14, 2021), https://nvhealthresponse.nv.gov/wp-content/uploads/2021/02/Directive-037.pdf.

[51] State of Nevada Executive Department, *Declaration of Emergency Directive 041* (March 12, 2021), https://nvhealthresponse.nv.gov/wp-content/uploads/2021/03/Emergency-Directive-041.pdf.

81.     In connection with this directive, on April 14, 2021, the Nevada Gaming Control Board issued revised "Health and Safety Policies for Resumption of Gaming Operations," which imposed occupancy limits of 50% in gaming areas, restrictions on the number of players per table game, cleaning, disinfecting, and sanitizing guidelines, and employee training on proper cleaning and disinfection protocols (among other required measures).[52]

82.     On May 3, 2021, after Wynn Resorts showed that over 88% of employees were fully vaccinated against COVID-19, the Nevada Gaming Control Board finally allowed Wynn Resorts' gaming floors to resume operations at full capacity.[53]

### ii.     The Massachusetts Closure and Stay at Home Orders

83.     On March 10, 2020, Massachusetts Governor Charlie Baker ("Governor Baker") issued Executive Order No. 591, declaring a state of emergency in Massachusetts relating to COVID-19.[54] By that time, Massachusetts had 92 confirmed and presumptive cases of COVID-19, including 41 in Middlesex County.[55]

84.     On March 12, 2020, the Massachusetts Gaming Commission (the "MGC") announced that an individual who visited Encore Boston Harbor on March 5, 2020 had tested positive for COVID-19.[56]

85.     The next day, Governor Baker issued COVID-19 Order No. 2, prohibiting gatherings of more than 250 people.[57]

---

[52] *Health and Safety Policies for Resumption of Gaming Operations*, NEV. GAMING CONTROL BD. (April 14, 2021), https://gaming.nv.gov/modules/showdocument.aspx?documentid=16731.

[53] Bailey Schulz, *Wynn, Encore casinos can operate at 100 percent capacity*, LAS VEGAS REVIEW J. (May 3, 2021), https://www.reviewjournal.com/business/wynn-encore-casinos-can-operate-at-100-percent-capacity-2345782/.

[54] Office of the Governor, Commonwealth of Massachusetts, *Governor's Declaration of Emergency* (March 10, 2020), https://www.mass.gov/doc/governors-declaration-of-emergency-march-10-2020-aka-executive-order-591/download.

[55] Massachusetts Department of Public Health, *Coronavirus Disease 2019 (COVID-19) Cases in MA* (March 10, 2020), https://www.mass.gov/doc/covid-19-cases-in-massachusetts-march-10-2020/download.

[56] *COVID-19 Updates and Alerts*, MASS. GAMING COMM'N, https://massgaming.com/news-events/covid19/ (last accessed on June 1, 2021).

[57] Office of the Governor, Commonwealth of Massachusetts, *Order Prohibiting Gatherings of More Than 250 People* (March 13, 2020), https://www.mass.gov/doc/order-prohibiting-gatherings-of-more-than-250-people/download.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

86.     On March 14, 2020, the MGC temporarily suspended operations at the state's three casinos, including Encore Boston Harbor.[58] By that time, Massachusetts now had 138 confirmed and presumptive cases of COVID-19, including 65 in Middlesex County.[59]

87.     On March 23, 2020, Governor Baker issued COVID-19 Order No. 13, prohibiting gatherings of more than 10 people, and temporarily closing the brick-and-mortar premises of businesses and organizations not providing "COVID-19 Essential Services," including various operations of Encore Boston Harbor.[60] Additionally, Governor Baker directed the Massachusetts Department of Public Health to issue a stay at home advisory outlining self-isolation and social distancing protocols for residents.[61]

88.     On March 25, 2020, April 3, 2020, May 1, 2020 and May 14, 2020, the MGC extended the temporary suspension of operations at the state's three casinos, including Encore Boston Harbor.[62] Pursuant to the MGC's orders, Encore Boston Harbor remained closed.[63]

89.     Likewise, on March 31, 2020, April 28, 2020, and May 15, 2020, Governor Baker issued COVID-19 Orders Nos. 21, 30, and 32, which extended the time period for which COVID-19 Order No. 13's restrictions would remain in place, including the temporary closure of businesses not providing "COVID-19 Essential Services" including various operations of Encore Boston Harbor.[64]

---

[58] *COVID-19 Updates and Alerts*, MASS. GAMING COMM'N, https://massgaming.com/news-events/covid19/ (last accessed on June 1, 2021).

[59] Massachusetts Department of Public Health, *Coronavirus Disease 2019 (COVID-19) Cases in MA* (March 14, 2020), https://www.mass.gov/doc/covid-19-cases-in-massachusetts-as-of-march-14-2020/download.

[60] Office of the Governor, Commonwealth of Massachusetts, *COVID-19 Order No. 13* (March 23, 2020), https://www.mass.gov/doc/march-23-2020-essential-services-and-revised-gatherings-order/download.

[61] *Id.*

[62] *COVID-19 Updates and Alerts*, MASS. GAMING COMM'N, https://massgaming.com/news-events/covid19/ (last accessed on June 1, 2021).

[63] *Updates*, ENCORE BOSTON HARBOR, https://encorebostoninfo.com/ (last accessed on June 1, 2021).

[64] Office of the Governor, Commonwealth of Massachusetts, *COVID-19 Order No. 21* (March 31, 2020), https://www.mass.gov/doc/march-31-2020-essential-services-extension-order/download; *COVID-19 Order No. 30* (April 28, 2020), https://www.mass.gov/doc/signed-second-extension-of-essential-services-order/download; *COVID-19 Order No. 32* (May 15, 2020), https://www.mass.gov/doc/may-15-2020-24-hour-extension-order/download.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

90.     On May 18, 2020, Governor Baker released the "Reopening Massachusetts" plan, a report issued by the state's Reopening Advisory Board, which set forth a four-stage plan for the reopening of businesses and activities within Massachusetts.[65]

91.     Under the "Reopening Massachusetts" plan, Governor Baker announced that Massachusetts anticipated allowing casinos to reopen under Phase III of the plan, subject to strict compliance with restrictions, safety precautions, and capacity limitations designed to protect against the spread of COVID-19.  Nightclubs and other large venues would not be allowed to open until Phase IV, which would occur once there was "full resumption of activity."[66]

92.     On July 2, 2020, following the implementation of "Reopening Massachusetts" Phase I in May 2020 and Phase II in June 2020, Governor Baker issued COVID-19 Order No. 43, which implemented Step 1 of Phase III of the plan allowing for the reopening of casinos, provided they complied with all COVID-19-related safety protocols."[67]

93.     That same day, the MGC vacated its orders temporarily suspending operations of the state's three casinos, thereby allowing for their reopening subject to strict compliance with the MGC's newly-drafted "Minimum Requirements for the Initial Phase 3 Opening of Gaming Establishments" (the "Reopening Requirements").[68]

94.     The MGC's Reopening Requirements include detailed COVID-19-related guidelines and protocols regarding cleaning and sanitization, social distancing, guest screening, capacity limits and reporting measures, among others.  The requirements included, for example, frequent cleaning and sanitization of all gaming equipment and devices, installation of plexiglass dividers at slot machines and table games, minimum distancing requirements between slot

---

[65] Office of the Governor, Commonwealth of Massachusetts, *Reopening Massachusetts* (May 18, 2020), https://www.mass.gov/doc/reopening-massachusetts/download.

[66] *Id.*; *see also* Office of the Governor, Commonwealth of Massachusetts, *COVID-19 Order No. 33* (May 18, 2020), https://www.mass.gov/doc/may-18-2020-re-opening-massachusetts-order/download; *COVID-19 Order No. 37* (June 6, 2020), https://www.mass.gov/doc/june-6-2020-phase-ii-reopening/download.

[67] *See* Young-Jin Kim, *Massachusetts to Enter Phase 3 of Reopening Process Monday, Baker Says*, NBC BOSTON (July 22, 2020), https://www.nbcboston.com/news/local/mass-gov-baker-to-provide-coronavirus-update-4/2152686/.

[68] *COVID-19 Updates and Alerts*, MASS. GAMING COMM'N, https://massgaming.com/news-events/covid19/ (last accessed on June 1, 2021); MGC Communications, *The Commission Approves Detailed Health and Safety Requirements for Casino Reopening* (June 23, 2020), https://massgaming.com/blog-post/the-commission-approves-detailed-health-and-safety-requirements-for-casino-reopening/.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

machines, no more than three player positions at each blackjack-style table, limitations on food and alcohol service, and adherence to a capacity limit calculated by a formula that equated to approximately 40% capacity.[69] In addition, the Reopening Requirements strictly prohibited any craps, poker and roulette "until further notice."[70]

95.     Prior to reopening and in compliance with the Reopening Requirements, Encore Boston Harbor submitted to the MGC a detailed plan for combatting the spread of COVID-19 at its property, which included, among other measures: cleaning and sanitizing guidelines; face coverings for guests; hand sanitizer at points of entry and throughout the gaming floor; occupancy limits; and social distancing protocols.[71] As required by the Reopening Requirements, Encore Boston Harbor identified and worked with "an individual with expert qualifications in the fields of public health and/or epidemiology to develop and approve its Plan."[72]

96.     Even after casinos were allowed to re-open, Governor Baker and the MGC continued to issue COVID-19-related orders that restricted Encore Boston Harbor's operations.

97.     For example, on July 24, 2020, Governor Baker issued COVID-19 Order No. 45 requiring all individuals traveling to Massachusetts to quarantine for 14 days, unless coming from certain designated "lower-risk" states or having proof of a negative COVID-19 test within 72 hours before arrival.[73]

98.     On October 8, 2020, the MGC issued an order allowing for the reintroduction of roulette, subject to detailed COVID-19-related health and safety requirements, including, but not limited to: limits on the number of roulette tables permitted and the number of players per table;

---

[69] Massachusetts Gaming Commission Investigation and Enforcement Bureau, *Minimum Requirements for the Initial Phase 3 Opening of Gaming Establishments* (June 23, 2020), https://massgaming.com/wp-content/uploads/Reopening-Minimum-Standards-06.23.20.pdf.

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] Office of the Governor, Commonwealth of Massachusetts, *COVID-19 Order No. 45* (July 24, 2020), https://www.mass.gov/doc/july-24-2020-travel-order-pdf/download.

plexiglass dividers between players; and social distancing and sanitization protocols.[74] Despite the addition of roulette gaming positions, no increase to overall capacity limits was allowed.[75]

99.  On November 5, 2020, in connection with the Massachusetts Department of Public Health's Stay at Home Advisory, Governor Baker issued COVID-19 Order No. 53 requiring casinos, restaurants and other businesses to close each day from 9:30 p.m. to 5:00 a.m.[76] That same day, the MGC supplemented its Reopening Requirements to adhere to the Governor's order requiring early closing and limited hours for the state's gaming establishments.[77] This mandatory night-time closing remained in effect until January 21, 2021.[78]

100.  On December 22, 2020, Governor Baker issued COVID-19 Order No. 62 reducing capacity at casinos, restaurants, and retail businesses to 25%.[79] That same day, the MGC limited gaming establishments to 25% capacity, including workers and staff.[80] The 25% capacity limit remained in place until February 8, 2021, at which time the 40% capacity limit was reinstated.[81]

101.  On March 11, 2021, the MGC issued an order allowing for the reintroduction of craps and a fourth player position at blackjack-style tables, subject to detailed COVID-19-related

---

[74] *COVID-19 Updates and Alerts*, MASS. GAMING COMM'N, https://massgaming.com/news-events/covid19/ (last accessed on June 1, 2021); Massachusetts Gaming Commission Investigation and Enforcement Bureau, *Minimum Requirements for the Reintroduction of Roulette at the Category 1 Gaming Establishments* (October 8, 2020), https://massgaming.com/wp-content/uploads/Minimum-Requirements-for-the-Reintroduction-of-Roulette-at-Category-1-Gaming-Establishments-10.8.20.pdf.

[75] *Id.*

[76] Office of the Governor, Commonwealth of Massachusetts, *COVID-19 Order No. 53* (November 2, 2020), https://www.mass.gov/doc/covid-19-order-53/download.

[77] *COVID-19 Updates and Alerts*, MASS. GAMING COMM'N, https://massgaming.com/news-events/covid19/ (last accessed on June 1, 2021).

[78] Office of the Governor, Commonwealth of Massachusetts, *COVID-19 Order No. 62* (January 21, 2021), https://www.mass.gov/doc/covid-19-order-62/download.

[79] Office of the Governor, Commonwealth of Massachusetts, *COVID-19 Order No. 59* (December 22, 2020), https://www.mass.gov/doc/covid-19-order-59/download; *see also COVID-19 Order No. 60* (January 7, 2021), https://www.mass.gov/doc/covid-19-order-60/download.

[80] *COVID-19 Updates and Alerts*, MASS. GAMING COMM'N, https://massgaming.com/news-events/covid19/ (last accessed on June 1, 2021); Massachusetts Gaming Commission Investigation and Enforcement Bureau, *Requirements to Ensure Compliance with COVID-19 Order No. 59, Temporarily Applying Further Capacity Restrictions to Statewide COVID-19 Safety Rules* (December 22, 2020), https://massgaming.com/wp-content/uploads/Requirements-to-Ensure-Compliance-with-COVID-19-Order-No.-59-Order-Temporarily-Applying-Further-Capacity-Restrictions-to-Statewide-COVID-19-Safety-Rules-12.22.20.pdf.

[81] Office of the Governor, Commonwealth of Massachusetts, *COVID-19 Order No. 62* (January 21, 2021), https://www.mass.gov/doc/covid-19-order-62/download.

Snell & Wilmer
L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

health and safety requirements, including, but not limited to: social distancing measures; plexiglass dividers between players; and sanitization protocols.[82]  The MGC continued to limit overall casino capacity to 40%, despite the increase in player positions and the reintroduction of craps.[83]

102.   Only recently, on May 29, 2021, did Governor Baker lift all of the state's COVID-19-related restrictions and permit operating capacity to increase to 100% for all industries, including casinos.[84]  Similarly, the MGC rescinded its COVID-19-related orders imposing restrictions and operation requirements on the state's casinos, effective May 29, 2021.[85]

F.   **The Effect of the COVID-19 Pandemic on Wynn Resorts' Insured Locations**

103.   As described above, due to the presence of, and attendant physical loss and damage to property caused by, COVID-19, state and local authorities ordered closures in every jurisdiction in which Wynn Resorts' insured properties are located.

104.   As a result of these Closure Orders and related Stay at Home Orders, various operations at Wynn Resorts' insured locations were closed from mid-March 2020 through early June 2020, in the case of Wynn Las Vegas and Encore Las Vegas, and mid-March 2020 through mid-July 2020, in the case of Encore Boston Harbor.

105.   Throughout the COVID-19 pandemic, Wynn Resorts' insured locations have also sustained physical loss and/or damage caused by the presence of COVID-19, which corrupted, physically altered, and rendered such property dangerous, unsafe, unusable, uninhabitable and unfit for its ordinary and intended use.

---

[82] *COVID-19 Updates and Alerts*, MASS. GAMING COMM'N, https://massgaming.com/news-events/covid19/ (last accessed on June 1, 2021); Massachusetts Gaming Commission Investigation and Enforcement Bureau, *Minimum Requirements for (1) Expanding Blackjack-Style Tables to Include a 4th Player Position and (2) the Reintroduction of Craps at the Category 1 Gaming Establishments* (March 11, 2021), https://massgaming.com/wp-content/uploads/Minimum-Requirements-for-Expanding-Blackjack-Style-Tables-and-the-Reintroduction-of-Craps.pdf.

[83] *Id.*

[84] Office of Governor Charlie Baker and Lt. Governor Karyn Polito, *Baker-Polito Administration to Lift COVID Restrictions May 29, State to Meet Vaccination Goal by Beginning of June* (May 17, 2021), https://www.mass.gov/news/baker-polito-administration-to-lift-covid-restrictions-may-29-state-to-meet-vaccination-goal-by-beginning-of-june.

[85] *COVID-19 Updates and Alerts*, MASS. GAMING COMM'N, https://massgaming.com/news-events/covid19/ (last accessed on June 1, 2021).

106. However, these conditions were not unique to Wynn Resorts' insured locations and were instead present throughout the Policies' expressly insured vicinity—*i.e.*, at locations away from, but within a five-statute mile vicinity of Wynn Resorts' insured locations (and beyond).

107. Nevertheless, during the period that its operations were shut down due to the Closure Orders, Wynn Resorts proactively enlisted a team of medical and public health experts to determine whether and, if so, the manner in which, Wynn Resorts' insured locations could be safely reopened. Following the guidance of these experts and the CDC, Wynn Resorts implemented rigorous health and safety protocols and modifications to its insured locations to facilitate their safe reopening and to mitigate the physical loss or damage to property caused by COVID-19, which the NGCB Policy and the MGC's Reopening Requirements (discussed above) mirrored.

108. As part of and/or in addition to the reduced capacity, reduced hours, and other significant restrictions imposed by the reopening orders of state and local authorities (discussed above), these protocols and mitigation measures included, by way of example, and without limitation: (i) limiting the number of seats per table game; (ii) slot machine spacing; (iii) temperature checks; (iv) mask protection; (v) physical distancing; (vi) suspension of certain entertainment and nightlife offerings; (vii) increased cleaning and sanitation protocols; (viii) preparation of all venues with PPE; (ix) optimized HVAC systems; (x) flushing of all water systems; and (xi) health screening for employees and guests.

109. In addition to these efforts, Wynn Las Vegas also established an on-site rapid COVID-19 testing facility, which provides same-day PCR tests to Wynn Resorts guests and employees, and is designed to help facilitate a return to more normal business activities, such as conventions and other mass gatherings. Wynn Resorts also established a round-the-clock, multi-department contact tracing team to ensure that any employee who tests positive for COVID-19 receives detailed, thorough and personalized service to ensure that they and their families return to full health and to reduce the risk of community spread.

110. Accordingly, the physical loss and/or damage to property caused by the prevalence of COVID-19 at Wynn Resorts' insured locations and locations within the Policies' expressly insured five-mile vicinity thereof, together with the impact of the Closure Orders on Wynn Resorts'

- - 27 - -

operations, has resulted in a direct and immediate business income loss to Wynn Resorts. Wynn Resorts' estimated COVID-19-related losses total at least $595 million and will continue to accrue until all of Wynn Resorts' insured locations resume normal operations.

**G.    The Factory Mutual "All Risks" Insurance Policies**

111.    In exchange for substantial premium, Wynn Resorts purchased commercial property insurance from Factory Mutual for the April 15, 2019 to April 15, 2020 and April 15, 2020 to April 15, 2021 policy periods in the form of Mutual Corporation Non-Assessable Policy Nos. 1048495 and 1064616 (defined above as the "Policies," true and correct copies of which are attached to the concurrently-filed appendix of exhibits as Exhibits 1 and 2).

112.    As set forth in the "Schedule of Locations" included as Appendix A to the Policies, the Policies insure various locations owned by Wynn Resorts and its subsidiaries, including, but not limited to, Wynn Las Vegas, Encore Las Vegas, and Encore Boston Harbor. (Ex. 1 at WR_FM Policies_079-80; Ex. 2 at WR_FM Policies_175-177).

113.    The Policies provide a maximum per "occurrence" limit of liability of $2.25 billion for "all coverages involved," with certain of their coverage sections, but not others, subject to sublimits and/or time limits. (Ex. 1 at WR_FM Policies_009-13; Ex. 2 at WR_FM Policies_105-108).

114.    In addition to certain location-specific deductibles, claims under the Policies are subject to a deductible of "$250,000 combined all coverages, per **occurrence**."[86] (Ex. 1 at WR_FM Policies_013; Ex. 2 at WR_FM Policies_109)

115.    The Policies define the term "**occurrence**," in relevant part, as "the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by one discrete event of physical loss or damage...." (Ex. 1 at WR_FM Policies_076; Ex. 2 at WR_FM Policies_171).

---

[86] Unless otherwise noted, bolded or capitalized terms in this Complaint appear in that manner in the Policies.

i.      **The Policies' "Property Damage" Coverage**

116.    The Policies' insuring agreement states that: "This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy." (Ex. 1 at WR_FM Policies_001, 008; Ex. 2 at WR_FM Policies_096, 103).

117.    Accordingly, if the Policies do not expressly exclude a particular risk of physical loss or damage to property, then that non-excluded risk triggers coverage.

118.    The Policies cover both the risks of "physical loss" *and* "damage" to Wynn Resorts' property.

119.    As used in the Policies, the term "physical loss" is separate, distinct, and has an independent meaning from the term "damage."

120.    The Policies do not define the terms "physical," "loss" or "damage," nor do the Policies define the phrase "physical loss or damage."

121.    In addition to providing broad "all risks" coverage, the Policies' "Property Damage" coverage section also contains several "Additional Coverages for insured physical loss or damage," including for "Communicable Disease Response," "Expediting Costs," and "Protection and Preservation of Property." (Ex. 1 at WR_FM Policies_024, 029-30, 032, 037-38; Ex. 2 at WR_FM Policies_119, 124-125, 127, 132-133).

122.    The Policies state that the "Additional Coverages" are subject to the Policies' "applicable exclusions and deductibles, all as shown in this section and elsewhere in this Policy." (Ex. 1 at WR_FM Policies_024; Ex. 2 at WR_FM Policies_119).

123.    The Policies' "Communicable Disease Response" additional coverage provides:

> If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:
>
> 1) an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or
>
> 2) a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

- - 29 - -

this Policy covers the reasonable and necessary costs incurred by the Insured at such **location** with the actual not suspected presence of **communicable disease** for the:

1) cleanup, removal and disposal of the actual not suspected presence of **communicable diseases** from insured property; and

2) actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of **communicable diseases** on insured property.

This Additional Coverage will apply when access to such **location** is limited, restricted or prohibited in excess of 48 hours.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to the actual not suspected presence of **communicable disease**.

(Ex. 1 at WR_FM Policies_029-30; Ex. 2 at WR_FM Policies_124-125).

124.    The Policies define "**location**" to include any location specified in the Policies' "Schedule of Locations," or any building "bounded on all sides by public streets, clear land space or open waterways...." (Ex. 1 at WR_FM Policies_075; Ex. 2 at WR_FM Policies_170).

125.    The Policies define the term "**communicable disease**" as: "disease which is:

A. transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or

B. Legionellosis." (Ex. 1 at WR_FM Policies_073; Ex. 2 at WR_FM Policies_168).

126.    The Policies' "Communicable Disease Response" additional coverage shares a $1 million aggregate sublimit with the "Interruption by Communicable Disease" coverage section, which is part of the Policies' "Time Element" coverage (described below).[87] (Ex. 1 at WR_FM Policies_010; Ex. 2 at WR_FM Policies_106).

127.    The Policies' "Expediting Costs" additional coverage insures the "reasonable and necessary costs incurred: 1) for the temporary repair of insured physical damage to insured property; 2) for the temporary replacement of insured equipment suffering insured physical damage; and 3) to expedite the permanent repair or replacement of such damaged property." (Ex. 1 at WR_FM Policies_032; Ex. 2 at WR_FM Policies_127).

---

[87] The 2020-2021 Policy's "Communicable Disease Response" additional coverage shares a $10,000 aggregate sublimit with the "Interruption by Communicable Disease" coverage section.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

1    128.    The Policies' "Expediting Costs" additional coverage is subject to a $100 million

2  sublimit that is shared with the Policies' "Extra Expense" coverage section, which is part of the

3  Policies' "Time Element" coverage (described below). (Ex. 1 at WR_FM Policies_011; Ex. 2 at

4  WR_FM Policies_106).

5    129.    The Policies' "Protection and Preservation of Property" additional coverage insures

6  "reasonable and necessary costs incurred for actions to temporarily protect or preserve insured

7  property; provided such actions are necessary due to actual, or to prevent immediately impending,

8  insured physical loss or damage to such insured property." (Ex. 1 at WR_FM Policies_037; Ex. 2

9  at WR_FM Policies_132).

10    **ii.    The Policies' "Time Element" Coverage**

11    130.    In addition to its "Property Damage" coverage, the Policies also afford broad "Time

12  Element" coverage, which insures Wynn Resorts' lost earnings "directly resulting from physical

13  loss or damage of the type insured" to Wynn Resorts' property. (Ex. 1 at WR_FM Policies_044;

14  Ex. 2 at WR_FM Policies_139).

15    131.    The Policies' "Time Element" coverage section also "covers expenses reasonably

16  and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of

17  this Policy." (Ex. 1 at WR_FM Policies_045; Ex. 2 at WR_FM Policies_140).

18    132.    The Policies' "Time Element" coverage section also includes "Extra Expense"

19  coverage, which is defined to include "extra expenses to temporarily continue as nearly **normal** as

20  practicable the conduct of the Insured's business...." (Ex. 1 at WR_FM Policies_047; Ex. 2 at

21  WR_FM Policies_142).

22    133.    The Policies' "Time Element" coverage section also includes "Rental Insurance,"

23  covering:

24    1) the fair rental value of any portion of the property occupied by the Insured;

25    2) the income reasonably expected from rentals of unoccupied or unrented portions of such
        property; and

26

27    3) the rental income from the rented portions of such property according to bona fide leases,
        contracts or agreements in force at the time of loss,

28    all not to include noncontinuing charges and expenses.

- - 31 - -

(Ex. 1 at WR_FM Policies_048; Ex. 2 at WR_FM Policies_143).

134.    The Policies' "Time Element" coverage section also includes various "Coverage Extensions," including, but not limited to, for:

- "Civil or Military Authority";
- "Continent Time Element Extended";
- "Ingress/Egress";
- "Attraction Property";
- "Extended Period of Liability";
- "Interruption by Communicable Disease"; and
- "Protection and Preservation of Property Time Element."

(Ex. 1 at WR_FM Policies_051, 054-56, 058-63; Ex. 2 at WR_FM Policies_147, 149-151, 154-158).

135.    The Policies' "Civil or Military Authority" coverage extension provides:

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location** provided such order is the direct result of physical damage of the type insured at the insured **location** or within five statute miles/eight kilometres of it.

For the purpose of this Extension only, State Gaming Control Board or Nevada Gaming Commission will also be considered a civil authority.

(Ex. 1 at WR_FM Policies_054; Ex. 2 at WR_FM Policies_149).

136.    The Policies' "Contingent Time Element Extended" coverage provides:

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured at **contingent time element locations** located within the TERRITORY of this Policy.

As respects CONTINGENT TIME ELEMENT EXTENDED:

1) Time Element loss recoverable under this Extension is extended to include the following TIME ELEMENT COVERAGE EXTENSIONS:

CIVIL OR MILITARY AUTHORITY
CONTINGENT TIME ELEMENT EXTENDED …
EXTENDED PERIOD OF LIABILITY
INGRESS/EGRESS….

1  (Ex. 1 at WR_FM Policies_054-55; Ex. 2 at WR_FM Policies_150).

2      137.    The Policies define "**contingent time element location**" to include:

3  A. any **location**:

4  1) of a direct customer, supplier, contract manufacturer or contract service provider to the Insured;

5  2) of any company under a royalty, licensing fee or commission agreement with the Insured;

6

7  B. any **location** of a company that is a direct or indirect customer, supplier, contract manufacturer or contract service provider to a **location** described in A1 above....

8  (Ex. 1 at WR_FM Policies_074; Ex. 2 at WR_FM Policies_169).

9      138.    The Policies have a per "occurrence" sublimit for "Contingent Time Element

10  Extended" coverage of $50 million.   (Ex. 1 at WR_FM Policies_011; Ex. 2 at WR_FM

11  Policies_106).

12      139.    The Policies' coverage for "Ingress/Egress" provides:

13  This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured **location**, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to property of the type insured.

16  (Ex. 1 at WR_FM Policies_055; Ex. 2 at WR_FM Policies_150-151).

17      140.    The Policies' Time Element coverage section also provides coverage for loss

18  suffered by Wynn Resorts in connection with physical loss or damage to an "Attraction Property"

19  as follows:

20  This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to an insured **location** and is within 1 statute mile/1.6 kilometres of the insured **location**, except this coverage will apply to the McCarran International Airport.

23  (Ex. 1 at WR_FM Policies_058-59; Ex. 2 at WR_FM Policies_154).

24      141.    The time limits for the Policies' "Civil or Military Authority," "Ingress/Egress," and

25  "Attraction Property" coverage sections are 30 days. (Ex. 1 at WR_FM Policies_010-11; Ex. 2 at

26  WR_FM Policies_105-106).

27      142.    The Policies' "Time Element" coverage section also provides an "Extended Period

28  of Liability," covering the reduction in sales resulting from the interruption of business "for such

Snell & Wilmer
L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

1   additional length of time as would be required with the exercise of due diligence and dispatch to

2   restore the Insured's business to the condition that would have existed had no loss happened...."

3   (Ex. 1 at WR_FM Policies_060; Ex. 2 at WR_FM Policies_156).

4   143.   The Policies have an "Extended Period of Liability" of 365 days. (Ex. 1 at WR_FM

5   Policies_011; Ex. 2 at WR_FM Policies_106).

6   144.   The Policies' "Interruption by Communicable Disease" coverage extension

7   provides that:

8   > If a **location** owned, leased or rented by the Insured has the actual not suspected presence
>   of **communicable disease** and access to such **location** is limited, restricted or prohibited
9   > by:

10  > 1) an order of an authorized governmental agency regulating the actual not suspected
>       presence of **communicable disease**; or
11

12  > 2) a decision of an Officer of the Insured as a result of the actual not suspected
>       presence of **communicable disease**,
13

14  > this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the
>   Insured during the PERIOD OF LIABILITY at such **location** with the actual not suspected
>   presence of **communicable disease**.
15

16  > This Extension will apply when access to such **location** is limited, restricted, or prohibited
>   in excess of 48 hours.

17  (Ex. 1 at WR_FM Policies_061-62; Ex. 2 at WR_FM Policies_157-158).

18  145.   The Policies' "Interruption by Communicable Disease" coverage extension is

19  subject to a time limit of one year and shares the $1 million sublimit with the "Communicable

20  Disease Response" coverage provided in the "Property Damage" coverage section.   (Ex. 1 at

21  WR_FM Policies_012; Ex. 2 at WR_FM Policies_107).[88]

22  146.   The Policies' "Protection and Preservation of Property Time Element" coverage

23  extension provides that:

24  > This Policy covers the Actual Loss Sustained by the Insured for a period of time not to
>   exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the
25  > temporary protection and preservation of property insured by this Policy provided such

26

---

27  [88] The 2020-2021 Policy's "Interruption by Communicable Disease" coverage extension is subject to a time limit of
    one year and shares a $10,000 aggregate sublimit with the "Communicable Disease Response" coverage provided in
28  the "Property Damage" coverage section.

Snell & Wilmer
L.L.P.
LAW OFFICES
1881 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- - 34 - -

action is necessary to prevent immediately impending insured physical loss or damage to such insured property.

(Ex. 1 at WR_FM Policies_063; Ex. 2 at WR_FM Policies_158).

### H.   Wynn Resorts' COVID-19 Losses Trigger Multiple Coverage Sections of the Factory Mutual Insurance Policies

147.   In addition to triggering the Policies' "all risks" property coverage, Wynn Resorts' COVID-19 losses also trigger multiple "Additional Coverages," "Time Element" coverage, and "Time Element Coverage Extensions" provided under the Policies.

#### i.   Wynn Resorts' COVID-19 Losses Trigger the Policies' "Property Damage" Coverage

148.   The presence of COVID-19 is an insured risk of "physical loss or damage" under the Policies.

149.   The presence of COVID-19 at Wynn Resorts' insured locations has caused physical loss and damage to Wynn Resorts' property by corrupting, physically altering, and rendering such property dangerous, unsafe, uninhabitable, and unfit for its ordinary and intended use—that is, as predominantly indoor venues for persons to congregate at and patronize for gaming, entertainment, accommodation, and dining.

150.   Accordingly, the Policies' "all risks" property coverage has been triggered and Wynn Resorts' physical loss and damage to its property caused by the presence of COVID-19 is covered by the Policies up to the full $2.25 billion per "occurrence" limits provided by each of the Policies.

#### ii.   Wynn Resorts' COVID-19 Losses Trigger the Policies' "Communicable Disease" Additional Coverage

151.   COVID-19 qualifies as a "communicable disease" under the Policies.

152.   The actual presence of COVID-19 has been confirmed at Wynn Resorts' insured locations.

153.   Wynn Resorts' insured locations have incurred costs for the cleanup, removal and disposal of the actual presence of COVID-19 from insured property.

- - 35 - -

154.     The actual presence of COVID-19 at Wynn Resorts' insured locations has also resulted in decisions by Wynn Resorts and/or the issuance of orders by authorized governmental agencies regulating communicable disease that limited, restricted and/or prohibited access to such locations, resulting in losses to Wynn Resorts.

155.     These costs and losses are covered under the Policies' "Communicable Disease Response" and "Interruption by Communicable Disease" additional coverage.

156.     However, the "Communicable Disease Response" and "Interruption by Communicable Disease" additional coverage does not apply to limit any other coverage available under the Policies, including, but not limited to, those triggered by physical loss or damage caused by COVID-19 away from Wynn Resorts' insured locations.

**iii.    Wynn Resorts' COVID-19 Losses Trigger the Policies' "Protection and Preservation of Property" Additional Coverage**

157.     The risk and actual presence of COVID-19 at Wynn Resorts' insured locations has threatened and continues to threaten to cause physical loss or damage to Wynn Resorts' insured property.

158.     The threatened and actual physical loss or damage to Wynn Resorts' insured property caused by COVID-19 at Wynn Resorts' insured locations has required Wynn Resorts to take reasonable and necessary action to temporarily protect or preserve its insured property, the costs and resultant "Time Element" loss from which trigger coverage under the Policies' "Protection and Preservation of Property" and "Protection and Preservation of Property Time Element" additional coverage.

**iv.    Wynn Resorts' COVID-19 Losses Trigger the Policies' "Time Element" and "Extra Expense" Coverage**

159.     Wynn Resorts has suffered "Time Element" loss as a direct result of the physical loss and damage to its insured property caused by the presence of COVID-19 at its insured locations.

160.     This loss triggers coverage under the Policies' "Time Element" coverage up to the full $2.25 billion per "occurrence" limits provided under each of the Policies.

- - 36 - -

161.   The physical loss or damage caused by COVID-19 at its insured locations has also required Wynn Resorts to incur reasonable and necessary extra expenses to temporarily continue as nearly as normal as practicable the conduct of Wynn Resorts' business.

162.   Such expenses are beyond those that would have normally been incurred in conducting Wynn Resorts' business absent the physical loss or damage caused by COVID-19 at its insured locations, and trigger coverage under the Policies' "Extra Expenses" coverage, subject to the Policies' applicable limits.

### v.   Wynn Resorts' COVID-19 Losses Trigger the Policies' "Expediting Costs" Additional Coverage

163.   The physical loss or damage caused by COVID-19 at its insured locations has also required Wynn Resorts to incur reasonable and necessary costs for the temporary repair or replacement and/or to expedite the permanent repair or replacement of such damaged property.

164.   Such costs trigger coverage under the Policies' "Expediting Costs" coverage, subject to the Policies' applicable limits.

### vi.   Wynn Resorts' COVID-19 Losses Trigger the Policies' "Civil or Military Authority" Coverage

165.   The physical damage caused by the presence of COVID-19 at property located at or within five statute miles of Wynn Resorts' insured locations has directly resulted in the issuance of orders from civil authorities limiting, restricting and/or prohibiting partial or total access to Wynn Resorts' insured locations.

166.   Wynn Resorts has accordingly sustained and will continue to sustain "Time Element" loss as a direct result of such civil authority orders limiting, restricting and/or prohibiting partial or total access to Wynn Resorts' insured locations, which triggers coverage under the Policies' "Civil or Military Authority" coverage, subject to the Policies' applicable limits.

vii.    **Wynn Resorts' COVID-19 Losses Trigger the Policies' "Contingent Time Element Extended" Coverage**

167.    The presence of COVID-19 at the locations of Wynn Resorts' direct and indirect customers, suppliers, contract manufacturers and/or contract service providers has caused physical loss or damage to property at such locations.

168.    In addition, the presence of COVID-19 at the locations of companies under a royalty, licensing fee and/or commission agreement with Wynn Resorts has caused physical loss or damage to property at such locations.

169.    Wynn Resorts has accordingly sustained and will continue to sustain "Time Element" loss as a result of the physical loss or damage to property at the locations described in the preceding two paragraphs, triggering coverage under the Policies' "Contingent Time Element Extended" coverage, subject to the Policies' applicable limits.

viii.    **Wynn Resorts' COVID-19 Losses Trigger the Policies' "Ingress/Egress" Coverage**

170.    The physical damage caused by the presence of COVID-19 at property located at or near Wynn Resorts' insured locations has directly resulted in the partial and/or total physical prevention of ingress to or egress from Wynn Resorts' insured locations.

171.    The necessary interruption of Wynn Resorts' business due to such partial and/or total physical prevention of ingress to or egress from Wynn Resorts' insured locations has caused Wynn Resorts to sustain "Time Element" loss and "Extra Expense" triggering coverage under the Policies' "Ingress/Egress" coverage, subject to the Policies' applicable limits.

ix.    **Wynn Resorts' COVID-19 Losses Trigger the Policies' "Attraction Property" Coverage**

172.    The presence of COVID-19 has also caused and is continuing to cause physical loss and damage to property away from Wynn Resorts' insured locations, including property located within 1 statute mile of Wynn Resorts' insured locations that attracts business to Wynn Resorts' insured locations.

173.    As a direct result of such physical loss and damage to the properties that attract business to Wynn Resorts' insured locations, Wynn Resorts has sustained and will continue to sustain "Time Element" loss and "Extra Expense" triggering coverage under the Policies' "Attraction Property" coverage, subject to the Policies' applicable limits.

**I.    No Policy Exclusion Applies to Wynn Resorts' COVID-19 Losses**

174.    A communicable disease, such as COVID-19, is a covered, not an excluded, risk of physical loss or damage under the Policies.

175.    A pandemic, such as the COVID-19 pandemic, is a covered, not an excluded, risk of physical loss or damage under the Policies.

176.    No exclusion in the Policies applies to preclude or limit coverage for Wynn Resorts' claimed COVID-19 losses.

**i.    The Policies' So-Called "Contamination Exclusion" Does Not Apply to Wynn Resorts' COVID-19 Losses**

177.    Factory Mutual has contended that the Policies' so-called "Contamination Exclusion" applies to limit or bar coverage for Wynn Resorts' COVID-19 losses. Factory Mutual is incorrect.

178.    The Policies' "Contamination Exclusion" states, in relevant part, that:

This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

1)    **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured.

(Ex. 1 at WR_FM Policies_021; Ex. 2 at WR_FM Policies_116).

179.    The Policies define "**contaminant**" as "anything that causes **contamination**" and define "**contamination**" as: "any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew." (Ex. 1 at WR_FM Policies_073; Ex. 2 at WR_FM Policies_168).

- - 39 - -

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

180.    For various reasons, the "Contamination Exclusion" does not apply to Wynn Resorts' COVID-19 losses.  Among the reasons, Factory Mutual has acknowledged that COVID-19 is a **"communicable disease"** as that term is defined in the Policies.  The "Contamination Exclusion" does not include or use the defined term **"communicable disease"** anywhere in the exclusion or in the definition of **"contamination."**

181.    Indeed, the "Contamination Exclusion" cannot apply to anything defined as **"communicable disease."**    Given that the Policies' "Contamination Exclusion" and "Communicable Disease" coverage do not reference one another, were the "Contamination Exclusion" to apply to **"communicable disease,"** the Policies' "Communicable Disease" coverage would be vitiated and rendered illusory.

182.    Instead, and as at least one Nevada court has already determined, so-called "contamination" exclusions, like the one Factory Mutual drafted in the Policies at issue here, apply to traditional forms of environmental and industrial pollution, not to naturally occurring catastrophes such as the COVID-19 pandemic.  To the extent that COVID-19 has been present at Wynn Resorts' insured locations or the Policies' expressly insured five-mile vicinity thereof, its presence has been the result of a natural process, as opposed to an act of pollution or contamination. Wynn Resorts accordingly reasonably expected and understood that the Policies' "Contamination Exclusion" would apply only to polluting activities, as opposed to natural catastrophes such as the COVID-19 pandemic.

183.    Moreover, the "Contamination Exclusion" excludes only contamination and associated "costs" incurred as a direct result of contamination, not "loss" or "damage," such as the "Time Element" loss and extra expenses claimed by Wynn Resorts at issue in this action.

**J.    Factory Mutual's Wrongful Breach of Its "All Risks" Insurance Policies**

184.    Wynn Resorts timely reported its COVID-19 losses to Factory Mutual under the Policies on June 1, 2020.

185.    In response, as part of its broader bad faith strategy to avoid paying losses to its policyholders, Factory Mutual began a concerted effort to repeatedly and improperly attempt to

limit the scope of coverage for Wynn Resorts' COVID-19 claim to the Policies' sublimited "Communicable Disease Response" and "Interruption by Communicable Disease" coverage.

186.    Specifically, by letter dated June 15, 2020, Factory Mutual asserted that "COVID-19 meets the definition of a communicable disease under the Policy," but referred Wynn Resorts only to the Policies' sublimited "Communicable Disease Response and "Interruption by Communicable Disease" coverage in a bad faith effort to misdirect its policyholder and conceal the other available coverage afforded by its Policies.

187.    By letter dated September 14, 2020, Factory Mutual again asserted that "COVID-19 meets the definition of a communicable disease under the Policy," but again referred Wynn Resorts only to the Policies' sublimited "Communicable Disease Response" and "Interruption by Communicable Disease" coverage as part of the same continuing bad faith effort to misdirect its policyholder and conceal the other available coverage afforded by its Policies.

188.    Notwithstanding Factory Mutual's repeated bad faith efforts to pigeonhole Wynn Resorts' COVID-19 claim into only the Policies' sublimited "Communicable Disease" coverage, by letter dated October 28, 2020, Wynn Resorts submitted its interim proof of loss to Factory Mutual for its COVID-19 claim, expressly stating that Wynn Resorts' "claim is being submitted under *all* potentially applicable coverage sections" (emphasis added).

189.    However, in response, by letter dated November 11, 2020, Factory Mutual "rejected" Wynn Resorts' interim proof of loss, again referring Wynn Resorts only to the Policies' sublimited "Communicable Disease Response" and "Interruption by Communicable Disease" coverage.

190.    Thereafter, by letter dated May 14, 2021, Wynn Resorts submitted its supplemental interim proof of loss to Factory Mutual, which itemized its COVID-19-related losses by insured location, month and business segment (*i.e.*, casino, hotel, food and beverage, entertainment, retail and other operations). In addition, Wynn Resorts provided an itemization (anonymized for privacy purposes) of the no less than 2,267 confirmed COVID-19 cases for Wynn Resorts employees, guests, tenants and vendors who were present at Wynn Resorts' insured locations. Wynn Resorts again reiterated that it "submitted its COVID-19 claim under *all* applicable coverage sections of

the Policies, including, but not limited to the Policies' coverage for: 'Property Damage,' 'Time Element,' 'Extra Expense,' 'Rental Insurance,' 'Civil or Military Authority,' 'Ingress/Egress,' 'Attraction Property,' 'Protection and Preservation of Property' and 'Communicable Disease.'"

191.    In response, by letter dated May 27, 2021, Factory Mutual "rejected" Wynn Resorts' supplemental interim proof of loss and wrongfully denied coverage for Wynn Resorts' COVID-19 claim in breach of its coverage obligations under the Policies. While again stating that "COVID-19 is a communicable disease," Factory Mutual's denial letter now asserted, without support, that "COVID-19 was not actually present at a location owned, leased or rented by Wynn Resorts." Factory Mutual's denial letter further contended, also without support, that "the presence of COVID-19, even if established, would not constitute 'physical loss or damage,' and it would be excluded as 'contamination'."

192.    In doing so, Factory Mutual has intentionally mishandled Wynn Resorts' claim as part of a broader strategy to improperly limit the coverage available for COVID-19 claims to, at most, the limited sublimit of its "Communicable Disease" coverage, despite its knowledge that the risks of COVID-19 trigger *multiple* coverage sections of its "all risks" Policies.

193.    Specifically, Factory Mutual, together with its affiliate, Affiliated FM Insurance Company, issued internal "Talking Points on the 2019 Novel Coronavirus (2019-nCoV)" (hereinafter, the "Talking Points"). A true and correct copy of the Talking Points, obtained from *Treasure Island, LLC v. Affiliated FM Ins. Co.,* Case No. 2:20-cv-00965 (D. Nev.), ECF No. 2-8, is attached to the concurrently-filed appendix of exhibits as Exhibit 4.

194.    Upon information and belief, the Talking Points were issued internally to advise Factory Mutual's claim adjusters of how to respond to COVID-19 claims, because "[s]everal of [Factory Mutual's] clients have inquired as to whether there is coverage for losses they have or expect to incur as a result of the virus, which has spread outside of China."

195.    Upon information and belief, Factory Mutual issued the Talking Points *before* receiving the details of Wynn Resorts' COVID-19 claim.

- - 42 - -

196. The Talking Points advise that the Global Advantage policy form, such as that sold to Wynn Resorts, provides communicable disease coverage when there is the "actual presence" of a communicable disease.

197. However, the Talking Points further make categorical statements that there is no coverage for COVID-19 claims under other policy coverage sections such as "Civil or Military Authority," "Contingent Time Element Extended," and "Ingress/Egress," stating:

> Q. Does coverage under Civil or Military Authority Apply?
> A. No....
>
> A virus will typically not cause physical damage. Under either policy, the presence of a communicable disease does not constitute physical damage and is not of the type insured against as a virus falls within the definition of **contamination**, which is excluded.
>
> Q. Does coverage under Contingent Time Element Extended (Advantage) ... or Ingress/Egress Apply?
>
> A. No
>
> These coverages require physical loss or damage to property of the type insured under either policy. The presence of a communicable disease does not constitute physical damage and is not the type insured against as a virus falls within the definition of **contamination**, which is excluded.

198. In other words, Factory Mutual advised its adjusters in advance of receiving the details of Wynn Resorts' claim to artificially attempt to redirect all COVID-19 claims into Factory Mutual's sublimited "Communicable Disease" coverage in a systemic, and textbook bad faith, effort to avoid coverage obligations under its other policy provisions.

199. Thus, prior to actually receiving and evaluating Wynn Resorts' claim, Factory Mutual had already developed a bad faith claims strategy to improperly predetermine its coverage position—*i.e.*, that coverage, if any, would be restricted to Factory Mutual's sublimited "Communicable Disease" coverage—and attempt to limit its contractual and equitable obligations to Wynn Resorts.

## FIRST CAUSE OF ACTION
### (Declaratory Relief)

200. Wynn Resorts repeats and realleges the allegations in paragraphs 1 through 199 as though fully set forth herein.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

201.   The Policies constitute valid contracts of insurance between Wynn Resorts and Factory Mutual.

202.   Wynn Resorts has timely satisfied all obligations and complied with all conditions applicable under the Policies.

203.   An actual and justiciable controversy presently exists between Wynn Resorts and Factory Mutual regarding their respective rights and obligations, and the availability of coverage, under the Policies for Wynn Resorts' COVID-19 claim.

204.   Given that the parties have an actual and justiciable controversy regarding their respective rights and obligations under the Policies, a declaratory judgment of the parties' respective rights and obligations under the Policies is necessary.

205.   Pursuant to the Nevada Uniform Declaratory Judgment Act (NRS 30.010 *et seq.*), Wynn Resorts therefore seeks a declaratory judgment in favor of Wynn Resorts and against Factory Mutual declaring that:

    i.    Wynn Resorts' losses resulting from the physical loss or damage to property caused by the presence of COVID-19 at Wynn Resorts' insured locations and locations within the Policies' expressly insured five-mile vicinity thereof, are covered in their entirety by the Policies and that Factory Mutual is obligated to pay for such losses under the Policies' triggered coverage sections including, but not limited to:

    a.    Property Damage;

    b.    Communicable Disease Response;

    c.    Expediting Costs;

    d.    Protection and Preservation of Property;

    e.    Time Element;

    f.    Extra Expense;

    g.    Rental Insurance;

    h.    Civil or Military Authority;

    i.    Contingent Time Element Extended;

    j.    Ingress/Egress;

    k.    Attraction Property;

    l.    Extended Period of Liability;

- - 44 - -

m.    Interruption by Communicable Disease; and

n.    Protection and Preservation of Property Time Element.

ii.    No exclusion in the Policies applies to bar or limit coverage for Wynn Resorts' claim.

iii.    The sublimit applicable to the Policies' on-site "Communicable Disease Response" and "Interruption by Communicable Disease" coverage does not limit or restrict coverage under the Policies' various other coverage sections triggered by physical loss or damage caused by COVID-19, including, but not limited to, at locations away from Wynn Resorts' insured locations.

iv.    Wynn Resorts is entitled to any other declaratory relief that the Court deems just and proper.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

206.    Wynn Resorts repeats and realleges the allegations in paragraphs 1 through 205 as though fully set forth herein.

207.    The Policies constitute valid contracts of insurance between Wynn Resorts and Factory Mutual, and their terms have been triggered to obligate Factory Mutual to provide insurance to Wynn Resorts.

208.    Wynn Resorts has timely satisfied all obligations and complied with all conditions applicable under the Policies.

209.    Factory Mutual has materially breached its obligations under the Policies by unjustifiably refusing to acknowledge coverage and pay for Wynn Resorts' claimed COVID-19 losses.

210.    Wynn Resorts has suffered and continues to suffer damages as a direct and proximate result of Factory Mutual's breach of its obligations under the Policies, with the exact amount to be proven at trial.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**THIRD CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

211.    Wynn Resorts repeats and realleges the allegations in paragraphs 1 through 210 as though fully set forth herein.

212.    Factory Mutual has denied Wynn Resorts' claim for coverage under the Policies for its COVID-19 losses.

213.    Factory Mutual's denial of Wynn Resorts' claim lacks any reasonable basis.

214.    Factory Mutual knew or was actually or implicitly aware of the lack of any reasonable basis to deny coverage for Wynn Resorts' COVID-19 claim.

215.    Factory Mutual acted with reckless disregard as to the unreasonableness of its denial of Wynn Resorts' COVID-19 claim under the Policies.

216.    Factory Mutual breached its duty of good faith and fair dealing owed to Wynn Resorts under the Policies by failing to reasonably investigate Wynn Resorts' COVID-19 claim and provide coverage.

217.    Factory Mutual's denial of coverage for Wynn Resorts' COVID-19 claim constitutes bad faith.

218.    As a direct and proximate result of Factory Mutual's bad faith denial of coverage for Wynn Resorts' COVID-19 losses, Wynn Resorts has suffered and continues to suffer damages, with the exact amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**(Violation of the Nevada Unfair Claims Practices Act - NRS 686A.310)**

219.    Wynn Resorts repeats and realleges the allegations in paragraphs 1 through 218 as though fully set forth herein.

220.    It is an improper and unfair claims practice for an insurer transacting business in Nevada to engage in certain activities in violation of NRS 686A.310, also known as the Nevada Unfair Claims Practices Act.

221.    Factory Mutual has failed to adopt and implement reasonable standards for the prompt investigation and processing of claims based on COVID-19 losses, which constitutes an

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

1    unfair or deceptive act or practice in the business of insurance in violation of NRS 686A.310(c)
2    and (n).

3         222.    Factory Mutual's deliberate and calculated practice of attempting to influence and
4    direct policyholders' claims for coverage for COVID-19 losses into only the sublimited
5    "Communicable Disease" coverage of its policy forms constitutes an unfair or deceptive act or
6    practice in the business of insurance in violation of NRS 686A.310(a), (c), (e), (l) and (n).

7         223.    In particular, and among other things, Factory Mutual's deliberate and calculated
8    use of the Talking Points to coach its claims adjusters to influence and direct policyholders' claims
9    for coverage for COVID-19 losses into only the sublimited "Communicable Disease" coverage of
10   its policy forms constitutes an unfair or deceptive act or practice in the business of insurance in
11   violation of NRS 686A.310(a), (c), (e), (l) and (n).

12        224.    Factory Mutual's deliberate and calculated practice of denying coverage for
13   policyholders' claims based on COVID-19 losses without conducting an adequate investigation of
14   the specific facts or law applicable to particular claims constitutes an unfair or deceptive act or
15   practice in the business of insurance in violation of NRS 686A.310(a), (c), (e), (l) and (n).

16        225.    In particular, and among other things, Factory Mutual's deliberate and calculated
17   use of the Talking Points to reach predetermined conclusions regarding coverage for COVID-19
18   claims without consideration of the specific facts or law applicable to particular claims constitutes
19   an unfair or deceptive act or practice in the business of insurance in violation of NRS 686A.310(a),
20   (c), (e), (l) and (n).

21        226.    Factory Mutual's deliberate and calculated attempt to improperly restrict coverage
22   for Wynn Resorts' COVID-19 losses to the Policies' sublimited "Communicable Disease"
23   coverage has compelled Wynn Resorts to institute this litigation to recover amounts due under the
24   Policies, which constitutes an unfair or deceptive act or practice in the business of insurance in
25   violation of NRS 686A.310(f).

26        227.    As a result of Factory Mutual's unfair or deceptive acts or practices in the business
27   of insurance, Wynn Resorts has suffered and continues to suffer damages, with the exact amount
28   to be proven at trial.

- - 47 - -

# PRAYER FOR RELIEF

WHEREFORE, Wynn Resorts prays for judgment against Factory Mutual as follows:

i.  On the First Cause of Action, Wynn Resorts prays:

    a.  for Declaratory Judgment as set forth in the First Cause of Action above; and

    b.  for attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

ii.  On the Second Cause of Action, Wynn Resorts prays:

    a.  for an order declaring that Factory Mutual has breached its obligations under the Policies;

    b.  for compensatory damages in excess of $15,000, in an amount to be determined at trial, interest thereon, and attorneys' fees and costs; and

    c.  for such other and further relief the Court deems just and proper.

iii.  On the Third Cause of Action, Wynn Resorts prays:

    a.  for an order declaring that Factory Mutual has breached its duty of good faith and fair dealing owed to Wynn Resorts under the Policies;

    b.  for compensatory damages in excess of $15,000, in an amount to be determined at trial, plus consequential damages, punitive damages, interest thereon, and attorneys' fees and costs; and

    c.  for such other and further relief the Court deems just and proper.

iv.  On the Fourth Cause of Action, Wynn Resorts prays:

    a.  for an order declaring that Factory Mutual's conduct violates the Nevada Unfair Claims Practices Act, NRS 686A.310;

    b.  for compensatory damages in excess of $15,000, in an amount to be determined at trial, plus consequential damages, punitive damages, interest thereon, and attorneys' fees and costs; and

    c.  for such other and further relief the Court deems just and proper.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

v.    For All Causes of Action, all pre-judgment and post-judgment interest as allowed by law and all of Wynn Resorts' costs incurred as a consequence of having to prosecute this lawsuit, including attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Wynn Resorts demands trial by jury on all issues so triable.

Dated: June 3, 2021                              Respectfully submitted,

SNELL & WILMER LLP                           JONES DAY

By: */s/ Patrick G. Byrne*                        Tyrone R. Childress, Esq.
    Patrick G. Byrne, P.C.                       Amanda P. Ellison, Esq.
    Nevada Bar No. 7636                          (*Pro Hac Vice Forthcoming*)
    Michael Paretti, Esq.                        555 South Flower Street, Fiftieth Floor
    Nevada Bar No. 13926                         Los Angeles, CA 90071
    3883 Howard Hughes Parkway,                  Telephone: (213) 489-3939
    Suite 1100                                   Facsimile: (213) 243-2539
    Las Vegas, NV 89169                          tchildress@jonesday.com
    Telephone: (702) 784-5201                    apellison@jonesday.com
    Facsimile: (702) 784-5252
    pbyrne@swlaw.com                             Jason B. Lissy, Esq.
    mparetti@swlaw.com                           Joseph D. Vandegriff, Esq.
                                                 (*Pro Hac Vice Forthcoming*)
                                                 250 Vesey Street
                                                 New York, NY 10281-1047
                                                 Telephone: (212) 326-3939
                                                 Facsimile: (212) 755-7306
                                                 jlissy@jonesday.com
                                                 jvandegriff@jonesday.com

                                                 *Attorneys for Plaintiff Wynn Resorts, Limited*

4822-1637-6300

- - 49 - -

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

Electronically Filed
6/3/2021 12:19 PM
Steven D. Grierson
CLERK OF THE COURT

CASE NO: A-21-835683-B
Department 27

1   Patrick G. Byrne
    Nevada Bar No. 7636
2   Michael Paretti
    Nevada Bar No. 13926
3   SNELL & WILMER L.L.P.
    3883 Howard Hughes Parkway, Suite 1100
4   Las Vegas, Nevada 89169
    Telephone:  702.784.5200
5   Facsimile:  702.784.5252
    Email: pbyrne@swlaw.com
6          mparetti@swlaw.com

7   Tyrone R. Childress, Esq.
    Amanda P. Ellison, Esq.
8   (*Pro Hac Vice Forthcoming*)
9   JONES DAY
    555 South Flower Street, Fiftieth Floor
10  Los Angeles, CA 90071
    Telephone: (213) 489-3939
11  Facsimile: (213) 243-2539
    tchildress@jonesday.com
12  apellison@jonesday.com

13  Jason B. Lissy, Esq.
14  Joseph D. Vandegriff, Esq.
    (*Pro Hac Vice Forthcoming*)
15  JONES DAY
    250 Vesey Street
16  New York, NY 10281-1047
    Telephone: (212) 326-3939
17  Facsimile: (212) 755-7306
    jlissy@jonesday.com
18  jvandegriff@jonesday.com

19
20  *Attorneys for Plaintiff Wynn Resorts, Limited*

**DISTRICT COURT**

21
22  **CLARK COUNTY, NEVADA**

23  WYNN RESORTS, LIMITED,                      Case No.:
                              Plaintiffs,
24  vs.                                          Dept. No.:

25  FACTORY MUTUAL INSURANCE              **APPENDIX OF EXHIBITS TO**
    COMPANY,                             **COMPLAINT**
26
                              Defendant.
27

28

*Snell & Wilmer*
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

Plaintiff Wynn Resorts, Limited hereby files this Appendix of Exhibits to its Complaint filed concurrently herewith.

**EXHIBITS**

| EXHIBIT NO. | DESCRIPTION | PAGE RANGE |
|---|---|---|
| 1 | Mutual Corporation Non-Assessable Policy No. 1048495 | 1-95 |
| 2 | Mutual Corporation Non-Assessable Policy No. 1064616 | 96-185 |
| 3 | *Factory Mut. Ins. Co. v. Federal Ins. Co.*, Case No. l:17-cv-00760 (D.N.M. Nov. 11, 2019), ECF No. 127 | 186-192 |
| 4 | *Treasure Island, LLC v. Affiliated FM Ins. Co.,* Case No. 2:20-cv-00965 (D. Nev.), ECF No. 2-8 | 193-194 |

Dated:  June 3, 2021

SNELL & WILMER L.L.P.

By: */s/ Patrick G. Byrne*
Patrick G. Byrne
Nevada Bar No. 7636
Michael Paretti
Nevada Bar No. 13926
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169

JONES DAY
Tyrone R. Childress, Esq.
Amanda P. Ellison, Esq.
(*Pro Hac Vice Forthcoming*)
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
tchildress@jonesday.com
apellison@jonesday.com

Jason B. Lissy, Esq.
Joseph D. Vandegriff, Esq.
(*Pro Hac Vice Forthcoming*)
250 Vesey Street
New York, NY 10281-1047
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
jlissy@jonesday.com
jvandegriff@jonesday.com
*Attorneys for Plaintiff Wynn Resorts, Limited*

4851-0429-0285

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

# EXHIBIT 1



# MUTUAL CORPORATION
# NON-ASSESSABLE POLICY

Factory Mutual Insurance Company
P.O. Box 7500
Johnston, Rhode Island 02919
1-800-343-7722

## DECLARATIONS

| Policy No. | Previous Policy No. | DATE OF ISSUE |
|---|---|---|
| 1048495 | 1035972 | 10 April, 2019 |
| **Account No.** | **Replaces Binder No.** | |
| 1-35024 | | |

In consideration of this Policy's Provisions, Conditions, Stipulations, Exclusions and Limits of Liability, and of premium charged, Factory Mutual Insurance Company, hereafter referred to as the Company, does insure:

> **INSURED:**
>
> Wynn Resorts, Limited
>
>
>
> (For Complete Title See Policy)

The term of this Policy is from the 15th day of April, 2019 to the 15th day of April, 2020 at 12:01 a.m., Standard Time, at the Locations of property involved as provided in this Policy.

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

By virtue of this Policy and any other policies purchased from the Company being in force, the Insured becomes a member of the Company, subject to the provisions of its charter and by-laws, and is entitled to one vote either in person or by proxy at any and all meetings of said Company.

Assignment of this Policy will not be valid except with the written consent of the Company.

This Policy is made and accepted subject to the above provisions and those hereinafter stated, which are made a part of this Policy, together with such other provisions and agreements as may be added to this Policy.

In Witness, this Company has issued this Policy at its office in the city of Johnston, R. I.
this 10th day of April, 2019.

_____
Authorized Signature

Secretary

President

Countersigned (if required) this          day of

_____
Agent

Form FMGA DEC
7020 (5/99)

Printed in U.S.A.

WR_FM Policies_002



Factory Mutual Insurance Company
Johnston, Rhode Island
A Mutual Corporation

This policy is Non-Assessable.

It is important that the written
portions of all policies covering
the same property read exactly
alike. If they do not, they should
be made uniform at once.

In case of loss notify the company
or its local agent at once in writing.

7019 (9/01)

WR_FM Policies_003

003

This policy is issued by a mutual company having special regulations lawfully applicable to its organization, membership, policies, or contracts of insurance of which the following shall apply to and form a part of this policy.

## EXTRACTS FROM CHARTER OF THIS COMPANY
### Granted by the General Assembly of the State of Rhode Island

SECTION 5:  Except as hereinafter specifically provided, each natural person, partnership, association, corporation or legal entity insured on the mutual plan by the Corporation shall be a member of the Corporation during the term of its policy but no longer, and at all meetings of the members shall be entitled to one vote either in person or by proxy, provided, however, that where there is more than one insured under any policy, such insureds shall nevertheless be deemed to be a single member of the Corporation for all purposes.  The Corporation may issue policies which do not entitle the insured to membership in the Corporation nor to participate in its surplus.

SECTION 10:  Upon the termination of the membership of any member, all his or its right and interest in the surplus, reserves and other assets of the Corporation shall forthwith cease.

## EXTRACTS FROM THE BY-LAWS OF THIS COMPANY
### Adopted July 13, 2000

ARTICLE 1 – MEETINGS OF THE MEMBERS

SECTION 1.  Annual Meeting
The annual meeting of the members shall be held at the principal offices of the Company, or at such other place as may be stated in the notice of the meeting, at 9:00 a.m. on the second Thursday of April in each year, for the election of directors and the transaction of such other business as may be brought before the meeting.  If the annual meeting is omitted on the day herein provided therefor, a special meeting may be held in place thereof; and any business transacted or elections held at such special meeting shall be as effective as if transacted or held at the annual meeting.

7019 (9/01)



## TABLE OF CONTENTS
### (Order In Which They Appear)                               Page No.

**DECLARATIONS PAGE**

**DECLARATIONS**

1.  NAMED INSURED AND MAILING ADDRESS ...................................................1
2.  POLICY DATES .........................................................................................................1
3.  INSURANCE PROVIDED ........................................................................................1
4.  PREMIUM ...................................................................................................................1
5.  PREMIUM PAYABLE ...............................................................................................1
6.  LOSS ADJUSTMENT/PAYABLE............................................................................1
7.  TERRITORY................................................................................................................2
8.  JURISDICTION...........................................................................................................2
9.  CURRENCY .................................................................................................................2
10. LIMITS OF LIABILITY ............................................................................................2
11. DEDUCTIBLES ..........................................................................................................6

**PROPERTY DAMAGE**

1.  INSURED PROPERTY ...............................................................................................9
2.  EXCLUDED PROPERTY ...........................................................................................9
3.  EXCLUSIONS ...........................................................................................................10
4.  APPLICATION OF POLICY TO DATE OR TIME RECOGNITION ...........................14
5.  VALUATION...............................................................................................................15
6.  ADDITIONAL COVERAGES .................................................................................17
    CYBER ADDITIONAL COVERAGES .................................................................17
    A.   DATA, PROGRAMS OR SOFTWARE.........................................................17
    B.   OFF PREMISES DATA SERVICES PROPERTY DAMAGE ..........................18
    OTHER ADDITIONAL COVERAGES ................................................................20
    A.   ACCIDENTAL INTERRUPTION OF SERVICES ....................................20
    B.   ACCOUNTS RECEIVABLE ..........................................................................20
    C.   AUTOMATIC COVERAGE ...........................................................................21
    D.   BRANDS AND LABELS ................................................................................21
    E.   CLAIMS PREPARATION COSTS.................................................................22
    F.   COMMUNICABLE DISEASE RESPONSE .................................................22
    G.   CONSEQUENTIAL REDUCTION IN VALUE............................................23
    H.   CONTROL OF DAMAGED PROPERTY.....................................................23
    I.   DEBRIS REMOVAL........................................................................................24
    J.   DECONTAMINATION COSTS .....................................................................24
    K.   ERRORS AND OMISSIONS ..........................................................................24
    L.   EXPEDITING COSTS .....................................................................................25
    M.   FINE ARTS AND VALUABLE PAPERS AND RECORDS ..........................25
    N.   INSTALLMENT OR DEFERRED PAYMENTS ..........................................26
    O.   LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL ......27
    P.   LAW AND ORDINANCE ...............................................................................27
    Q.   LOSS PAYMENT INCREASED TAX LIABILITY ....................................28
    R.   MACHINERY OR EQUIPMENT STARTUP OPTION................................29



# TABLE OF CONTENTS
## (Order In Which They Appear)               Page No.

S.    MISCELLANEOUS PROPERTY ................................................................29
T.    OPERATIONAL TESTING ..................................................................30
U.    PROTECTION AND PRESERVATION OF PROPERTY ................................30
V.    SERVICE ANIMALS ........................................................................31
W.   SERVICE INTERRUPTION PROPERTY DAMAGE ................................31
X.    TEMPORARY REMOVAL OF PROPERTY ............................................32
Y.    TERRORISM ................................................................................33
Z.    TRANSPORTATION ........................................................................34

**TIME ELEMENT**

1.   LOSS INSURED ................................................................................37
2.   TIME ELEMENT COVERAGES ..............................................................38
    A.   GROSS EARNINGS ....................................................................38
    B.   EXTRA EXPENSE ......................................................................40
    C.   LEASEHOLD INTEREST ..............................................................40
    D.   RENTAL INSURANCE ................................................................41
3.   PERIOD OF LIABILITY ......................................................................42
4.   TIME ELEMENT EXCLUSIONS ..............................................................44
5.   TIME ELEMENT COVERAGE EXTENSIONS ............................................44
    CYBER TIME ELEMENT COVERAGE EXTENSIONS ....................................45
    A.   COMPUTER SYSTEMS NON PHYSICAL DAMAGE ..........................45
    B.   OFF PREMISES DATA SERVICES TIME ELEMENT ..........................45
    SUPPLY CHAIN TIME ELEMENT COVERAGE EXTENSIONS ........................47
    A.   CIVIL OR MILITARY AUTHORITY ..............................................47
    B.   CONTINGENT TIME ELEMENT EXTENDED ..................................47
    C.   INGRESS/EGRESS ....................................................................48
    D.   LOGISTICS EXTRA COST ..........................................................49
    E.   SERVICE INTERRUPTION TIME ELEMENT ..................................50
    ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS ..........................51
    A.   ATTRACTION PROPERTY ..........................................................51
    B.   CRISIS MANAGEMENT ............................................................52
    C.   DELAY IN STARTUP ................................................................53
    D.   EXTENDED PERIOD OF LIABILITY ............................................53
    E.   GOODWILL AND PUBLIC RELATIONS ........................................54
    F.   INTERRUPTION BY COMMUNICABLE DISEASE ............................54
    G.   ON PREMISES SERVICES ..........................................................55
    H.   PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT ....56
    I.   RELATED REPORTED VALUES ..................................................56
    J.   RESEARCH AND DEVELOPMENT ................................................56
    K.   SOFT COSTS ..........................................................................56

**LOSS ADJUSTMENT AND SETTLEMENT**

1.   REQUIREMENTS IN CASE OF LOSS ......................................................58
2.   CURRENCY FOR LOSS PAYMENT ........................................................59
3.   PARTIAL PAYMENT OF LOSS SETTLEMENT ..........................................59



**Account No. 1-35024**
**Policy No. 1048495**

# TABLE OF CONTENTS
## (Order In Which They Appear)

**Page No.**

4. COLLECTION FROM OTHERS .............................................................................................59
5. SUBROGATION ..................................................................................................................59
6. COMPANY OPTION ............................................................................................................59
7. ABANDONMENT .................................................................................................................59
8. APPRAISAL .......................................................................................................................60
9. SUIT AGAINST THE COMPANY ..........................................................................................60
10. SETTLEMENT OF CLAIMS .................................................................................................61

**GENERAL PROVISIONS**

1. CANCELLATION/NON-RENEWAL ......................................................................................62
2. INSPECTIONS ....................................................................................................................62
3. PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS .................................................63
4. LIBERALIZATION ..............................................................................................................63
5. MISREPRESENTATION AND FRAUD ..................................................................................63
6. LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS ..................63
7. OTHER INSURANCE ..........................................................................................................65
8. POLICY MODIFICATION ....................................................................................................65
9. REDUCTION BY LOSS ........................................................................................................66
10. SUSPENSION .....................................................................................................................66
11. TITLES ..............................................................................................................................66
12. ASSIGNMENT ...................................................................................................................66
13. DEFINITIONS ....................................................................................................................66
SCHEDULE OF LOCATIONS ........................................................................................ Appendix A
NAMED FLOOD LOCATIONS .......................................................................................Appendix B
SERVICE ANIMALS......................................................................................................Appendix C
CYBER OPTIMAL RECOVERY ENDORSEMENT, FORM FMG7558
SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT,
FORM FMG7308



**Account No.   1-35024**
**Policy No.   1048495**

# DECLARATIONS

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

**1.   NAMED INSURED AND MAILING ADDRESS**

Wynn Resorts, Limited and any subsidiary, and Wynn Resorts, Limited's interest in any partnership or joint venture in which Wynn Resorts, Limited has management control or ownership as now constituted or hereafter is acquired, as the respective interest of each may appear; all hereafter referred to as the "Insured," including legal representatives.

3720 Howard Hughes Pkwy Suite 170
Las Vegas, NV 89169-6016

**2.   POLICY DATES**

TERM:  One year

FROM:  15 April, 2019 at 12:01 a.m., Standard Time;
TO:       15 April, 2020 at 12:01 a.m., Standard Time,

at the **location** of property involved as provided in this Policy.

**3.   INSURANCE PROVIDED**

The coverage under this Policy applies to property described on the Schedule of Locations or covered under the terms and conditions of the AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or MISCELLANEOUS PROPERTY provisions, unless otherwise provided.

Schedule of Locations are as listed on the Schedule of Locations attached to this Policy.

**4.   PREMIUM**

This Policy is issued in consideration of an initial premium.

**5.   PREMIUM PAYABLE**

Willis of Pennsylvania, Inc. (Radnor) pays the premium under this Policy, and any return of the paid premium accruing under this Policy will be paid to the account of Willis of Pennsylvania, Inc. (Radnor).

**6.   LOSS ADJUSTMENT/PAYABLE**

Loss, if any, will be adjusted with and payable to Wynn Resorts, Limited, or as may be directed by Wynn Resorts, Limited.



**Account No.   1-35024**
**Policy No.   1048495**

Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgagee and/or loss payee either on a Certificate of Insurance or other evidence of insurance on file with the Company or named below.

When named on a Certificate of Insurance or other evidence of insurance, such additional interests are automatically added to this Policy as their interests may appear as of the effective date shown on the Certificate of Insurance or other evidence of insurance.  The Certificate of Insurance or other evidence of insurance will not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

The following additional interest(s) is added to the Policy as Additional Named Insured as their interests may appear.  Such interests do not extend to any TIME ELEMENT coverage under this Policy.

Deutsche Bank AG New York Branch, as Collateral Agent
60 Wall Street
New York, New York 10005

As respects their interest in Real and Personal Property at all locations listed on the Schedule of Locations.

Adding such additional interest(s) does not amend, extend or alter the terms, conditions or provisions of this Policy.

## 7.   TERRITORY

Coverage as provided under this Policy applies in Canada, the United States of America and the Commonwealth of Puerto Rico.

## 8.   JURISDICTION

This Policy will be governed by the laws of the United States of America.

Any disputes arising hereunder will be exclusively subject to United States of America jurisdiction.

## 9.   CURRENCY

All amounts, including deductibles, premiums and limits of liability, indicated in this Policy shall be in the currency represented by the three letter currency designation shown.  This three letter currency designator is defined in Table A.1-Currency and funds code list, International Organization for Standardization (ISO) 4217, edition in effect at the inception of this Policy.

## 10.   LIMITS OF LIABILITY

The Company's maximum limit of liability in an **occurrence**, including any insured TIME ELEMENT loss, will not exceed the Policy limit of liability of USD2,250,000,000 subject to the following provisions:



**Account No.   1-35024**
**Policy No.   1048495**

A.   Limits of liability and time limits stated below or elsewhere in this Policy are part of, and not in addition to, the Policy limit of liability.

B.   Limits of liability in an **occurrence** apply to the total loss or damage at all **locations** and for all coverages involved, including any insured TIME ELEMENT loss, subject to the following provisions:

   1)   when a limit of liability applies in the **aggregate during any policy year**, the Company's maximum amount payable will not exceed such limit of liability during any policy year.

   2)   when a limit of liability applies to a **location** or other specified property, such limit of liability will be the maximum amount payable for all loss or damage at all **locations** arising from physical loss or damage at such **location** or to such other specified property.

C.   Should an **occurrence** result in liability payable under more than one policy issued to the Named Insured by the Company, or its **representative companies**, the maximum amount payable in the aggregate under all such policies will be the applicable limit(s) of liability indicated in this Policy.

Applicable Limits of Liability/Time Limits:

| | |
|---|---|
| ATTRACTION PROPERTY | 30 consecutive days<br><br>As respects the McCarran International Airport:<br><br>30 consecutive days but not to exceed a USD10,000,000 limit |
| AUTOMATIC COVERAGE | 90 day period but not to exceed a USD100,000,000 limit, per **location** |
| CIVIL OR MILITARY AUTHORITY | 30 consecutive days |
| CLAIMS PREPARATION COSTS | USD250,000 plus 50% of the amount recoverable under this coverage in excess of USD250,000 |
| COMMUNICABLE DISEASE RESPONSE | USD1,000,000 in the **aggregate during any policy year**<br><br>The Company's maximum limit of liability for INTERRUPTION BY COMMUNICABLE DISEASE and this coverage combined shall not exceed USD1,000,000 in the **aggregate during any policy year** regardless of the number of locations, coverages or **occurrences** involved. |



**Account No.  1-35024**
**Policy No.  1048495**

| | |
|---|---|
| COMPUTER SYSTEMS NON PHYSICAL DAMAGE and DATA, PROGRAMS OR SOFTWARE combined | USD10,000,000 in the **aggregate during any policy year** |
| CONTINGENT TIME ELEMENT EXTENDED | USD50,000,000 |
| CRISIS MANAGEMENT | 30 consecutive days |
| **earth movement** | USD500,000,000 in the **aggregate during any policy year** |
| ERRORS AND OMISSIONS | USD100,000,000 |
| EXPEDITING COSTS and EXTRA EXPENSE combined | USD100,000,000 |
| EXTENDED PERIOD OF LIABILITY | 365 day period |
| fill beneath car parks, parking lots, pavement, roadways, railways, transformer enclosures, walkways, or buildings and structures combined | USD5,000,000 |
| **fine arts** | USD100,000,000 but not to exceed a USD10,000 limit per item for **irreplaceable fine arts** not on a schedule on file with the Company |
| fines or penalties for breach of contract or for late or noncompletion of orders combined | USD100,000 |
| **flood** | USD50,000,000 in the **aggregate during any policy year** except a USD500,000,000 limit in the **aggregate during any policy year** for locations as described on Named Flood Locations, Appendix B<br><br>This Company's maximum limit of liability will not exceed a USD500,000,000 limit in the **aggregate during any policy year** regardless of the number of locations, coverages or **occurrences** involved. |
| GOODWILL AND PUBLIC RELATIONS | USD1,000,000 but not to exceed a USD500 limit, per room per day |
| INGRESS/EGRESS | 30 day period |

Advantage - GENA - US - 2016 ©2017 FM Global. All rights reserved



**Account No.   1-35024**
**Policy No.   1048495**

| | |
|---|---|
| INTERRUPTION BY COMMUNICABLE DISEASE | 12 month period but not to exceed a USD1,000,000 limit in the **aggregate during any policy year**<br><br>The Company's maximum limit of liability for COMMUNICABLE DISEASE RESPONSE and this coverage combined shall not exceed USD1,000,000 in the **aggregate during any policy year** regardless of the number of locations, coverages or **occurrences** involved. |
| LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL | USD1,000,000 in the **aggregate during any policy year** |
| LOGISTICS EXTRA COST | 180 day period but not to exceed 200% of the **normal cost** |
| MISCELLANEOUS PROPERTY | As respects property at a **location**:<br><br>a)      USD50,000,000 per **location**<br><br>As respects property not at a **location**:<br><br>a)      USD25,000,000 |
| OFF PREMISES DATA SERVICES PROPERTY DAMAGE and OFF PREMISES DATA SERVICES TIME ELEMENT combined | USD5,000,000 in the **aggregate during any policy year** |
| Ordinary Payroll | 90 day period |
| SERVICE ANIMALS | USD100,000 in the **aggregate during any policy year** but not to exceed a USD20,000 limit, per animal |
| SERVICE INTERRUPTION PROPERTY DAMAGE and SERVICE INTERRUPTION TIME ELEMENT combined | USD50,000,000 |
| TERRORISM | USD5,000,000 in the **aggregate during any policy year** but not to exceed the following limits in the **aggregate during any policy year**:<br><br>a)      USD5,000,000 for AUTOMATIC COVERAGE, ERRORS AND OMISSIONS, MISCELLANEOUS |



Account No.   1-35024
Policy No.   1048495

| | PROPERTY and TEMPORARY REMOVAL OF PROPERTY combined<br><br>b)      USD5,000,000 for **flood** when caused by or resulting from **terrorism**<br><br>The limits for TERRORISM shall not include the **actual cash value** portion of fire damage caused by **terrorism**.<br><br>The limits for TERRORISM do not apply to the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S). |
|---|---|
| **valuable papers and records** | USD100,000,000 but not to exceed a USD10,000 limit per item for **irreplaceable valuable papers and records** not on a schedule on file with the Company |
| vehicles | USD500,000 |

## 11.   DEDUCTIBLES

Subject to the deductible general provisions stated below, in each case of loss covered by this Policy the following deductibles apply:

| CONTINGENT TIME ELEMENT EXTENDED | The following deductible(s) shall apply at each **contingent time element location** where the physical damage occurs:<br><br>USD250,000 per **location** |
|---|---|
| LOGISTICS EXTRA COST | USD250,000 per **occurrence** |
| TRANSPORTATION | USD25,000 combined all coverages, **per occurrence** |
| All Other Loss | USD250,000 combined all coverages, per **occurrence** |

Deductible General Provisions:

In each case of loss covered by this Policy, the Company will be liable only if the Insured sustains a loss, including any insured TIME ELEMENT loss, in a single **occurrence** greater than the applicable deductible specified above, and only for its share of that greater amount.



A.   For SERVICE INTERRUPTION loss, when a deductible is not specifically stated as applying to SERVICE INTERRUPTION, the deductible applied to the SERVICE INTERRUPTION loss will be the deductible that would apply if the cause of the interruption happened at the insured **location** that sustains the interruption of the specified services.

B.   For CONTINGENT TIME ELEMENT EXTENDED loss, when a deductible is not specifically stated as applying to CONTINGENT TIME ELEMENT EXTENDED, the deductible for CONTINGENT TIME ELEMENT EXTENDED loss will be determined as though the **contingent time element location** was an insured **location** under this Policy.

C.   The stated earthquake deductible will be applied to earthquake loss.  The stated **flood** deductible will be applied to **flood** loss.  The stated **wind** deductible will be applied to **wind** loss.  The provisions of item E below will also be applied to each.

D.   When this Policy insures more than one **location**, the deductible will apply against the total loss covered by this Policy in an **occurrence** except that a deductible that applies on a per **location** basis, if specified, will apply separately to each **location** where the physical damage happened regardless of the number of **locations** involved in the **occurrence**.

E.   Unless stated otherwise, if two or more deductibles apply to an **occurrence**, the total to be deducted will not exceed the largest deductible applicable.  For the purposes of this provision, when a separate Property Damage and a separate Time Element deductible apply, the sum of the two deductibles will be considered a single deductible.  If two or more deductibles apply on a per **location** basis in an **occurrence**, the largest deductible applying to each **location** will be applied separately to each such **location**.

F.   When a % deductible is stated above, whether separately or combined, the deductible is calculated as follows:

Property Damage – % of the value, per the Valuation clause(s) of the PROPERTY DAMAGE section, of the property insured at the **location** where the physical damage happened.

Time Element – % of the full Time Element values that would have been earned in the 12 month period following the **occurrence** by use of the facilities at the **location** where the physical damage happened, plus that proportion of the full Time Element values at all other **locations** where TIME ELEMENT loss ensues that was directly affected by use of such facilities and that would have been earned in the 12 month period following the **occurrence**.

G.   For insured physical loss or damage:

1)   to insured fire protection equipment; or

2)   from water or other substance discharged from fire protection equipment of the type insured,

the applicable deductible applying to items 1 or 2 above only will be reduced by fifty percent (50%), per **occurrence**.  However, this provision will not apply to loss or damage resulting



**Account No.   1-35024**
**Policy No.   1048495**

from fire or **earth movement** regardless of whether claim is made for such fire or **earth movement**.



**Account No.   1-35024**
**Policy No.   1048495**

## PROPERTY DAMAGE

### 1.   INSURED PROPERTY

This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, to the extent of the interest of the Insured in such property:

A.   Real Property, including new buildings and additions under construction, in which the Insured has an insurable interest.

B.   Personal Property:

    1)   owned by the Insured.

    2)   consisting of the Insured's interest as a tenant in improvements and betterments.  In the event of physical loss or damage, the Company agrees to accept and consider the Insured as sole and unconditional owner of improvements and betterments, notwithstanding any contract or lease to the contrary.

    3)   of officers and employees of the Insured.

    4)   of others in the Insured's custody to the extent the Insured is under obligation to keep insured for physical loss or damage insured by this Policy.

    5)   of others in the Insured's custody to the extent of the Insured's legal liability for insured physical loss or damage to Personal Property.  The Company will defend that portion of any suit against the Insured that alleges such liability and seeks damages for such insured physical loss or damage.  The Company may, without prejudice, investigate, negotiate and settle any claim or suit as the Company deems expedient.

This Policy also insures the interest of contractors and subcontractors in insured property during construction at an insured **location** or within 1,000 feet/300 metres thereof, to the extent of the Insured's legal liability for insured physical loss or damage to such property.  Such interest of contractors and subcontractors is limited to the property for which they have been hired to perform work and such interest will not extend to any TIME ELEMENT coverage provided under this Policy.

### 2.   EXCLUDED PROPERTY

The following exclusions apply unless otherwise stated in this Policy:

This Policy excludes:

A.   currency, money, notes or securities.

B.   precious metal in bullion form.



Account No.   1-35024
Policy No.   1048495

C.  land and any substance in or on land.  However, this exclusion does not apply to:

   1)  landscape gardening.

   2)  car parks, parking lots, pavement, roadways, railways, transformer enclosures or walkways.

   3)  fill beneath car parks, parking lots, pavement, roadways, railways, transformer enclosures, walkways, or buildings and structures.

D.  water.  However, this exclusion does not apply to:

   1)  water that is contained within any enclosed tank, piping system or any other processing equipment.

E.  animals, except as provided by the SERVICE ANIMALS coverage of this Policy, standing timber or growing crops.

F.  watercraft or aircraft, except when unfueled and manufactured by the Insured.

G.  vehicles of officers or employees of the Insured or vehicles otherwise insured for physical loss or damage.

H.  underground mines or mine shafts or any property within such mine or shaft.

I.  dams or dikes.

J.  property in transit, except as otherwise provided by this Policy.

K.  property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers, except as provided by the INSTALLMENT OR DEFERRED PAYMENTS coverage of this Policy.

L.  electronic data, programs or software, except when they are stock in process, finished goods manufactured by the Insured, raw materials, supplies or other merchandise not manufactured by the Insured, or as otherwise provided by the DATA, PROGRAMS OR SOFTWARE coverage of this Policy.

M.  property of Wynn MA, LLC (Wynn MA) and property located at 1 Horizon Way, Everett, Massachusetts, 02149.

## 3.  EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply unless otherwise stated:

A.  This Policy excludes:

   1)  indirect or remote loss or damage.



2)  interruption of business, except to the extent provided by this Policy.

3)  loss of market or loss of use.

4)  loss or damage or deterioration arising from any delay.

5)  mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss.

6)  loss from enforcement of any law or ordinance:

    a)  regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or

    b)  requiring the demolition of any property, including the cost in removing its debris;

except as provided by the DECONTAMINATION COSTS and LAW AND ORDINANCE coverages of this Policy.

7)  loss resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretence.

B.  This Policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1)  nuclear reaction or nuclear radiation or radioactive contamination.  However:

    a)  if physical damage by fire or sprinkler leakage results, then only that resulting damage is insured; but not including any loss or damage due to nuclear reaction, radiation or radioactive contamination.

    b)  this Policy does insure physical damage directly caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the insured **location**, provided that on the date of loss, there is neither a nuclear reactor nor any new or used nuclear fuel on the insured **location**.  This coverage does not apply to any act, loss or damage excluded in item B2f of this EXCLUSIONS clause.

This exclusion B1 and the exceptions in B1a and B1b do not apply to any act, loss or damage which also comes within the terms of exclusion B2b of this EXCLUSIONS clause.

2)  a)  hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any:

      (i)   government or sovereign power (de jure or de facto);



(ii)  military, naval or air force; or

(iii) agent or authority of any party specified in i or ii above.

b)   discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

c)   insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

d)   seizure or destruction under quarantine or custom regulation, or confiscation by order of any governmental or public authority.

e)   risks of contraband, or illegal transportation or trade.

f)   **terrorism**, including action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**, except to the extent provided in the TERRORISM coverage of the Policy.  However, if direct loss or damage by fire results from any of these acts (unless committed by or on behalf of the Insured), then this Policy covers only to the extent of the **actual cash value** of the resulting direct loss or damage by fire to property insured.  This coverage exception for such resulting fire loss or damage does not apply to:

(i)  direct loss or damage by fire which results from any other applicable exclusion in the Policy, including the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

(ii)  any coverage provided in the TIME ELEMENT section of this Policy or to any other coverages provided in this Policy.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion, or any other risk of physical loss or damage covered elsewhere in this Policy.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2a of this EXCLUSIONS clause then item B2a applies in place of this item B2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2b of this EXCLUSIONS clause then item B2b applies in place of this item B2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2c of this EXCLUSIONS clause then item B2c applies in place of this item B2f exclusion.



If any act excluded herein involves nuclear reaction, nuclear radiation or radioactive contamination, this item B2f exclusion applies in place of item B1 of this EXCLUSIONS clause.

3)   any dishonest act, including but not limited to theft, committed alone or in collusion with others, at any time:

   a)   by an Insured or any proprietor, partner, director, trustee, officer, or employee of an Insured; or

   b)   by any proprietor, partner, director, trustee, or officer of any business or entity (other than a common carrier) engaged by an Insured to do anything in connection with property insured under this Policy.

   This Policy does insure acts of direct insured physical damage intentionally caused by an employee of an Insured or any individual specified in b above, and done without the knowledge of the Insured.  This coverage does not apply to any act excluded in B2f of this EXCLUSIONS clause.  In no event does this Policy cover loss by theft by any individual specified in a or b above.

4)   lack of the following services:

   a)   incoming electricity, fuel, water, gas, steam or refrigerant;

   b)   outgoing sewerage;

   c)   incoming or outgoing voice, data or video,

   all when caused by an event off the insured **location**, except as provided in the SERVICE INTERRUPTION and OFF PREMISES DATA SERVICES coverages of this Policy.  But, if the lack of such a service directly causes insured physical damage on the insured **location**, then only that resulting damage is insured.

5)   **earth movement** for property located in California.

C.   This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

1)   faulty workmanship, material, construction or design from any cause.

2)   loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested, or otherwise worked on.

3)   deterioration, depletion, rust, corrosion or erosion, wear and tear, inherent vice or latent defect.



    4)   settling, cracking, shrinking, bulging, or expansion of:

       a)   foundations (including any pedestal, pad, platform or other property supporting machinery).

       b)   floors.

       c)   pavements.

       d)   walls.

       e)   ceilings.

       f)   roofs.

    5)   a)   changes of temperature damage (except to machinery or equipment); or

       b)   changes in relative humidity damage,

       all whether atmospheric or not.

    6)   insect, animal or vermin damage.

    7)   loss or damage to the interior portion of buildings under construction from rain, sleet or snow, whether or not driven by wind, when the installation of the roof, walls or windows of such buildings has not been completed.

D.   This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

    1)   **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.  If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured.  This exclusion D1 does not apply to radioactive contamination which is excluded elsewhere in this Policy.

    2)   shrinkage.

    3)   changes in color, flavor, texture or finish.

## 4.   APPLICATION OF POLICY TO DATE OR TIME RECOGNITION

With respect to situations caused by any **date or time recognition** problem by **electronic data processing equipment or media** (such as the so-called Year 2000 problem), this Policy applies as follows.

A.   This Policy does not pay for remediation, change, correction, repair or assessment of any **date or time recognition** problem, including the Year 2000 problem, in any **electronic data**



**processing equipment or media**, whether preventative or remedial, and whether before or after a loss, including temporary protection and preservation of property. This Policy does not pay for any TIME ELEMENT loss resulting from the foregoing remediation, change, correction, repair or assessment.

B.    Failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000, is not insured physical loss or damage. This Policy does not pay for any such incident or for any TIME ELEMENT loss resulting from any such incident.

Subject to all of its terms and conditions, this Policy does pay for physical loss or damage not excluded by this Policy that results from a failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000. Such covered resulting physical loss or damage does not include any loss, cost or expense described in A or B above. If such covered resulting physical loss or damage happens, and if this Policy provides TIME ELEMENT coverage, then, subject to all of its terms and conditions, this Policy also covers any insured Time Element loss directly resulting therefrom.

## 5.    VALUATION

Adjustment of the physical loss amount under this Policy will be computed as of the date of loss at the place of the loss, and for no more than the interest of the Insured.

Unless stated otherwise in an Additional Coverage, adjustment of physical loss to property will be subject to the following:

A.    On stock in process, the value of raw materials and labor expended plus the proper proportion of overhead charges.

B.    On finished goods manufactured by the Insured, the regular cash selling price, less all discounts and charges to which the finished goods would have been subject had no loss happened.

C.    On raw materials, supplies or other merchandise not manufactured by the Insured:

1)    if repaired or replaced, the actual expenditure incurred in repairing or replacing the damaged or destroyed property; or

2)    if not repaired or replaced, the **actual cash value**.

D.    On exposed films, records, manuscripts and drawings that are not **valuable papers and records**, the value blank plus the cost of copying information from back-up or from originals of a previous generation. These costs will not include research, engineering or any costs of restoring or recreating lost information.



E.   On property that is damaged by fire and such fire is the result of **terrorism**, the **actual cash value** of the fire damage loss.  Any remaining fire damage loss shall be adjusted according to the terms and conditions of the Valuation clause(s) in this section of the Policy and shall be subject to the limit(s) of liability for TERRORISM, and if stated the limit of liability for SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S), as shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

F.   On all other property, the lesser of the following:

1)   The cost to repair.

2)   The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

3)   The cost in rebuilding, repairing or replacing on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

4)   The selling price of real property or machinery and equipment, other than stock, offered for sale on the date of loss.

5)   The cost to replace unrepairable electrical or mechanical equipment, including computer equipment, with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

6)   The increased cost of demolition, if any, directly resulting from insured loss, if such property is scheduled for demolition.

7)   The unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

8)   The **actual cash value** if such property is:

   a)   useless to the Insured; or

   b)   not repaired, replaced or rebuilt on the same or another site within two years from the date of loss, unless such time is extended by the Company.

The Insured may elect not to repair or replace the insured real or personal property lost, damaged or destroyed.  Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss.  As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at an insured **location** under this Policy.  This item does not extend to LAW AND ORDINANCE.



**6.   ADDITIONAL COVERAGES**

This Policy includes the following Additional Coverages for insured physical loss or damage.

These Additional Coverages:

1)      are subject to the applicable limit of liability;

2)      will not increase the Policy limit of liability; and

3)      are subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

## CYBER ADDITIONAL COVERAGES

## A.   DATA, PROGRAMS OR SOFTWARE

This Policy covers insured **physical loss or damage to electronic data, programs or software**, including physical loss or damage caused by the malicious introduction of a machine code or instruction.

For the purposes of this Additional Coverage, insured data, programs or software can be anywhere worldwide, including while in transit, except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

With respect to destruction, distortion or corruption caused by the malicious introduction of machine code or instruction, this Additional Coverage will apply when the Period of Liability is in excess of 48 hours.

This Additional Coverage also covers:

1)      the cost of the following reasonable and necessary actions taken by the Insured provided such actions are taken due to actual insured **physical loss or damage to electronic data, programs or software**:

   a)   actions to temporarily protect and preserve insured electronic data, programs or software.

   b)   actions taken for the temporary repair of insured **physical loss or damage to electronic data, programs or software**.

   c)   actions taken to expedite the permanent repair or replacement of such damaged property.

2)      the reasonable and necessary costs incurred by the Insured to temporarily protect or preserve insured electronic data, programs or software against immediately impending insured **physical loss or damage to electronic data, programs or software**.  In the event that there is no physical loss or damage, the costs covered under this item will be



**Account No.   1-35024**
**Policy No.   1048495**

subject to the deductible that would have applied had there been such physical loss or damage.

Costs recoverable under this Additional Coverage are excluded from coverage elsewhere in this Policy.

This Additional Coverage excludes loss or damage to data, programs or software when they are stock in process, finished goods manufactured by the Insured, raw materials, supplies or other merchandise not manufactured by the Insured.

DATA, PROGRAMS OR SOFTWARE Exclusions: As respects DATA, PROGRAMS OR SOFTWARE, the following applies:

1) the exclusions in the EXCLUSIONS clause of this section do not apply except for A1, A2, A6, B1, B2, B3a, B4 and B5.

2) the following additional exclusions apply:

This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

a) errors or omissions in processing or copying.

b) loss or damage to data, programs or software from errors or omissions in programming or machine instructions.

c) deterioration, inherent vice, vermin or wear and tear.

DATA, PROGRAMS OR SOFTWARE Valuation: On property covered under this Additional Coverage the loss amount will not exceed:

1) the cost to repair, replace or restore data, programs or software including the costs to recreate, research and engineer;

2) if not repaired, replaced or restored within two years from the date of loss, the blank value of the media.

**B.    OFF PREMISES DATA SERVICES PROPERTY DAMAGE**

This Policy covers insured physical loss or damage to insured property at an insured **location** when such physical loss or damage results from the interruption of **off-premises data processing or data transmission services** by reason of any accidental event at the facilities of the provider of such services that immediately prevents in whole or in part the delivery of such provided services.



**Account No.   1-35024**
**Policy No.   1048495**

For the purposes of this Additional Coverage:

1) facilities of the provider of **off-premises data processing or data transmission services** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine, and

2) an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This Additional Coverage will apply when the period of interruption of **off-premises data processing or data transmission services** as described below is in excess of 24 hours.

The period of interruption of **off-premises data processing or data transmission services** is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Provisions:

1) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

OFF PREMISES DATA SERVICES PROPERTY DAMAGE Exclusions: As respects OFF PREMISES DATA SERVICES PROPERTY DAMAGE, the following applies:

1) Items B4 and C5 of the EXCLUSIONS clause in this section do not apply except for B4 with respect to:

   a) incoming electricity, fuel, water, gas, steam or refrigerant; and

   b) outgoing sewerage.

2) The following additional exclusions apply:

   This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a) **earth movement** for property located in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

   b) **terrorism**.



**Account No.   1-35024**
**Policy No.   1048495**

## OTHER ADDITIONAL COVERAGES

### A.   ACCIDENTAL INTERRUPTION OF SERVICES

This Policy covers physical damage resulting from changes in temperature or relative humidity to insured property at an insured **location** when such changes in temperature or relative humidity result from the interruption of services consisting of electricity, gas, fuel, steam, water or refrigeration by reason of any accidental event, other than insured physical loss or damage, at the insured **location**.

This Additional Coverage will apply when the period of service interruption as described below is in excess of 24 hours.

The period of service interruption is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored.

### B.   ACCOUNTS RECEIVABLE

This Policy covers the following directly resulting from insured physical loss or damage to accounts receivable records while anywhere within this Policy's TERRITORY, including while in transit:

1)   any shortage in the collection of accounts receivable.

2)   the interest charges on any loan to offset such impaired collection pending repayment of such uncollectible sum.  Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts will be deducted in determining the amount recoverable.

3)   the reasonable and necessary cost incurred for material and time required to re-establish or reconstruct accounts receivable records excluding any costs covered by any other insurance.

4)   any other necessary and reasonable costs incurred to reduce the loss, to the extent the losses are reduced.

Accounts receivable records will include accounts receivable records stored as electronic data.

In the event of loss, the Insured will:

1)   use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding accounts receivable.

2)   reduce loss by use of any suitable property or service:

    a)   owned or controlled by the Insured; or



b)   obtainable from other sources.

3)   reconstruct, if possible, accounts receivable records so that no shortage is sustained.

The settlement of loss will be made within 90 days from the date of physical loss or damage. All amounts recovered by the Insured on outstanding accounts receivable on the date of loss will belong and be paid to the Company up to the amount of loss paid by the Company.  All recoveries exceeding the amount paid will belong to the Insured.

ACCOUNTS RECEIVABLE Exclusions: As respects ACCOUNTS RECEIVABLE, the following additional exclusions apply:

This Policy does not insure against shortage resulting from:

1)   bookkeeping, accounting or billing errors or omissions; or

2)   a)   alteration, falsification, manipulation; or

b)   concealment, destruction or disposal,

of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property; but only to the extent of such wrongful giving, taking, obtaining or withholding.

## C.   AUTOMATIC COVERAGE

This Policy covers insured physical loss or damage to insured property at any **location** purchased, leased or rented by the Insured after the inception date of this Policy.

This Additional Coverage applies:

1)   from the date of purchase, lease or rental,

2)   until the first of the following:

a)   the **location** is bound by the Company.

b)   agreement is reached that the **location** will not be insured under this Policy.

c)   the time limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section has been reached.  The time limit begins on the date of purchase, lease or rental.

## D.   BRANDS AND LABELS

If branded or labeled insured property is physically damaged and the Company elects to take all or any part of that property, the Insured may at the Company's expense:



**Account No.   1-35024**
**Policy No.   1048495**

1)   stamp "salvage" on the property or its containers; or

2)   remove or obliterate the brands or labels,

if doing so will not damage the property.

The Insured must relabel such property or its containers to be in compliance with any applicable law.

### E.   CLAIMS PREPARATION COSTS

This Policy covers the actual costs incurred by the Insured:

1)   of reasonable fees payable to the Insured's: accountants, architects, auditors, engineers, or other professionals; and

2)   the cost of using the Insured's employees,

for producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Company resulting from insured loss payable under this Policy for which the Company has accepted liability.

This Additional Coverage will not cover the fees and costs of:

1)   attorneys, public adjusters, and loss appraisers, all including any of their subsidiary, related or associated entities either partially or wholly owned by them or retained by them for the purpose of assisting them,

2)   loss consultants who provide consultation on coverage or negotiate claims.

This Additional Coverage is subject to the deductible that applies to the loss.

### F.   COMMUNICABLE DISEASE RESPONSE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1)   an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2)   a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the reasonable and necessary costs incurred by the Insured at such **location** with the actual not suspected presence of **communicable disease** for the:

1)   cleanup, removal and disposal of the actual not suspected presence of **communicable diseases** from insured property; and



2)   actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of **communicable diseases** on insured property.

This Additional Coverage will apply when access to such **location** is limited, restricted or prohibited in excess of 48 hours.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to the actual not suspected presence of **communicable disease**.

COMMUNICABLE DISEASE RESPONSE Exclusions: As respects COMMUNICABLE DISEASE RESPONSE, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1)   **terrorism**.

## G.   CONSEQUENTIAL REDUCTION IN VALUE

This Policy covers the reduction in value of insured merchandise that is a part of pairs, sets, or components, directly resulting from insured physical loss or damage to other insured parts of pairs, sets or components of such merchandise.  If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such merchandise to the Company.

## H.   CONTROL OF DAMAGED PROPERTY

This Policy gives control of physically damaged property consisting of finished goods manufactured by the Insured as follows:

1)   the Insured will have full rights to the possession and control of damaged property in the event of insured physical damage to such property provided proper testing is done to show which property is physically damaged.

2)   the Insured using reasonable judgment will decide if the physically damaged property can be reprocessed or sold.

3)   property so judged by the Insured to be unfit for reprocessing or selling will not be sold or disposed of except by the Insured, or with the Insured's consent.

4)   any salvage proceeds received will go to the:

a)   Company at the time of loss settlement; or

b)   Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable accordingly.



I. **DEBRIS REMOVAL**

This Policy covers the reasonable and necessary costs incurred to remove debris from an insured **location** that remains as a direct result of insured physical loss or damage.

This Additional Coverage does not cover the costs of removal of:

1) contaminated uninsured property; or

2) the **contaminant** in or on uninsured property,

whether or not the **contamination** results from insured physical loss or damage.  This Additional Coverage covers the costs of removal of contaminated insured property or the **contaminant** in or on insured property only if the **contamination**, due to the actual not suspected presence of **contaminant(s)**, of the debris resulted directly from other physical damage not excluded by the Policy.

J. **DECONTAMINATION COSTS**

If insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating **contamination** due to the actual not suspected presence of **contaminant(s)**, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance.  This Additional Coverage applies only to that part of insured property so contaminated due to the actual not suspected presence of **contaminant(s)** as a direct result of insured physical damage.

The Company is not liable for the costs required for removing contaminated uninsured property or the **contaminant** therein or thereon, whether or not the **contamination** results from an insured event.

K. **ERRORS AND OMISSIONS**

If physical loss or damage is not payable under this Policy solely due to an error or unintentional omission:

1) in the description of where insured property is physically located;

2) to include any **location**:

    a) owned, leased or rented by the Insured on the effective date of this Policy; or

    b) purchased, leased or rented by the Insured during the term of this Policy; or



**Account No.   1-35024**
**Policy No.   1048495**

3)   that results in cancellation of the property insured under this Policy;

this Policy covers such physical loss or damage, to the extent it would have provided coverage had such error or unintentional omission not been made.

It is a condition of this Additional Coverage that any error or unintentional omission be reported by the Insured to the Company when discovered and corrected.

## L.   EXPEDITING COSTS

This Policy covers the reasonable and necessary costs incurred:

1)   for the temporary repair of insured physical damage to insured property;

2)   for the temporary replacement of insured equipment suffering insured physical damage; and

3)   to expedite the permanent repair or replacement of such damaged property.

This Additional Coverage does not cover costs recoverable elsewhere in this Policy, including the cost of permanent repair or replacement of damaged property.

## M.   FINE ARTS AND VALUABLE PAPERS AND RECORDS

This Policy covers insured physical loss or damage to **fine arts** and **valuable papers and records** while anywhere within this Policy's TERRITORY, including while in transit.

FINE ARTS AND VALUABLE PAPERS AND RECORDS Exclusions: As respects FINE ARTS AND VALUABLE PAPERS AND RECORDS, the following applies:

1)   the exclusions in the EXCLUSIONS clause of this section do not apply except for A1, A2, A6, A7, B1, B2, B3a, B4 and B5.

2)   the following additional exclusions apply:

This Policy excludes:

a)   currency, money, securities.

b)   errors or omissions in processing or copying of **valuable papers and records**, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured.

c)   deterioration, inherent vice, or wear and tear, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured.

d)   fungus, mold or mildew unless directly resulting from other physical damage not excluded by this Policy.



**Account No.   1-35024**
**Policy No.   1048495**

e)   loss or damage to **fine arts** from any repairing, restoration or retouching process.

FINE ARTS AND VALUABLE PAPERS AND RECORDS Valuation: On property covered under this Additional Coverage the loss amount will not exceed the lesser of the following:

1)   the cost to repair or restore such property to the physical condition that existed on the date of loss.

2)   the cost to replace.

3)   the value, if any, designated for the item on the schedule on file with the Company.

If a **fine arts** article is part of a pair or set, and a physically damaged article cannot be replaced, or repaired or restored to the condition that existed immediately prior to the loss, the Company will be liable for the lesser of the full value of such pair or set or the amount designated on the schedule.  The Insured agrees to surrender the pair or set to the Company.

**N.    INSTALLMENT OR DEFERRED PAYMENTS**

This Policy covers insured physical loss or damage to personal property of the type insured sold by the Insured under a conditional sale or trust agreement or any installment or deferred payment plan and after such property has been delivered to the buyer.  Coverage is limited to the unpaid balance for such property.

In the event of loss to property sold under deferred payment plans, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding amounts due or to regain possession of the property.

There is no liability under this Policy for loss:

1)   pertaining to products recalled including, but not limited to, the costs to recall, test or to advertise such recall by the Insured.

2)   from theft or conversion by the buyer of the property after the buyer has taken possession of such property.

3)   to the extent the buyer continues payments.

4)   not within the TERRITORY of this Policy.

INSTALLMENT OR DEFERRED PAYMENTS Valuation: On property covered under this Additional Coverage the loss amount will not exceed the lesser of the following:

1)   total amount of unpaid installments less finance charges.

2)   **actual cash value** of the property at the time of loss.

3)   cost to repair or replace with material of like size, kind and quality.



### O.   LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL

This Policy covers the reasonable and necessary cost for the cleanup, removal and disposal of the actual not suspected presence of **contaminant(s)** from uninsured property consisting of land, water or any other substance in or on land at the insured **location** if the release, discharge or dispersal of such **contaminant(s)** is a direct result of insured physical loss or damage to insured property.

This Policy does not cover the cost to cleanup, remove and dispose of **contamination** from such property:

1)   at any **location** insured for Personal Property only.

2)   at any property insured under AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or MISCELLANEOUS PROPERTY coverage provided by this Policy.

3)   when the Insured fails to give written notice of loss to the Company within 180 days after inception of the loss.

### P.   LAW AND ORDINANCE

This Policy covers the costs as described herein resulting from the Insured's obligation to comply with a law or ordinance, provided that:

1)   such law or ordinance is enforced as a direct result of insured physical loss or damage at an insured **location**;

2)   such law or ordinance is in force at the time of such loss or damage; and

3)   such **location** was not required to be in compliance with such law or ordinance prior to the happening of the insured physical loss or damage.

Coverage A:

The reasonable and necessary costs incurred by the Insured to comply with the enforcement of the minimum requirements of any law or ordinance that regulates the demolition, construction, repair, replacement or use of buildings, structures, machinery or equipment.

As respects insured property, this Coverage A covers the reasonable and necessary costs to:

1)   demolish any physically damaged and undamaged portions of the insured buildings, structures, machinery or equipment.

2)   repair or rebuild the physically damaged and undamaged portions, whether or not demolition is required, of such insured buildings, structures, machinery or equipment.



The Company's maximum liability for this Coverage A at each insured **location** in any **occurrence** will not exceed the actual costs incurred in demolishing the physically damaged and undamaged portions of the insured property plus the lesser of:

1)   the reasonable and necessary cost, excluding the cost of land, to rebuild on another site; or

2)   the cost to rebuild on the same site.

Coverage B:

The reasonable estimated cost to repair, replace or rebuild insured property consisting of buildings, structures, machinery or equipment that the Insured is legally prohibited from repairing, replacing or rebuilding to the same height, floor area, number of units, configuration, occupancy or operating capacity, because of the enforcement of any law or ordinance that regulates the construction, repair, replacement or use of buildings, structures, machinery or equipment.

LAW AND ORDINANCE Coverage B Valuation: On property covered under this Coverage B that cannot legally be repaired or replaced**,** the loss amount will be the difference between:

1)   the **actual cash value**; and

2)   the cost that would have been incurred to repair, replace or rebuild such lost or damaged property had such law or ordinance not been enforced at the time of loss.

LAW AND ORDINANCE Exclusions: As respects LAW AND ORDINANCE, the following additional exclusions apply:

This Policy does not cover:

1)   any cost incurred as a direct or indirect result of enforcement of any law or ordinance regulating any form of **contamination**.

2)   any machinery or equipment manufactured by or for the Insured, unless used by the Insured in its operation at the **location** suffering the physical loss or damage.

## Q.   LOSS PAYMENT INCREASED TAX LIABILITY

This Policy covers the increase in tax liability as described herein incurred by the Insured.

Coverage A:

The increase in tax liability from an insured loss at an insured **location** if the tax treatment of:

1)   the profit portion of a loss payment under this Policy involving finished stock manufactured by the Insured; and/or



**Account No.   1-35024**
**Policy No.   1048495**

2)   the profit portion of a TIME ELEMENT loss payment under this Policy;

is greater than the tax treatment of profits that would have been incurred had no loss happened.

### R.   MACHINERY OR EQUIPMENT STARTUP OPTION

After insured machinery or equipment that has sustained insured physical loss or damage is repaired or replaced and such machinery or equipment is undergoing startup, the following applies:

If physical loss or damage of the type insured directly results to such machinery or equipment from such startup, the Insured shall have the option of claiming such resulting insured damage as part of the original event of physical loss or damage or as a separate **occurrence**.

This Additional Coverage applies only:

1)   to the first startup event after the original repair or replacement; and

2)   when the first startup event happens during the term of this Policy or its renewal issued by the Company.

For the purposes of this Additional Coverage, startup means:

1)   the introduction into machinery or equipment of feedstock or other materials for processing or handling;

2)   the commencement of fuel or energy supply to machinery or equipment.

### S.   MISCELLANEOUS PROPERTY

This Policy covers insured physical loss or damage to:

1)   insured property;

2)   property of the type insured that is under contract to be used in a construction project at an insured **location**:

   a)   from the time such property is delivered to the Insured or their contractor (with respect to the property under construction) by the manufacturer or supplier;

   b)   while such property is located at a storage site; and

   c)   while such property is in transit from a storage site to another storage site or to a construction project at an insured **location**,

   that does not include any such property owned or rented by the contractor;



while anywhere within this Policy's TERRITORY, including while in transit.

This Additional Coverage excludes property covered elsewhere in this Policy.

MISCELLANEOUS PROPERTY Exclusions: As respects MISCELLANEOUS PROPERTY, the following additional exclusions apply:

1) This Policy excludes:

   a) **transmission and distribution systems** not at a **location**.

   b) property insured under import or export ocean marine insurance.

   c) property shipped between continents.

   d) airborne shipments unless by regularly scheduled passenger airlines or air freight carriers.

   e) property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

2) This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a) **earth movement** for property located in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

## T.   OPERATIONAL TESTING

This Policy covers insured physical loss or damage to insured property during the **period of operational testing**.

This Additional Coverage excludes property, including stock or material, manufactured or processed by the Insured.

## U.   PROTECTION AND PRESERVATION OF PROPERTY

This Policy covers:

1) reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

2) reasonable and necessary:

   a) fire department firefighting charges imposed as a result of responding to a fire in, on or exposing the insured property.



**Account No.   1-35024**
**Policy No.   1048495**

    b)   costs incurred of restoring and recharging fire protection systems following an insured loss.

    c)   costs incurred for the water used for fighting a fire in, on or exposing the insured property.

This Additional Coverage does not cover costs incurred for actions to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by TERRORISM coverage as provided in this section of the Policy.

This Additional Coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## V.   SERVICE ANIMALS

This Policy covers insured physical loss or damage to service animals as described on Service Animals, Appendix C.

SERVICE ANIMALS Exclusions:  As respects SERVICE ANIMALS, the following additional exclusions apply:

This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

1)   death, destruction, or injury from natural causes.

2)   escape.

3)   sickness, disease, infection, infestation, or illness.

4)   error or omission in processing and/ or failure on the part of the Insured to provide nourishment, medicine, or sanitary conditions.

5)   contamination of animals, food, or medicine.

SERVICE ANIMALS Valuation:  On property covered under this Additional Coverage the loss amount will not exceed:

1)   the purchase price of commercially available animals, including costs associated with training of the service animals.

## W.   SERVICE INTERRUPTION PROPERTY DAMAGE

This Policy covers insured physical loss or damage to insured property at an insured **location** when such physical loss or damage results from the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental event at the facilities of the supplier



of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable service.

This Additional Coverage will apply when the period of service interruption as described below is in excess of 24 hours.

The period of service interruption is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Provisions:

1) The Insured will immediately notify the suppliers of services of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

SERVICE INTERRUPTION PROPERTY DAMAGE Exclusions: As respects SERVICE INTERRUPTION PROPERTY DAMAGE, the following applies:

1) The exclusions in the EXCLUSIONS clause in this section do not apply except for:

   a) A1, A2, A3, A6, B1, B2, and

   b) B4 with respect to incoming or outgoing voice, data or video, and

   c) D1 except with respect to fungus, mold or mildew.

2) The following additional exclusions apply:

   This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a) **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

   b) **terrorism**.

## X.   TEMPORARY REMOVAL OF PROPERTY

When insured property is removed from an insured **location** for the purpose of being repaired or serviced or in order to avoid threatened physical loss or damage of the type insured by this Policy, this Policy covers such property:

1) while at the premises to which such property has been moved; and



Account No.   1-35024
Policy No.   1048495

2)  for physical loss or damage as provided at the insured **location** from which such property was removed.

This Additional Coverage does not apply to property:

1)  insured, in whole or in part, elsewhere in this Policy.

2)  insured, in whole or in part, by any other insurance policy.

3)  removed for normal storage, processing or preparation for sale or delivery.

## Y.   TERRORISM

This Policy covers physical loss or damage to property as described in the INSURANCE PROVIDED provision caused by or resulting from **terrorism**.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion, or any other risk of physical loss or damage covered elsewhere in this Policy.

Amounts recoverable under this Additional Coverage are excluded from coverage elsewhere in this Policy.

This Additional Coverage does not cover loss or damage which also comes within the terms of either item B2a or B2c of the EXCLUSIONS clause in this section of the Policy.

This Additional Coverage does not in any event cover loss or damage directly or indirectly caused by or resulting from any of the following, regardless of any other cause or event, whether or not insured under this Policy contributing concurrently or in any other sequence to the loss:

1)  that involves the use, release or escape of nuclear materials, or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination or that involves the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion, or radioactive force, whether in time of peace or war and regardless of who commits the act; or

2)  that is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

3)  in which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials; or

4)  that involves action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**.



**Account No.   1-35024**
**Policy No.   1048495**

### Z.   TRANSPORTATION

This Policy covers the following personal property, except as excluded by this Policy, while in transit within the TERRITORY of this Policy:

1)   owned by the Insured.

2)   shipped to customers under F.O.B., C & F or similar terms.  The Insured's contingent interest in such shipments is admitted.

3)   of others in the actual or constructive custody of the Insured to the extent of the Insured's interest or legal liability.

4)   of others sold by the Insured, that the Insured has agreed prior to the loss to insure during course of delivery including:

  a)   when shipped by the Insured's direct contract service provider or by the Insured's direct contract manufacturer to the Insured or to the Insured's customer.

  b)   when shipped by the Insured's customer to the Insured or to the Insured's contract service provider or to the Insured's contract manufacturer.

Coverage Attachment and Duration:

1)   This Additional Coverage covers from the time the property leaves the original point of shipment for transit until the property arrives at the destination.

2)   However, coverage on export shipments not insured under ocean cargo policies ends when the property is loaded on board overseas vessels or aircraft.  Coverage on import shipments not insured under ocean cargo policies begins after discharge from overseas vessels or aircraft.

This Additional Coverage:

1)   covers general average and salvage charges on shipments covered while waterborne.

2)   insures physical loss or damage caused by or resulting from:

  a)   unintentional acceptance of fraudulent bills of lading, shipping or messenger receipts.

  b)   improper parties having gained possession of property through fraud or deceit.

Additional General Provisions:

1)   This Additional Coverage will not inure directly or indirectly to the benefit of any carrier or bailee.



**Account No.   1-35024**
**Policy No.   1048495**

2)   The Insured has permission, without prejudicing this insurance, to accept:

   a)   ordinary bills of lading used by carriers;

   b)   released bills of lading;

   c)   undervalued bills of lading; and

   d)   shipping or messenger receipts.

3)   The Insured may waive subrogation against railroads under side track agreements.

Except as otherwise stated, the Insured will not enter into any special agreement with carriers releasing them from their common law or statutory liability.

TRANSPORTATION Exclusions: As respects TRANSPORTATION, the following applies:

1)   the exclusions in the EXCLUSIONS clause of this section do not apply except for A1 through A4, B1 through B5, C1, C3, C5, C6, D1 through D3.

2)   the following additional exclusions apply:

   This Policy excludes:

   a)   samples in the custody of salespeople or selling agents.

   b)   property insured under import or export ocean marine insurance.

   c)   waterborne shipments, unless:

      (i)  by inland water; or

      (ii) by coastal shipments.

   d)   waterborne shipments via Panama Canal or to and from Alaska, the Commonwealth of Puerto Rico, and Hawaii.

   e)   airborne shipments unless by regularly scheduled passenger airlines or air freight carriers.

   f)   property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

   g)   any transporting vehicle.



TRANSPORTATION Valuation: On property covered under this Additional Coverage the loss amount will not exceed:

1)  Property shipped to or for the account of the Insured will be valued at actual invoice to the Insured.  Included in the value are accrued costs and charges legally due.  Charges may include the Insured's commission as selling agent.

2)  Property sold by the Insured and shipped to or for the purchaser's account will be valued at the Insured's selling invoice amount.  Prepaid or advanced freight costs are included.

3)  Property not under invoice will be valued:

    a)  for property of the Insured, at the valuation provisions of this Policy applying at the place from which the property is being transported; or

    b)  for other property, at the actual cash market value at the destination point on the date of loss,

    less any charges saved which would have become due and payable upon arrival at destination.



## TIME ELEMENT

TIME ELEMENT loss as provided in the TIME ELEMENT COVERAGES and TIME ELEMENT COVERAGE EXTENSIONS of this section of the Policy:

A.   is subject to the applicable limit of liability that applies to the insured physical loss or damage but in no event for more than any limit of liability that is stated as applying to the specific TIME ELEMENT COVERAGE and/or TIME ELEMENT COVERAGE EXTENSION; and

B.   will not increase the Policy limit of liability; and

C.   is subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

## 1.   LOSS INSURED

A.   This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured:

   1)   to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;

   2)   used by the Insured, or for which the Insured has contracted use;

   3)   while located as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, or as described in the TEMPORARY REMOVAL OF PROPERTY provision; or

   4)   while in transit as provided by this Policy, and

   5)   during the Periods of Liability described in this section,

   provided such loss or damage is not at a **contingent time element location**.

B.   This Policy insures TIME ELEMENT loss only to the extent it cannot be reduced through:

   1)   the use of any property or service owned or controlled by the Insured;

   2)   the use of any property or service obtainable from other sources;

   3)   working extra time or overtime; or

   4)   the use of inventory,

   all whether at an insured **location** or at any other premises. The Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the TIME ELEMENT loss.



C.   This Policy covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy.  The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.

D.   In determining the amount of loss payable, the Company will consider the experience of the business before and after and the probable experience during the PERIOD OF LIABILITY.  The probable experience will consider any increase or decrease in demand for the Insured's goods or services during the PERIOD OF LIABILITY, even if such increase or decrease is from the same event that caused physical loss or damage starting the PERIOD OF LIABILITY.

## 2.   TIME ELEMENT COVERAGES

### A.   GROSS EARNINGS

Measurement of Loss:

1)   The recoverable GROSS EARNINGS loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

   a)   Gross Earnings;

   b)   less all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services;

   c)   less ordinary payroll; and

   d)   plus all other earnings derived from the operation of the business.

   e)   Ordinary Payroll, including taxes and charges dependent on the payment of wages:

      (i)   for a period of time of not more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section immediately following the interruption of production or suspension of business operations or services, and

      (ii)   only to the extent such payroll continues following the loss and would have been earned had no such interruption happened.

      However, if an Insured reduces the daily loss payable under Ordinary Payroll, either by:

      (i)   providing gainful employment for, or

      (ii)   paying less than the normal salary rate to,

      all or part of its employees, then the number of consecutive days of Ordinary Payroll may be extended.  However, this provision will not increase the total liability of this



**Account No.  1-35024**
**Policy No.   1048495**

Company beyond the amount it would have been liable for Ordinary Payroll costs without this provision. Ordinary Payroll does not cover any portion of salaries or wages included in Gross Earnings.

2)  For the purposes of the Measurement of Loss, Gross Earnings is:

for manufacturing operations: the net sales value of production less the cost of all raw stock, materials and supplies used in such production; or

for mercantile or non-manufacturing operations: the total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured.

Any amount recovered under property damage coverage at selling price will be considered to have been sold to the Insured's regular customers and will be credited against net sales.

3)  In determining the indemnity payable as the Actual Loss Sustained, the Company will consider the continuation of only those normal charges and expenses that would have been earned had there been no interruption of production or suspension of business operations or services.

4)  If the Insured would have operated at a deficit had no interruption of production or suspension of business operations or services happened, the following applies:

a)  for Gross Earnings, the extent to which charges and expenses would have been earned will be determined by subtracting the operating deficits from the charges and expenses that necessarily continue.

b)  for Ordinary Payroll, the extent payroll would have been earned will be determined by subtracting the excess, if any, of the operating deficit over the fixed charges that need to continue from such payroll.

5)  There is recovery hereunder to the extent that the Insured is:

a)  wholly or partially prevented from producing goods or continuing business operations or services;

b)  unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;

c)  unable to continue such operations or services during the PERIOD OF LIABILITY; and

d)  able to demonstrate a loss of sales for the operations, services or production prevented.



### B.   EXTRA EXPENSE

Measurement of Loss:

The recoverable EXTRA EXPENSE loss will be the reasonable and necessary extra costs incurred by the Insured of the following during the PERIOD OF LIABILITY:

1)   extra expenses to temporarily continue as nearly **normal** as practicable the conduct of the Insured's business;

2)   extra costs of temporarily using property or facilities of the Insured or others; and

3)   costs to purchase finished goods from third parties to fulfill orders when such orders cannot be met due to physical loss or damage to the Insured's finished goods, less payment received for the sale of such finished goods.

less any value remaining at the end of the PERIOD OF LIABILITY for property obtained in connection with the above.

EXTRA EXPENSE Exclusions: As respects EXTRA EXPENSE, the following applies:

1)   TIME ELEMENT EXCLUSIONS C does not apply to item 3 above.

2)   The following additional exclusions apply:

This Policy does not insure:

a)   any loss of income.

b)   costs that usually would have been incurred in conducting the business during the same period had no physical loss or damage happened.

c)   costs of permanent repair or replacement of property that has been damaged or destroyed.  However, this exclusion does not apply to item 3 above.

d)   any expense recoverable elsewhere in this Policy.

### C.   LEASEHOLD INTEREST

Measurement of Loss:

The recoverable LEASEHOLD INTEREST incurred by the Insured of the following:

1)   If the lease agreement requires continuation of rent; and if the property is wholly untenantable or unusable, the actual rent payable for the unexpired term of the lease; or if the property is partially untenantable or unusable, the proportion of the rent payable for the unexpired term of the lease.



2)   If the lease is cancelled by the lessor pursuant to the lease agreement or by the operation of law; the Lease Interest for the first three months following the loss; and the Net Lease Interest for the remaining unexpired term of the lease.

3)   As used above, the following terms mean:

Net Lease Interest:
That sum which placed at 6% interest rate compounded annually would equal the Lease Interest (less any amounts otherwise payable hereunder).

Lease Interest:
The excess rent paid for the same or similar replacement property over actual rent payable plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the Insured's lease.

LEASEHOLD INTEREST Exclusions: As respects LEASEHOLD INTEREST, the following applies:

1)   This Policy does not insure loss directly resulting from physical loss or damage to Personal Property.

2)   TIME ELEMENT EXCLUSIONS A, B and C do not apply and the following applies instead:

This Policy does not insure any increase in loss resulting from the suspension, lapse or cancellation of any license, or from the Insured exercising an option to cancel the lease; or from any act or omission of the Insured that constitutes a default under the lease.

## D.   RENTAL INSURANCE

Measurement of Loss:

The recoverable RENTAL INSURANCE loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

1)   the fair rental value of any portion of the property occupied by the Insured;

2)   the income reasonably expected from rentals of unoccupied or unrented portions of such property; and

3)   the rental income from the rented portions of such property according to bona fide leases, contracts or agreements in force at the time of loss,

all not to include noncontinuing charges and expenses.



Account No.  1-35024
Policy No.  1048495

RENTAL INSURANCE Exclusions: As respects RENTAL INSURANCE, TIME ELEMENT EXCLUSIONS A does not apply and the following applies instead:

This Policy does not insure any loss of rental income during any period in which the insured property would not have been tenantable for any reason other than an insured loss.

## 3.   PERIOD OF LIABILITY

A.   The PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES, except LEASEHOLD INTEREST and as shown below or if otherwise provided under any TIME ELEMENT COVERAGE EXTENSION, and subject to any Time Limit provided in the LIMITS OF LIABILITY clause in the DECLARATIONS section, is as follows:

1)   For building and equipment, the period:

   a)   starting from the time of physical loss or damage of the type insured; and

   b)   ending when with due diligence and dispatch the building and equipment could be:

     (i)   repaired or replaced; and

     (ii)  made ready for operations,

     under the same or equivalent physical and operating conditions that existed prior to the damage.

   c)   not to be limited by the expiration of this Policy.

2)   For building and equipment under construction:

   a)   the equivalent of the above period of time will be applied to the level of business that would have been reasonably achieved after construction and startup would have been completed had no physical damage happened; and

   b)   due consideration will be given to the actual experience of the business compiled after completion of the construction and startup.

3)   For stock-in-process and mercantile stock, including finished goods not manufactured by the Insured, the time required with the exercise of due diligence and dispatch:

   a)   to restore stock in process to the same state of manufacture in which it stood at the inception of the interruption of production or suspension of business operations or services; and

   b)   to replace physically damaged mercantile stock.

This item does not apply to RENTAL INSURANCE.



**Account No.   1-35024**
**Policy No.   1048495**

4) For raw materials and supplies, the period of time:

   a) of actual interruption of production or suspension of operations or services resulting from the inability to get suitable raw materials and supplies to replace similar ones damaged; but

   b) limited to that period for which the damaged raw materials and supplies would have supplied operating needs.

5) If water:

   a) used for any manufacturing purpose, including but not limited to as a raw material or for power;

   b) stored behind dams or in reservoirs; and

   c) on any insured **location**,

   is released as the result of physical damage of the type insured to such dam, reservoir or connected equipment, the Company's liability for the actual interruption of production or suspension of operations or services due to inadequate water supply will not extend beyond 30 consecutive days after the damaged dam, reservoir or connected equipment has been repaired or replaced.

   This item does not apply to RENTAL INSURANCE.

6) For physically damaged exposed films, records, manuscripts and drawings, the time required to copy from backups or from originals of a previous generation. This time does not include research, engineering or any other time necessary to restore or recreate lost information.

   This item does not apply to RENTAL INSURANCE.

7) For physically damaged or destroyed property covered under DATA, PROGRAMS OR SOFTWARE, the time to recreate or restore including the time for researching or engineering lost information.

   This item does not apply to RENTAL INSURANCE.

B. The PERIOD OF LIABILITY does not include any additional time due to the Insured's inability to resume operations for any reason, including but not limited to:

1) making changes to the buildings, structures, machinery or equipment except as provided in the LAW AND ORDINANCE clause in the PROPERTY DAMAGE section.

2) restaffing or retraining employees. However, this item does not apply to additional time needed to train staff to use new machinery or equipment that replaces machinery or equipment that suffered insured physical loss or damage, provided such training is



Account No.   1-35024
Policy No.   1048495

completed within 90 consecutive days after the new machinery or equipment has been installed.

If two or more Periods of Liability apply such periods will not be cumulative.

## 4.    TIME ELEMENT EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to TIME ELEMENT loss:

This Policy does not insure:

A.    Any loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

    1)    physical loss or damage not insured by this Policy on or off of the insured **location**.

    2)    planned or rescheduled shutdown.

    3)    strikes or other work stoppage.

    4)    any other reason other than physical loss or damage insured under this Policy.

B.    Any increase in loss due to:

    1)    suspension, cancellation or lapse of any lease, contract, license or orders.

    2)    damages for breach of contract or for late or noncompletion of orders.

    3)    fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

    4)    any other consequential or remote loss.

C.    Any loss resulting from physical loss or damage to finished goods manufactured by the Insured, or the time required for their reproduction.

D.    Any loss resulting from the **actual cash value** portion of direct physical loss or damage by fire caused by or resulting from **terrorism**.

E.    Any loss resulting from loss or damage to SERVICE ANIMALS.

## 5.    TIME ELEMENT COVERAGE EXTENSIONS

This Policy also insures TIME ELEMENT loss, as provided by the TIME ELEMENT COVERAGES of this Policy, for the TIME ELEMENT COVERAGE EXTENSIONS described below.



**Account No.   1-35024**
**Policy No.   1048495**

## CYBER TIME ELEMENT COVERAGE EXTENSIONS

### A.   COMPUTER SYSTEMS NON PHYSICAL DAMAGE

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of interruption directly resulting from:

1)   the failure of the Insured's **electronic data processing equipment or media** to operate, provided that such failure is the direct result of a malicious act directed at the NAMED INSURED; or

2)   the Insured's reasonable action to temporarily protect the Insured's **electronic data processing equipment or media** against an actual or immediately impending malicious act directed at the NAMED INSURED, provided such action is necessary to prevent failure of the Insured's **electronic data processing equipment or media** to operate.

For the purposes of this Extension, the Insured's **electronic data processing equipment or media** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

As respects item 1 above, this Extension will apply when the period of interruption is in excess of 48 hours.

As used above, the period of interruption:

1)   is the period starting when the Insured's **electronic data processing equipment or media** fails to operate and ending when with due diligence and dispatch, the Insured's **electronic data processing equipment or media** could be restored to the same or equivalent operating condition that existed prior to the failure.

2)   does not include the additional time to make changes to the Insured's **electronic data processing equipment or media**.

### B.   OFF PREMISES DATA SERVICES TIME ELEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of interruption at an insured **location** of **off-premises data processing or data transmission services**, when the interruption is caused by any accidental event at the facilities of the provider of such services that immediately prevents in whole or in part the delivery of such provided services.

For the purposes of this Extension:

1)   facilities of the provider of **off-premises data processing or data transmission services** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine, and

2)   an accidental event to satellites will be considered an accidental event at the facilities of the provider.



**Account No.   1-35024**
**Policy No.   1048495**

This Extension will apply when the period of interruption of **off-premises data processing or data transmission services** is in excess of 24 hours.

Additional General Provisions:

1)  The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2)  The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Coverage provided in this Extension is excluded from coverage elsewhere in this Policy.

This Extension does not cover Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured covered by COMPUTER SYSTEMS NON PHYSICAL DAMAGE coverage as provided in this section of the Policy.

OFF PREMISES DATA SERVICES TIME ELEMENT Exclusions: As respects OFF PREMISES DATA SERVICES TIME ELEMENT, the following applies:

1)  Item B4 of the EXCLUSIONS clause in the PROPERTY DAMAGE section does not apply except for B4 with respect to:

    a)  incoming electricity, fuel, water, gas, steam or refrigerant; and

    b)  outgoing sewerage.

2)  The following additional exclusions apply:

    This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

    a)  **earth movement** for property located in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

    b)  **terrorism**.

As used above, the period of interruption of **off-premises data processing or data transmission services**:

1)  is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.



2) is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

3) does not extend to include the interruption of operations caused by any reason other than interruption of the provided service(s).

## SUPPLY CHAIN TIME ELEMENT COVERAGE EXTENSIONS

### A.    CIVIL OR MILITARY AUTHORITY

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location** provided such order is the direct result of physical damage of the type insured at the insured **location** or within five statute miles/eight kilometres of it.

For the purpose of this Extension only, State Gaming Control Board or Nevada Gaming Commission will also be considered a civil authority.

This Extension does not apply to LEASEHOLD INTEREST.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of such physical damage; but

2) not to exceed the time limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

### B.    CONTINGENT TIME ELEMENT EXTENDED

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured at **contingent time element locations** located within the TERRITORY of this Policy.

As respects CONTINGENT TIME ELEMENT EXTENDED:

1) Time Element loss recoverable under this Extension is extended to include the following TIME ELEMENT COVERAGE EXTENSIONS:

   CIVIL OR MILITARY AUTHORITY
   CONTINGENT TIME ELEMENT EXTENDED
   DELAY IN STARTUP



**Account No.   1-35024**
**Policy No.   1048495**

EXTENDED PERIOD OF LIABILITY
INGRESS/EGRESS
OFF PREMISES DATA SERVICES TIME ELEMENT
ON PREMISES SERVICES
SERVICE INTERRUPTION TIME ELEMENT

2)   The Insured will influence and cooperate with the **contingent time element location** in every way and take any reasonable and necessary action to mitigate the loss payable hereunder.

3)   TIME ELEMENT EXCLUSIONS C does not apply.

CONTINGENT TIME ELEMENT EXTENDED Exclusions: As respects CONTINGENT TIME ELEMENT EXTENDED, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1)   lack of incoming or outgoing transmission of voice, data or video.

2)   **earth movement** as respects a direct or indirect customer, supplier, contract manufacturer or contract service provider located in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

3)   physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence of loss.

## C.   INGRESS/EGRESS

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured **location**, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to property of the type insured.

INGRESS/EGRESS Exclusions: As respects INGRESS/EGRESS, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1)   lack of incoming or outgoing service consisting of electric, fuel, gas, water, steam, refrigerant, sewerage and voice, data or video.

2)   picketing or other action by strikers except for physical damage not excluded by this Policy.

3)   physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.



**Account No.   1-35024**
**Policy No.   1048495**

This Policy does not provide coverage under this Extension for more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

### D.   LOGISTICS EXTRA COST

This Policy covers the extra cost incurred by the Insured during the PERIOD OF LIABILITY due to the disruption of the **normal** movement of goods or materials:

1)   directly between insured **locations**; or

2)   directly between an insured **location** and a **location** of a direct customer, supplier, contract manufacturer or contract service provider to the Insured,

provided that such disruption is a direct result of physical loss or damage of the type insured to property of the type insured located within the TERRITORY of this Policy.

Measurement of Loss:

The recoverable extra cost loss will be the reasonable and necessary extra costs incurred by the Insured of the following:

1)   extra costs to temporarily continue as nearly **normal** as practicable the movement of goods or materials.

This Extension will apply when the PERIOD OF LIABILITY is in excess of 48 hours except 168 hours applies for **earth movement** and/or **flood** and/or **wind**.

LOGISTICS EXTRA COST Exclusions: As respects LOGISTICS EXTRA COST, the following additional exclusions apply:

This Policy does not insure:

1)   any loss resulting from disruption in the movement of goods or materials between **contingent time element locations**.

2)   any loss resulting from disruption of incoming or outgoing services consisting of electricity, gas, fuel, steam, water, refrigeration, sewerage and voice, data or video.

3)   any loss of income.

4)   costs that usually would have been incurred in conducting the business during the same period had there been no disruption of **normal** movement of goods or materials.

5)   costs of permanent repair or replacement of property that has been damaged or destroyed.



6) any expense recoverable elsewhere in this Policy.

7) any loss resulting from disruption caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

8) any loss resulting from disruption caused by loss or damage from **earth movement** in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

9) any loss resulting from disruption caused by physical loss or damage to personal property of the Insured while in transit.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of physical loss or damage causing the disruption of the **normal** movement of goods or materials directly between insured **locations**; or directly between the insured **location** and the **location** of the direct customer, supplier, contract manufacturer or contract service provider to the Insured, and

2) ending not later than:

   a) when with due diligence and dispatch the **normal** movement of goods or materials directly between insured **locations**; or directly between the insured **location** and the **location** of the direct customer, supplier, contract manufacturer or contract service provider to the Insured could be resumed; or

   b) the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

## E.   SERVICE INTERRUPTION TIME ELEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of service interruption at an insured **location** when the loss is caused by the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental event at the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable services.

This Extension will apply when the period of service interruption is in excess of 24 hours.

Additional General Provisions:

1) The Insured will immediately notify the suppliers of services of any interruption of such services.



2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

SERVICE INTERRUPTION TIME ELEMENT Exclusions: As respects SERVICE INTERRUPTION TIME ELEMENT, the following applies:

1) The exclusions in the EXCLUSIONS clause in the PROPERTY DAMAGE section do not apply except for:

   a) A1, A2, A3, A6, B1, B2, and

   b) B4 with respect to incoming or outgoing voice, data or video, and

   c) D1 except with respect to fungus, mold or mildew.

2) The following additional exclusions apply:

   This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a) **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

   b) **terrorism**.

As used above, the period of service interruption:

1) is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.

2) is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

3) does not extend to include the interruption of operations caused by any reason other than interruption of the specified service(s).

## ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS

### A.   ATTRACTION PROPERTY

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to an insured



**Account No.   1-35024**
**Policy No.   1048495**

**location** and is within 1 statute mile/1.6 kilometres of the insured **location**, except this coverage will apply to the McCarran International Airport.

ATTRACTION PROPERTY Exclusions: As respects ATTRACTION PROPERTY, the following additional exclusion applies:

This Policy does not insure loss resulting from:

1)  physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)  starting at the time of such physical damage; but

2)  not to exceed the time limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

**B.   CRISIS MANAGEMENT**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location**, provided such order is a direct result of:

1)  a violent crime, suicide, attempted suicide, or armed robbery; or

2)  a death or bodily injury caused by a workplace accident;

at such insured **location**.

For the purposes of this Extension only, a workplace accident shall be considered a sudden, fortuitous event that happens during working hours and arises out of work performed in the course and the scope of employment.

This Extension of coverage will apply when the PERIOD OF LIABILITY is in excess of 4 hours.

CRISIS MANAGEMENT Exclusions: As respects CRISIS MANAGEMENT, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:



1)   **terrorism**.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)   starting with the time the civil or military authority prohibits access; but

2)   not to exceed the time limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

## C.   DELAY IN STARTUP

GROSS EARNINGS and EXTRA EXPENSE are extended to cover the Actual Loss Sustained incurred by the Insured during the PERIOD OF LIABILITY due to the reasonable and necessary delay in startup of business operations directly resulting from physical loss or damage of the type insured to insured property under construction at an insured **location**.

## D.   EXTENDED PERIOD OF LIABILITY

The GROSS EARNINGS coverage is extended to cover the reduction in sales resulting from:

1)   the interruption of business as covered by GROSS EARNINGS;

2)   for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss happened; and

3)   commencing with the date on which the liability of the Company for loss resulting from interruption of business would terminate if this Extension had not been included in this Policy.

However, this Extension does not apply to GROSS EARNINGS loss resulting from physical loss or damage caused by or resulting from **terrorism**.

EXTENDED PERIOD OF LIABILITY Exclusions: As respects EXTENDED PERIOD OF LIABILITY, the TIME ELEMENT EXCLUSIONS B of this section does not apply and the following applies instead:

This Policy does not insure against any increase in loss due to damages for breach of contract or for late or noncompletion of orders, or fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

Coverage under this Extension for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the extended period of liability.



**Account No.   1-35024**
**Policy No.   1048495**

Coverage under this Extension does not apply for more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

## E.   GOODWILL AND PUBLIC RELATIONS

This Policy covers the reasonable and necessary extra cost incurred by the Insured to compensate or accommodate guests as a direct result of actual or immediately impending physical loss or damage of the type insured by this Policy at the insured **location** where the costs are incurred.

This Additional Coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

Measurement of Loss:

The recoverable extra cost loss will be the reasonable and necessary extra costs or loss incurred by the Insured of the following:

1)   extra costs or loss to transport and temporarily relocate guests, payments to guests for inconvenience or annoyance, removing or forgiving guest charges, and providing complimentary room, dining, shows, spa services, or other amenities, not to exceed the limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

GOODWILL AND PUBLIC RELATIONS Exclusions:  As respects GOODWILL AND PUBLIC RELATIONS, the following additional exclusions apply:

This Policy does not insure:

1)   any loss resulting from disruption of incoming or outgoing services consisting of electricity, gas, fuel, steam, water, refrigeration, sewerage and voice, data or video.

2)   any loss of income.

3)   costs that usually would have been incurred in conducting the business during the same period had there been no disruption of **normal** guest services.

4)   any expense recoverable elsewhere in this Policy.

5)   any loss resulting from disruption caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

## F.   INTERRUPTION BY COMMUNICABLE DISEASE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1)   an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

Advantage - GENA - US - 2016  ©2017 FM Global. All rights reserved



**Account No.   1-35024**
**Policy No.   1048495**

2)   a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such **location** with the actual not suspected presence of **communicable disease**.

This Extension will apply when access to such **location** is limited, restricted, or prohibited in excess of 48 hours.

INTERRUPTION BY COMMUNICABLE DISEASE Exclusions: As respects INTERRUPTION BY COMMUNICABLE DISEASE, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1)   the enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.

2)   loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any sequence of loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)   starting at the time of the order of the authorized governmental agency or the Officer of the Insured; but

2)   not to exceed the time limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

### G.   ON PREMISES SERVICES

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to the following property located within 1,000 feet/300 metres of the insured **location**:

1)   Electrical equipment and equipment used for the transmission of voice, data or video.

2)   Electrical, fuel, gas, water, steam, refrigeration, sewerage, voice, data or video transmission lines.



**Account No.   1-35024**
**Policy No.   1048495**

### H.   PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT

This Policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.

This Extension does not cover the Actual Loss Sustained by the Insured to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by TERRORISM coverage as provided in the PROPERTY DAMAGE section.

This Extension is subject to the deductible provisions that would have applied had the physical loss or damage happened.

### I.   RELATED REPORTED VALUES

If reported TIME ELEMENT values include:

1)   **locations** used by the Insured (such as branch stores, sales outlets and other plants) but not listed on a schedule under this Policy; and

2)   a TIME ELEMENT loss would result at such **locations**,

3)   from insured physical loss or damage at an insured **location**,

then this Policy provides coverage for such resulting TIME ELEMENT loss in accordance with the coverage applicable at such insured **location**.

### J.   RESEARCH AND DEVELOPMENT

The GROSS EARNINGS coverage is extended to insure the Actual Loss Sustained by the Insured of continuing fixed charges and Ordinary Payroll directly attributable to the interruption of research and development activities that in themselves would not have produced income during the PERIOD OF LIABILITY.

The PERIOD OF LIABILITY for this Extension will be the period from the time of direct physical loss or damage of the type insured to the time when the property could be repaired or replaced and made ready for operations, except Ordinary Payroll shall not exceed the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.  Such period of time shall not be limited by the date of expiration of this Policy.

### K.   SOFT COSTS

This Policy covers the Actual Loss Sustained incurred by the Insured of **soft costs** during the PERIOD OF LIABILITY arising out of the delay of completion of buildings and additions



**Account No.   1-35024**
**Policy No.   1048495**

under construction directly resulting from physical loss or damage of the type insured to insured property under construction at an insured **location**.



**Account No.   1-35024**
**Policy No.   1048495**

**LOSS ADJUSTMENT AND SETTLEMENT**

**1.    REQUIREMENTS IN CASE OF LOSS**

The Insured will:

1)    give immediate written notice to the Company of any loss.

2)    protect the property from further loss or damage.

3)    promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, **actual cash value**, replacement value and amount of loss claimed.

4)    give a signed and sworn proof of loss to the Company within 90 days after the loss, unless that time is extended in writing by the Company.  The proof of loss must state the knowledge and belief of the Insured as to:

   a)   the time and origin of the loss.

   b)   the Insured's interest and that of all others in the property.

   c)   the **actual cash value** and replacement value of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property.

   d)   any changes in the title, use, occupation, location, possession or exposures of the property since the effective date of this Policy.

   e)   by whom and for what purpose any **location** insured by this Policy was occupied on the date of loss, and whether or not it then stood on leased ground.

5)    include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged.

6)    further, the Insured, will as often as may be reasonably required:

   a)   exhibit to any person designated by the Company all that remains of any property;

   b)   submit to examination under oath by any person designated by the Company and sign the written records of examinations; and

   c)   produce for examination at the request of the Company:

      (i)   all books of accounts, business records, bills, invoices and other vouchers; or

      (ii)  certified copies if originals are lost,



at such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made.

## 2.   CURRENCY FOR LOSS PAYMENT

Losses will be adjusted and paid in the currency of the United States of America, except in Canada where losses will be paid in Canadian currency, unless directed otherwise by the Insured.

## 3.   PARTIAL PAYMENT OF LOSS SETTLEMENT

In the event of insured physical loss or damage determined by the Company's representatives to be in excess of the applicable Policy deductible, the Company will advance mutually agreed upon partial payment(s), subject to the Policy's provisions.  To obtain such partial payments, the Insured will submit a signed and sworn Proof of Loss as described in this Policy, with adequate supporting documentation.

## 4.   COLLECTION FROM OTHERS

The Company will not be liable for any loss to the extent that the Insured has collected for such loss from others.

## 5.   SUBROGATION

The Insured is required to cooperate in any subrogation proceedings.  The Company may require from the Insured an assignment or other transfer of all rights of recovery against any party for loss to the extent of the Company's payment.

The Company will not acquire any rights of recovery that the Insured has expressly waived prior to a loss, nor will such waiver affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by the Company in such proceedings, will be payable to the Insured in the proportion that the amount of:

1)      any applicable deductible; and/or

2)      any provable uninsured loss,

bears to the entire provable loss amount.

## 6.   COMPANY OPTION

The Company has the option to take all or any part of damaged property at the agreed or appraised value.  The Company must give notice to the Insured of its intention to do so within 30 days after receipt of Proof of Loss.

## 7.   ABANDONMENT

There may be no abandonment of any property to the Company.

Advantage - GENA - US - 2016  ©2017 FM Global. All rights reserved



**Account No.   1-35024**
**Policy No.   1048495**

8.    **APPRAISAL**

If the Insured and the Company fail to agree on the amount of loss, each will, on the written demand of either, select a competent and disinterested appraiser after:

1)    the Insured has fully complied with all provisions of this Policy, including REQUIREMENTS IN CASE OF LOSS; and

2)    the Company has received a signed and sworn Proof of Loss from the Insured.

Each will notify the other of the appraiser selected within 20 days of such demand.

The appraisers will first select a competent and disinterested umpire.  If the appraisers fail to agree upon an umpire within 30 days then, on the request of the Insured or the Company, the umpire will be selected by a judge of a court of record in the jurisdiction in which the appraisal is pending.  The appraisers will then appraise the amount of loss, stating separately the **actual cash value** and replacement cost value as of the date of loss and the amount of loss, for each item of physical loss or damage or if, for TIME ELEMENT loss, the amount of loss for each TIME ELEMENT coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire.  An award agreed to in writing by any two will determine the amount of loss.

The Insured and the Company will each:

1)    pay its chosen appraiser; and

2)    bear equally the other expenses of the appraisal and umpire.

A demand for APPRAISAL shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under REQUIREMENTS IN CASE OF LOSS.

The Company will not be held to have waived any of its rights by any act relating to appraisal.

9.    **SUIT AGAINST THE COMPANY**

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless:

1)    the Insured has fully complied with all the provisions of this Policy; and

2)    legal action is started within twelve months after inception of the loss.

If under the insurance laws of the jurisdiction in which the property is located, such twelve months' limitation is invalid, then any such legal action must be started within the shortest limit of time permitted by such laws.



## 10.   SETTLEMENT OF CLAIMS

The amount of loss for which the Company may be liable will be paid within 30 days after:

A.     proof of loss as described in this Policy is received by the Company; and

B.     when a resolution of the amount of loss is made either by:

    1)   written agreement between the Insured and the Company; or

    2)   the filing with the Company of an award as provided in the APPRAISAL clause of this section.



**Account No.   1-35024**
**Policy No.   1048495**

## GENERAL PROVISIONS

1. **CANCELLATION/NON-RENEWAL**

This Policy may be:

A.   cancelled at any time at the request of the Insured by surrendering this Policy to the Company or by giving written notice to the Company stating when such cancellation will take effect; or

B.   cancelled by the Company by giving the Insured not less than:

    1)   60 days' written notice of cancellation; or

    2)   10 days' written notice of cancellation if the Insured fails to remit, when due, payment of premium for this Policy; or

C.   non-renewed by the Company by giving the Insured not less than 60 days' written notice of non-renewal.

Return of any unearned premium will be calculated on the customary short rate basis if the Insured cancels and on a pro-rata basis if the Company cancels this Policy.  Return of any unearned premium will be made by the Company as soon as practicable.

2. **INSPECTIONS**

The Company, at all reasonable times, will be permitted, but will not have the duty, to inspect insured property.  The Company does not address life, safety or health issues.

The Company's:

A.   right to make inspections;

B.   making of inspections; or

C.   providing recommendations or other information in connection with any inspections,

will not constitute an undertaking, on behalf of or for the benefit of the Insured or others.  The Company will have no liability to the Insured or any other person because of any inspection or failure to inspect.

When the Company is not providing jurisdictional inspections, the Owner/Operator has the responsibility to assure that jurisdictional inspections are performed as required, and to assure that required jurisdictional Operating Certificates are current for their pressure equipment.



3.    **PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS**

    A.    If the provisions of this Policy conflict with the laws of any jurisdictions in which this Policy applies, and if certain provisions are required by law to be stated in this Policy, this Policy will be read so as to eliminate such conflict or deemed to include such provisions for insured **locations** within such jurisdictions.

    B.    The Company will provide to the Insured copies of endorsements mandated for use by the laws of provinces in Canada.  The endorsements modify this Policy with respect to any insured property located in the province in which the endorsement applies.

    C.    The Company will provide to the Insured copies of endorsements mandated for use by the laws of states in the United States of America.  The endorsements modify this Policy with respect to any insured property located in the state in which the endorsement applies.

    D.    As respects the United States, its territories and possessions and the Commonwealth of Puerto Rico, the definition of **terrorism** is declared null and void and it is agreed that an event defined as a Certified Act of Terrorism under the terms of the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) attached to this Policy shall be considered an act of **terrorism** within the terms of this Policy.  Coverage recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) is excluded from any other coverage under this Policy. Any difference in limit between loss recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) and this Policy is not recoverable under this Policy.

4.    **LIBERALIZATION**

If during the period that insurance is in force under this Policy, any filed rules or regulations affecting the same are revised by statute so as to broaden the insurance without additional premium charge, such extended or broadened insurance will inure to the benefit of the Insured within such jurisdiction, effective the date of the change specified in such statute.

5.    **MISREPRESENTATION AND FRAUD**

    This entire Policy will be void if, whether before or after a loss, an Insured has:

    A.    willfully concealed or misrepresented any material fact or circumstance concerning this insurance, the subject thereof, any insurance claim, or the interest of an Insured.

    B.    made any attempt to defraud the Company.

    C.    made any false swearing.

6.    **LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS**

    A.    The Company will pay for loss to specified property insured under this Policy to each specified Lender Loss Payee (hereinafter referred to as Lender) as its interest may appear,

Advantage - GENA - US - 2016  ©2017 FM Global. All rights reserved



and to each specified Mortgagee as its interest may appear, under all present or future mortgages upon such property, in order of precedence of the mortgages.

B.   The interest of the Lender or Mortgagee (as the case may be) in property insured under this Policy will not be invalidated by:

    1)   any act or neglect of the debtor, mortgagor, or owner (as the case may be) of the property.

    2)   foreclosure, notice of sale, or similar proceedings with respect to the property.

    3)   change in the title or ownership of the property.

    4)   change to a more hazardous occupancy.

The Lender or Mortgagee will notify the Company of any known change in ownership, occupancy, or hazard and, within 10 days of written request by the Company, may pay the increased premium associated with such known change.  If the Lender or Mortgagee fails to pay the increased premium, all coverage under this Policy will cease.

C.   If this Policy is cancelled at the request of the Insured or its agent, the coverage for the interest of the Lender or Mortgagee will terminate 10 days after the Company sends to the Lender or Mortgagee written notice of cancellation, unless:

    1)   sooner terminated by authorization, consent, approval, acceptance, or ratification of the Insured's action by the Lender or Mortgagee, or its agent.

    2)   this Policy is replaced by the Insured, with a policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement policy, notwithstanding any other provision of this Policy.

D.   The Company may cancel this Policy and/or the interest of the Lender or Mortgagee under this Policy, by giving the Lender or Mortgagee written notice 60 days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment.  If the debtor, mortgagor, or owner has failed to pay any premium due under this Policy, the Company may cancel this Policy for such non-payment, but will give the Lender or Mortgagee written notice 10 days prior to the effective date of cancellation.  If the Lender or Mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this Policy will cease.

E.   The Company has the right to invoke this Policy's SUSPENSION clause.  The suspension of insurance will apply to the interest of the Lender or Mortgagee in any machine, vessel, or part of any machine or vessel, subject to the suspension.  The Company will provide the Lender or Mortgagee at the last known address a copy of the suspension notice.

F.   If the Company pays the Lender or Mortgagee for any loss, and denies payment to the debtor, mortgagor or owner, the Company will, to the extent of the payment made to the Lender or Mortgagee be subrogated to the rights of the Lender or Mortgagee under all



securities held as collateral to the debt or mortgage.  No subrogation will impair the right of the Lender or Mortgagee to sue or recover the full amount of its claim.  At its option, the Company may pay to the Lender or Mortgagee the whole principal due on the debt or mortgage plus any accrued interest.  In this event, all rights and securities will be assigned and transferred from the Lender or Mortgagee to the Company, and the remaining debt or mortgage will be paid to the Company.

G.    If the Insured fails to render proof of loss, the Lender or Mortgagee, upon notice of the Insured's failure to do so, will render proof of loss within 60 days of notice and will be subject to the provisions of this Policy relating to APPRAISAL, SETTLEMENT OF CLAIMS, and SUIT AGAINST THE COMPANY.

H.    Other provisions relating to the interests and obligations of the Lender or Mortgagee may be added to this Policy by agreement in writing.

## 7.    OTHER INSURANCE

A.    If there is any other insurance that would apply in the absence of this Policy, this Policy will apply only after such insurance whether collectible or not.

B.    In no event will this Policy apply as contributing insurance.

C.    The Insured is permitted to have other insurance over any limits or sublimits of liability specified elsewhere in this Policy without prejudice to this Policy.  The existence of any such insurance will not reduce any limit or sublimit of liability in this Policy.  Any other insurance that would have provided primary coverage in the absence of this Policy will not be considered excess.

D.    The Insured is permitted to have other insurance for all, or any part, of any deductible in this Policy.  The existence of such other insurance will not prejudice recovery under this Policy. If the limits of liability of such other insurance are greater than this Policy's applicable deductible, this Policy's insurance will apply only after such other insurance has been exhausted.

E.    If this Policy is deemed to contribute with other insurance, the limit of liability applicable at each **location**, for the purposes of such contribution with other insurers, will be the latest amount described in this Policy or the latest **location** value on file with the Company.

## 8.    POLICY MODIFICATION

This Policy contains all of the agreements between the Insured and the Company concerning this insurance.  The Insured and the Company may request changes to this Policy.  This Policy can be changed only by endorsements issued by the Company and made a part of this Policy.

Notice to any agent or knowledge possessed by any agent or by any other person will not:

A.    create a waiver, or change any part of this Policy; or

B.    prevent the Company from asserting any rights under the provisions of this Policy.



## 9.   REDUCTION BY LOSS

Claims paid under this Policy will not reduce its limit of liability, except claims paid will reduce any **aggregate during any policy year** limit.

## 10.   SUSPENSION

On discovery of a dangerous condition, the Company may immediately suspend this insurance on any machine, vessel or part thereof by giving written notice to the Insured.  The suspended insurance may be reinstated by the Company.  Any unearned premium resulting from such suspension will be returned by the Company.

## 11.   TITLES

The titles in this Policy are only for reference.  The titles do not in any way affect the provisions of this Policy.

## 12.   ASSIGNMENT

Assignment of this Policy will not be valid except with the written consent of the Company.

## 13.   DEFINITIONS

The following terms when appearing in **boldface** in this Policy mean:

**actual cash value**:
the amount it would cost to repair or replace insured property, on the date of loss, with material of like kind and quality, with proper deduction for obsolescence and physical depreciation.

**aggregate during any policy year**:
the Company's maximum amount payable during any policy year.

**communicable disease**:
disease which is:

A.   transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or

B.   Legionellosis.

**contaminant**:
anything that causes **contamination**.

**contamination**:
any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.



**contingent time element location**:
A.    any **location**:

    1)    of a direct customer, supplier, contract manufacturer or contract service provider to the Insured;

    2)    of any company under a royalty, licensing fee or commission agreement with the Insured;

B.    any **location** of a company that is a direct or indirect customer, supplier, contract manufacturer or contract service provider to a **location** described in A1 above,

not including **locations** of any company directly or indirectly supplying to, or receiving from, the Insured, electricity, fuel, gas, water, steam, refrigeration, sewage, voice, data or video.

**date or time recognition**:
the recognition, interpretation, calculation, comparison, differentiation, sequencing, accessing or processing of data involving one or more dates or times, including the Year 2000.

**earth movement**:
any natural or man-made earth movement including, but not limited to earthquake or landslide, regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical loss or damage by fire, explosion, sprinkler leakage, or **flood** resulting from **earth movement** will not be considered to be loss by **earth movement** within the terms and conditions of this Policy.

**electronic data processing equipment or media**:
any computer, computer system or component, hardware, network, microprocessor, microchip, integrated circuit or similar devices or components in computer or non-computer equipment, operating systems, data, programs or other software stored on electronic, electro-mechanical, electro-magnetic data processing or production equipment, whether the property of the Insured or not.

**fine arts**:
paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft, money, securities.

**flood**:
flood; surface waters; rising waters; storm surge, sea surge, wave wash; waves; tsunami; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; all whether driven by wind or not; or sewer back-up resulting from any of the foregoing; regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss.  Physical loss or damage from **flood** associated with a storm or weather disturbance whether or not identified by name by any meteorological authority, is considered to be **flood** within the terms of this Policy. However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **flood** is not considered to be loss by **flood** within the terms and conditions of this Policy.

Advantage - GENA - US - 2016  ©2017 FM Global. All rights reserved



**irreplaceable**:
an item which cannot be replaced with other of like kind and quality.

**location**:

A.     as specified in the Schedule of Locations, or

B.     if not so specified in the Schedule of Locations:

    1)     a building, yard, dock, wharf, pier or bulkhead (or any group of the foregoing),

        a)     bounded on all sides by public streets, clear land space or open waterways, each not less than 50 feet/15 metres wide.  Any bridge or tunnel crossing such street, space or waterway will render such separation inoperative for the purpose of this definition.

**New Madrid Seismic Zone**:
Arkansas, United States of America, counties of:
Arkansas, Clay, Craighead, Crittenden, Cross, Fulton, Greene, Independence, Izard, Jackson, Lawrence, Lee, Lonoke, Mississippi, Monroe, Phillips, Poinsett, Prairie, Randolph, Sharp, St. Francis, White, Woodruff

Illinois, United States of America, counties of:
Alexander, Bond, Clay, Clinton, Crawford, Edwards, Effingham, Fayette, Franklin, Gallatin, Hamilton, Hardin, Jackson, Jasper, Jefferson, Johnson, Lawrence, Madison, Marion, Massac, Monroe, Perry, Pope, Pulaski, Randolph, Richland, Saline, St. Clair, Union, Wabash, Washington, Wayne, White, Williamson

Indiana, United States of America, counties of:
Gibson, Knox, Pike, Posey, Spencer, Vanderburgh, Warrick

Kentucky, United States of America, counties of:
Ballard, Caldwell, Calloway, Carlisle, Christian, Crittenden, Daviess, Fulton, Graves, Henderson, Hickman, Hopkins, Livingston, Lyon, Marshall, McCracken, McLean, Muhlenberg, Todd, Trigg, Union, Webster

Mississippi, United States of America, counties of:
Alcorn, Benton, Coahoma, De Soto, Lafayette, Marshall, Panola, Quitman, Tate, Tippah, Tunica

Missouri, United States of America, counties of:
Bollinger, Butler, Cape Girardeau, Carter, Dunklin, Iron, Jefferson, Madison, Mississippi, New Madrid, Oregon, Pemiscot, Perry, Reynolds, Ripley, Scott, Shannon, St. Francois, St. Louis, City of St. Louis, Ste. Genevieve, Stoddard, Washington, Wayne

Tennessee, United States of America, counties of:
Benton, Carroll, Chester, Crockett, Decatur, Dyer, Fayette, Gibson, Hardeman, Hardin, Haywood, Henderson, Henry, Houston, Humphreys, Lake, Lauderdale, Madison, McNairy, Montgomery, Obion, Perry, Shelby, Stewart, Tipton, Weakley



Account No.   1-35024
Policy No.   1048495

**normal**:
the condition that would have existed had no physical loss or damage happened.

**normal cost**:
the cost associated with the movement of goods or materials suffering the disruption that the Insured would have incurred had no physical loss or damage causing disruption happened.

**occurrence**:
the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by one discrete event of physical loss or damage, except as respects the following:

A. **terrorism**: **occurrence** shall mean the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by all acts of **terrorism** during a continuous period of seventy-two (72) hours.

B. **earth movement**: **occurrence** shall mean the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by all **earth movement(s)** during a continuous period of seventy-two (72) hours.

**off-premises data processing or data transmission services**:
the storage or processing of data performed off-premises of the Insured's property, including the transmission of voice, data or video over a single, or combination of, computer or communication networks.

**Pacific Northwest Seismic Zone**:
Oregon, United States of America, counties of:
Benton, Clackamas, Clatsop, Columbia, Coos, Curry, Douglas, Hood River, Jackson, Josephine, Klamath, Lane, Lincoln, Linn, Marion, Multnomah, Polk, Tillamook, Washington, Yamhill

Washington, United States of America, counties of:
Chelan, Clallam, Clark, Cowlitz, Grays Harbor, Island, Jefferson, King, Kitsap, Kittitas, Lewis, Mason, Pacific, Pierce, San Juan, Skagit, Skamania, Snohomish, Thurston, Wahkiakum, Whatcom

British Columbia (includes Vancouver Island), Canada:
South of 50° N latitude and west of 120° W longitude

**period of operational testing**:
the period of time beginning 24 hours prior to the earlier of the following:

A. introduction, into a system, of feedstock or other materials for processing or handling;

B. commencement of fuel or energy supply to a system,

and ending with the earlier of the following:

A. the expiration date or cancellation date of this Policy.



B.      if specified, the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

**physical loss or damage to electronic data, programs or software**:
the destruction, distortion or corruption of electronic data, programs or software.

**representative company(ies)**:
Factory Mutual Insurance Company, FM Insurance Company Limited or FM Insurance Europe S.A.; Affiliated FM Insurance Company; Appalachian Insurance Company or any other company issuing a local policy at the direction of the Company.

**soft costs**:
costs over and above those that are **normal** at an insured **location** undergoing renovation or in the course of construction, limited to the following:

A.      construction loan fees - the additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction including; the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, charges by the lenders for the extension or renewal of loans necessary.

B.      commitment fees, leasing and marketing expenses - the cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of re-leasing and marketing due to loss of tenant(s) or purchaser(s).

C.      additional fees for architects, engineers, consultants, attorneys and accountants needed for the completion of construction, repairs or reconstruction.

D.      property taxes, building permits, additional interest on loans, realty taxes and insurance premiums.

**terrorism**:
any act, involving the use or threat of: force, violence, dangerous conduct, interference with the operations of any business, government or other organization or institution, or any similar act,

when the effect or apparent purpose is:

A.      to influence or instill fear in any government (de jure or de facto) or the public, or any segment of either; or

B.      to further or to express support for, or opposition to, any political, religious, social, ideological or similar type of objective or position.

**transmission and distribution systems**:
transmission and distribution systems including but not limited to electricity, gas, fuel, steam, water, refrigeration, sewerage, voice, data, and video.  Such systems shall include poles, towers and fixtures, overhead conductors and devices, underground and underwater conduit, underground and underwater conductors and devices, line transformers, service meters, street lighting and signal systems.



**Account No.  1-35024**
**Policy No.  1048495**

**valuable papers and records**:
written, printed or otherwise inscribed documents and records, including books, maps, films, drawings, abstracts, deeds, mortgages and manuscripts, all of which must be of value to the Insured.

**wind**:
direct action of wind including substance driven by wind.  **Wind** does not mean or include anything defined as **flood** in this Policy.



**Account No. 1-35024**
**Policy No. 1048495**

## SCHEDULE OF LOCATIONS, APPENDIX A

| Location No. | Index No. | Location Description |
|---|---|---|
| 0001 | 079312.84 | 3131 and 3121 Las Vegas Boulevard S<br>Las Vegas Nevada 89109-1967<br>United States of America<br>Clark<br><br>Wynn Las Vegas and Encore at Wynn Las Vegas |
| 0005 | 079311.62 | 3720 Howard Hughes Pkwy<br>Las Vegas Nevada 89169-6016<br>United States of America<br>Clark<br><br>Office |
| 0008 | 001383.42 | 3661 W Martin Avenue<br>Las Vegas Nevada 89118-4556<br>United States of America<br>Clark<br><br>Warehouse - Off-site - Retail Operations (WDD/Angel Fragoso/Laura Herzog) |
| 0012 | 079301.53 | 181 E Reno Avenue, Hanger G-7<br>Las Vegas Nevada 89119-1138<br>United States of America<br>Clark<br><br>Hangar G-7 |
| 0015 | 002073.25 | 225 W Valley Boulevard, Suite H-188<br>San Gabriel California 91776-3724<br>United States of America<br>Los Angeles<br><br>Marketing Office |
| 0016 | 002220.67 | 734 Pilot Rd<br>Las Vegas Nevada 89119-4416<br>United States of America<br>Clark<br><br>Office, Wynn Design and Development |
| 0017 | 002220.67 | 736 Pilot Rd<br>Las Vegas Nevada 89119-4416<br>United States of America<br>Clark<br><br>Wynn Design and Development files, fabric samples, and offices/cubicles - Off-site |

WR_FM Policies_079
079



**Account No. 1-35024**
**Policy No. 1048495**

## SCHEDULE OF LOCATIONS, APPENDIX A

| Location No. | Index No. | Location Description |
|---|---|---|
| 0018 | 002220.67 | 740 Pilot Rd<br>Las Vegas Nevada 89119-4416<br>United States of America<br>Clark<br><br>Office, Information Technology, Risk Management, Internal Audit, Information Technology Equipment |
| 0020 | 002635.50 | 3848 Koval Lane<br>Las Vegas Nevada 89109<br>United States of America<br>Clark<br><br>Wynn Design & Development - Flex Building |
| 0022 | 003080.45 | 101 Station Landing<br>Medford Massachusetts 02155-5134<br>United States of America<br>Middlesex<br><br>Office Space |
| 0023 | 079301.53 | 177 E Reno Avenue Ste G6<br>Las Vegas Nevada 89119-1162<br>United States of America<br>Clark<br><br>Hangar G-6 |
| 0025 | 003288.59 | 3 Charlton St<br>Everett Massachusetts 02149-2405<br>United States of America<br>Middlesex<br><br>Office Space |

WR_FM Policies_080
080



Account No. 1-35024
Policy No. 1048495

## NAMED FLOOD LOCATIONS, APPENDIX B

| Location No. | Index No. | Location Description |
|---|---|---|
| 0001 | 079312.84 | 3131 and 3121 Las Vegas Boulevard S<br>Las Vegas Nevada 89109-1967<br>United States of America<br>Clark<br><br>Wynn Las Vegas and Encore at Wynn Las Vegas |
| 0005 | 079311.62 | 3720 Howard Hughes Pkwy<br>Las Vegas Nevada 89169-6016<br>United States of America<br>Clark<br><br>Office |
| 0008 | 001383.42 | 3661 W Martin Avenue<br>Las Vegas Nevada 89118-4556<br>United States of America<br>Clark<br><br>Warehouse - Off-site - Retail Operations (WDD/Angel Fragoso/Laura Herzog) |
| 0012 | 079301.53 | 181 E Reno Avenue, Hanger G-7<br>Las Vegas Nevada 89119-1138<br>United States of America<br>Clark<br><br>Hangar G-7 |
| 0015 | 002073.25 | 225 W Valley Boulevard, Suite H-188<br>San Gabriel California 91776-3724<br>United States of America<br>Los Angeles<br><br>Marketing Office |
| 0016 | 002220.67 | 734 Pilot Rd<br>Las Vegas Nevada 89119-4416<br>United States of America<br>Clark<br><br>Office, Wynn Design and Development |
| 0017 | 002220.67 | 736 Pilot Rd<br>Las Vegas Nevada 89119-4416<br>United States of America<br>Clark<br><br>Wynn Design and Development files, fabric samples, and offices/cubicles - Off-site |



Account No. 1-35024
Policy No. 1048495

**NAMED FLOOD LOCATIONS, APPENDIX B**

| Location No. | Index No. | Location Description |
|---|---|---|
| 0018 | 002220.67 | 740 Pilot Rd<br>Las Vegas Nevada 89119-4416<br>United States of America<br>Clark<br><br>Office, Information Technology, Risk Management, Internal Audit, Information Technology Equipment |
| 0020 | 002635.50 | 3848 Koval Lane<br>Las Vegas Nevada 89109<br>United States of America<br>Clark<br><br>Wynn Design & Development - Flex Building |
| 0022 | 003080.45 | 101 Station Landing<br>Medford Massachusetts 02155-5134<br>United States of America<br>Middlesex<br><br>Office Space |
| 0023 | 079301.53 | 177 E Reno Avenue Ste G6<br>Las Vegas Nevada 89119-1162<br>United States of America<br>Clark<br><br>Hangar G-6 |
| 0025 | 003288.59 | 3 Charlton St<br>Everett Massachusetts 02149-2405<br>United States of America<br>Middlesex<br><br>Office Space |

WR_FM Policies_082<br>082



**Account No. 1-35024**
**Policy No. 1048495**

## SERVICE ANIMALS, APPENDIX C

<u>**Description**</u>

Harley
Male
Labrador Retriever
DOB: 4/15/09

Rocket
Male
Labrador Retriever
DOB: 8/7/14

Bob
Male
Springer Spaniel
DOB: 11/21/12

Umit
Male
Belgian Malinois/German Shepherd
DOB: 4/24/15

Buddy
Male
German Shepherd
DOB: 1/5/15

Maxx
Male English Springer Spaniel
DOB: 11/29/13

Astor
Male
German Shepherd
DOB: 8/26/12

Scamp
Male
Labrador Retriever
DOB: 1/1/15

Mint
Female
Springer Spaniel
DOB: 2/10/15

WR_FM Policies_083
083



Account No. 1-35024
Policy No. 1048495

**SERVICE ANIMALS, APPENDIX C**

<u>**Description**</u>

Rocky
Male
Labrador Retriever
DOB:  1/11/15

Robbie
Male
German Shepherd Mix
DOB:  10/20/15

Marko
Male
German Shepherd
DOB:  9/12/17

WR_FM Policies_084
084

**Account No. 1-35024**
**Policy No. 1048495**

# SUPPLEMENTAL UNITED STATES
# CERTIFIED ACT OF TERRORISM ENDORSEMENT

**This Endorsement is applicable to all insured Locations in the United States, its territories and possessions and the Commonwealth of Puerto Rico.**

**Coverage for "Certified Act of Terrorism" Under The Terrorism Risk Insurance Act of 2002, as amended.**

In consideration of a premium charged of USD**235,848**, this Policy, subject to the terms and conditions therein and in this Endorsement, covers direct physical loss or damage to insured property and any resulting TIME ELEMENT loss, as provided in the TIME ELEMENT section of the Policy, caused by or resulting from a Certified Act of Terrorism as defined herein.

Notwithstanding anything contained elsewhere in this Policy, any exclusion or limitation of terrorism in this Policy and any endorsement attached to and made a part of this Policy, is hereby amended to the effect that such exclusion or limitation does not apply to a "Certified Act of Terrorism" as defined herein. This amendment does not apply to any limit of liability for a Certified Act of Terrorism, if any, stated under the LIMITS OF LIABILITY clause of the DECLARATIONS section of this Policy.

With respect to any one or more Certified Act(s) of Terrorism, this Company will not pay any amounts for which the Company is not responsible under the terms of the Terrorism Risk Insurance Act of 2002 (including subsequent action of Congress pursuant to the Act) which includes a provision stating that if the aggregate insured losses exceed USD100,000,000,000 during any calendar year, neither the United States Government nor any insurer that has met its insurer deductible shall be liable for the payment of any portion of the amount of such losses that exceed USD100,000,000,000.  If the aggregate insured losses for all insurers exceed USD100,000,000,000, your coverage may be reduced.

The coverage provided under this Endorsement for "Certified" losses caused by acts of terrorism will be partially reimbursed by the United States Government under a formula established by Federal Law. Under this formula, the United States pays 85% (and beginning on January 1, 2016, shall then decrease by 1 percentage point per calendar year until equal to 80 percent) of covered terrorism losses exceeding a statutorily established retention by the insurer referenced in this Policy.  The premium charged for this coverage is provided above.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Endorsement or the Policy.

The coverage provided by this Endorsement only applies to a Certified Act of Terrorism.

Reference and Application:  The following term(s) means:

Certified Act of Terrorism:

A "Certified Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002 as amended and

**Form FMG7308**                    Page 1 of 2                    Edition January 2015

extended in 2005, 2007, and in 2015.  The criteria contained in that Act for a "Certified Act of Terrorism" include the following:

    a.   The act resulted in aggregate losses in excess of USD5,000,000; and

    b.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.



**Account No. 1-35024**
**Policy No. 1048495**

## CYBER OPTIMAL RECOVERY ENDORSEMENT

It is agreed that this Endorsement is a part of the Policy and that the terms and conditions of the Policy are amended as described herein.  All other terms and conditions of the Policy remain unchanged.

INSURED OPTION:

The Insured acknowledges having purchased a cyber policy.

As respects loss or damage that is covered by both this Policy and the cyber policy, and notwithstanding anything contained in the OTHER INSURANCE clause in the GENERAL PROVISIONS section of this Policy, the Insured may elect, within 180 days of notifying this Company of the loss, to apportion the loss between this Policy and the cyber policy and to designate this Policy as primary, excess or contributing insurance to the cyber policy with respect to each portion of the loss, provided designating it as such is necessary to maximize the total indemnity available for the loss under both this Policy and the cyber policy.

This election option shall be subject to the following additional conditions:

ADDITIONAL CONDITIONS

1)   The Insured will provide this Company with a copy of any cyber policy in force at the time of loss.

2)   Any coverage provided by the cyber policy that is not provided by this Policy does not extend to this Policy.

3)   The insolvency, inability or unwillingness to pay of the company issuing the cyber policy shall in no event increase this Company's liability or delay settlement under this Policy.

WR_FM Policies_087
087

## GENERAL CHANGE ENDORSEMENT NO.  001

**Account No.   1-35024**
**Policy No.   1048495**

**Insured:  Wynn Resorts, Limited**

**This Endorsement is attached to and forms a part of the above stated Policy.  Premium for this Endorsement, if any, and the future installment amount are stated elsewhere.**

Effective:        15 June, 2019

1)    The following locations are added to the Schedule of Locations:

| Location No. | Index No. | Location Description |
|---|---|---|
| 0024 | 002995.48 | 1 Broadway<br>Everett, Massachusetts, 02149<br>United States of America<br>Middlesex |
| 0035 | 012554.98 | 80 Broadway<br>Everett, Massachusetts, 02149<br>United States of America<br>Middlesex |

2)    The following limit is added under Applicable Limits of Liability/Time Limits under the LIMITS OF LIABILITY clause in the DECLARATIONS section:

| Location No. 0024, 1 Broadway, Everett, Massachusetts, 02149 | USD1,500,000,000 |
|---|---|

3)    The following deductible is added under the DEDUCTIBLES clause in the DECLARATIONS section:

| **wind** | As respects locations in **wind areas United States Northeast**<br><br>USD250,000 combined all coverages, per **location** |
|---|---|

4)    Item M. under the EXCLUDED PROPERTY clause in the PROPERTY DAMAGE section is deleted.

5)    The following is added under the DEFINITIONS clause in the GENERAL PROVISIONS section:

**wind areas United States Northeast**:
Connecticut, United States of America, counties of:
Fairfield, Hartford, Middlesex, New Haven, New London, Tolland, Windham

Delaware, United States of America, county of:
Kent, New Castle, Sussex

WR_FM Policies_088
088

## GENERAL CHANGE ENDORSEMENT NO.  001

**Account No.   1-35024**
**Policy No.   1048495**

**Insured:  Wynn Resorts, Limited**

Maine, United States of America, counties of:
Androscoggin, Cumberland, Hancock, Knox, Lincoln, Sagadahoc, Waldo, Washington, York

Maryland, United States of America, counties of:
Calvert, Charles, Dorchester, St. Mary's, Somerset, Wicomico, Worcester

Massachusetts, United States of America, counties of:
Barnstable, Bristol, Dukes, Essex, Middlesex, Nantucket, Norfolk, Plymouth, Suffolk

New Hampshire, United States of America, counties of:
Rockingham, Strafford

New Jersey, United States of America, counties of:
Atlantic, Bergen, Burlington, Cape May, Cumberland, Essex, Hudson, Middlesex, Monmouth, Ocean, Salem, Union

New York, United States of America, counties of:
Bronx, Kings, Nassau, New York, Queens, Richmond, Suffolk, Westchester

Rhode Island, United States of America, counties of:
Bristol, Kent, Newport, Providence, Washington

Virginia, United States of America, counties and independent cities of:
the counties of Accomack, Gloucester, Isle of Wight, James City, Lancaster, Mathews, Middlesex, Northampton, Northumberland, Surry, York
the independent cities of Chesapeake, Hampton, Newport News, Norfolk, Poquoson, Portsmouth, Suffolk, Virginia Beach, Williamsburg

**Factory Mutual Insurance Company**

**Dated   14 June, 2019   **                    **By**_____
                                                              **Authorized Signature**

## GENERAL CHANGE ENDORSEMENT NO.  002

**Account No.  1-35024**
**Policy No.   1048495**

**Insured:  Wynn Resorts, Limited**

**This Endorsement is attached to and forms a part of the above stated Policy.  Premium for this Endorsement, if any, and the future installment amount are stated elsewhere.**

Effective:        26 May, 2019

1)        The following service animals are added to Service Animals, Appendix C:

Tika
Dutch Shepherd
Female
DOB: 4/7/17

Simms
Labrador Retriever
Male
DOB: 5/10/16

Tessie
Weimaraner
Female
DOB: 11/10/16

Paddy
Labrador Retriever
Male
DOB: 2/17/17

Mystic
German Shepherd
Male
DOB: 10/15/16

Liberty
German Shepherd
Female
DOB: 5/17/16

**Factory Mutual Insurance Company**

**Dated** __10 July, 2019__                **By**_____
                                                    **Authorized Signature**

## GENERAL CHANGE ENDORSEMENT NO.  004

**Account No.   1-35024**
**Policy No.   1048495**

**Insured:  Wynn Resorts, Limited**

**This Endorsement is attached to and forms a part of the above stated Policy.  Premium for this Endorsement, if any, and the future installment amount are stated elsewhere.**

Effective:        22 August, 2019

1)      The following limit under the Applicable Limits of Liability/Time Limits under the LIMITS OF LIABILITY clause in the DECLARATIONS section is amended to read as follows:

| Location No. 0024, 1 Broadway, Everett, Massachusetts, 02149 | USD1,000,000,000 |
| --- | --- |

2)      The following deductible is added under the DEDUCTIBLES clause in the DECLARATIONS section:

| Location No. 0024, 1 Broadway, Everett, Massachusetts, 02149 | USD500,000 |
| --- | --- |

**Factory Mutual Insurance Company**

**Dated__27 August, 2019___**            **By_____**

**Authorized Signature**

## GENERAL CHANGE ENDORSEMENT NO.  005

**Account No.   1-35024**
**Policy No.   1048495**

**Insured:  Wynn Resorts, Limited**

**This Endorsement is attached to and forms a part of the above stated Policy.  Premium for this Endorsement, if any, and the future installment amount are stated elsewhere.**

Effective:        01 August, 2019

1)      The following location is added to the Schedule of Locations:

| Location No. | Index No. | Location Description |
|---|---|---|
| 0039 | | 10801 W Charleston Boulevard Ste 440 |
| | | Las Vegas, Nevada, 89135-1206 |
| | | United States of America |
| | | Clark |

**Factory Mutual Insurance Company**

**Dated   18 September, 2019**          **By**_____

**Authorized Signature**

## GENERAL CHANGE ENDORSEMENT NO.  006

**Account No.   1-35024**
**Policy No.   1048495**

**Insured:  Wynn Resorts, Limited**

**This Endorsement is attached to and forms a part of the above stated Policy.  Premium for this Endorsement, if any, and the future installment amount are stated elsewhere.**

Effective:        11 October, 2019

1)      The following limit is added under Applicable Limits of Liability/Time Limits under the LIMITS OF LIABILITY clause in the DECLARATIONS section:

| golf courses | USD 27,000,000 |
|---|---|

**Factory Mutual Insurance Company**

**Dated**   14 November, 2019            **By**_____

**Authorized Signature**

## GENERAL CHANGE ENDORSEMENT NO.  007

**Account No.  1-35024**
**Policy No.  1048495**

**Insured:  Wynn Resorts, Limited**

**This Endorsement is attached to and forms a part of the above stated Policy.  Premium for this Endorsement, if any, and the future installment amount are stated elsewhere.**

Effective:         22 November, 2019

1)        The following service animal is removed from Service Animals, Appendix C:

Harley
Male
Labrador Retriever
DOB:  4/15/19

Effective:         21 January, 2020

1)        The following location is added to the Schedule of Locations:

| Location No. | Index No. | Location Description |
|---|---|---|
| 0040 | | 1201 Searles Avenue<br>Las Vegas, Nevada, 89101-1199<br>United States of America<br>Clark |

2)        The following deductible is added under the DEDUCTIBLES clause in the DECLARATIONS section:

| Location No. 0040 as described on the Schedule of Locations | USD50,000 for Personal Property |
|---|---|

Effective:         22 January, 2020

1)        The following service animal is added to Service Animals, Appendix C:

Lotto
German Shorthaired Pointer
Male
DOB:  2/19/18

## GENERAL CHANGE ENDORSEMENT NO.  007

**Account No.  1-35024**
**Policy No.  1048495**

**Insured:  Wynn Resorts, Limited**

**Factory Mutual Insurance Company**

**Dated**__14 February, 2020__     **By**_____

**Authorized Signature**

# EXHIBIT 2



Factory Mutual Insurance Company
P.O. Box 7500
Johnston, Rhode Island 02919
1-800-343-7722

# MUTUAL CORPORATION
# NON-ASSESSABLE POLICY

## DECLARATIONS

| Policy No. | Previous Policy No. | DATE OF ISSUE |
|---|---|---|
| 1064616 | 1048495 | 17 April, 2020 |

| Account No. | Replaces Binder No. | |
|---|---|---|
| 1-35024 | | |

In consideration of this Policy's Provisions, Conditions, Stipulations, Exclusions and Limits of Liability, and of premium charged, Factory Mutual Insurance Company, hereafter referred to as the Company, does insure:

---

**INSURED:**

Wynn Resorts, Limited

(For Complete Title See Policy)

---

The term of this Policy is from the 15th day of April 2020 to the 15th day of April 2021 at 12:01 a.m., Standard Time, at the Locations of property involved as provided in this Policy.

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

By virtue of this Policy and any other policies purchased from the Company being in force, the Insured becomes a member of the Company, subject to the provisions of its charter and by-laws, and is entitled to one vote either in person or by proxy at any and all meetings of said Company.

Assignment of this Policy will not be valid except with the written consent of the Company.

This Policy is made and accepted subject to the above provisions and those hereinafter stated, which are made a part of this Policy, together with such other provisions and agreements as may be added to this Policy.

In Witness, this Company has issued this Policy at its office in the city of Johnston, R. I.
this  17th day of  April, 2020.

_____
Authorized Signature

Secretary

President

Countersigned (if required) this          day of

_____
Agent

Form FMGA DEC
7020 (5/99)

Printed in U.S.A.

WR_FM Policies_097



Factory Mutual Insurance Company
Johnston, Rhode Island
A Mutual Corporation

This policy is Non-Assessable.

It is important that the written portions of all policies covering the same property read exactly alike. If they do not, they should be made uniform at once.

In case of loss notify the company or its local agent at once in writing.

7019 (9/01)

WR_FM Policies_098

098

This policy is issued by a mutual company having special regulations lawfully applicable to its organization, membership, policies, or contracts of insurance of which the following shall apply to and form a part of this policy.

# EXTRACTS FROM CHARTER OF THIS COMPANY
Granted by the General Assembly of the State of Rhode Island

SECTION 5:   Except as hereinafter specifically provided, each natural person, partnership, association, corporation or legal entity insured on the mutual plan by the Corporation shall be a member of the Corporation during the term of its policy but no longer, and at all meetings of the members shall be entitled to one vote either in person or by proxy, provided, however, that where there is more than one insured under any policy, such insureds shall nevertheless be deemed to be a single member of the Corporation for all purposes.  The Corporation may issue policies which do not entitle the insured to membership in the Corporation nor to participate in its surplus.

SECTION 10:  Upon the termination of the membership of any member, all his or its right and interest in the surplus, reserves and other assets of the Corporation shall forthwith cease.

# EXTRACTS FROM THE BY-LAWS OF THIS COMPANY
Adopted July 13, 2000

ARTICLE 1 – MEETINGS OF THE MEMBERS

SECTION 1.  Annual Meeting
The annual meeting of the members shall be held at the principal offices of the Company, or at such other place as may be stated in the notice of the meeting, at 9:00 a.m. on the second Thursday of April in each year, for the election of directors and the transaction of such other business as may be brought before the meeting.  If the annual meeting is omitted on the day herein provided therefor, a special meeting may be held in place thereof; and any business transacted or elections held at such special meeting shall be as effective as if transacted or held at the annual meeting.

7019 (9/01)



**Account No.   1-35024**
**Policy No.   1064616**

## TABLE OF CONTENTS
### (Order In Which They Appear)                    Page No.

**DECLARATIONS PAGE**

**DECLARATIONS**

1.   NAMED INSURED AND MAILING ADDRESS ...................................................1
2.   POLICY DATES...................................................................................................1
3.   INSURANCE PROVIDED ...................................................................................1
4.   PREMIUM ............................................................................................................1
5.   PREMIUM PAYABLE ..........................................................................................1
6.   LOSS ADJUSTMENT/PAYABLE.........................................................................2
7.   TERRITORY.........................................................................................................2
8.   JURISDICTION ....................................................................................................2
9.   CURRENCY ..........................................................................................................2
10.  LIMITS OF LIABILITY .......................................................................................3
11.  DEDUCTIBLES ....................................................................................................6

**PROPERTY DAMAGE**

1.   INSURED PROPERTY .........................................................................................9
2.   EXCLUDED PROPERTY .....................................................................................9
3.   EXCLUSIONS .....................................................................................................10
4.   APPLICATION OF POLICY TO DATE OR TIME RECOGNITION ...............14
5.   VALUATION .......................................................................................................15
6.   ADDITIONAL COVERAGES .............................................................................17
     CYBER ADDITIONAL COVERAGES ...............................................................17
     A.   DATA RESTORATION .............................................................................17
     B.   DATA SERVICE PROVIDER PROPERTY DAMAGE ..........................18
     OTHER ADDITIONAL COVERAGES ...............................................................20
     A.   ACCIDENTAL INTERRUPTION OF SERVICES ..................................20
     B.   ACCOUNTS RECEIVABLE .....................................................................20
     C.   AUTOMATIC COVERAGE .....................................................................21
     D.   BRANDS AND LABELS ...........................................................................21
     E.   CLAIMS PREPARATION COSTS ............................................................22
     F.   COMMUNICABLE DISEASE RESPONSE .............................................22
     G.   CONSEQUENTIAL REDUCTION IN VALUE........................................23
     H.   CONTROL OF DAMAGED PROPERTY .................................................23
     I.    DEBRIS REMOVAL..................................................................................24
     J.    DECONTAMINATION COSTS ................................................................24
     K.   ERRORS AND OMISSIONS .....................................................................24
     L.   EXPEDITING COSTS ...............................................................................25
     M.   FINE ARTS AND VALUABLE PAPERS AND RECORDS ....................25
     N.   INSTALLMENT OR DEFERRED PAYMENTS ......................................26
     O.   LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL ......27
     P.   LAW AND ORDINANCE ..........................................................................27
     Q.   LOSS PAYMENT INCREASED TAX LIABILITY ................................28
     R.   MACHINERY OR EQUIPMENT STARTUP OPTION............................29
     S.   MISCELLANEOUS PROPERTY .............................................................29



# TABLE OF CONTENTS
## (Order In Which They Appear)

**Page No.**

T.   OPERATIONAL TESTING ...................................................................................30
U.   PROTECTION AND PRESERVATION OF PROPERTY ...................................30
V.   SERVICE ANIMALS ..........................................................................................31
W.   SERVICE INTERRUPTION PROPERTY DAMAGE ........................................31
X.   TEMPORARY REMOVAL OF PROPERTY .....................................................32
Y.   TERRORISM ......................................................................................................33
Z.   TRANSPORTATION ..........................................................................................34

**TIME ELEMENT**

1.   LOSS INSURED ..................................................................................................37
2.   TIME ELEMENT COVERAGES .........................................................................38
     A.   GROSS EARNINGS .....................................................................................38
     B.   EXTRA EXPENSE ........................................................................................40
     C.   LEASEHOLD INTEREST ............................................................................40
     D.   RENTAL INSURANCE .................................................................................41
3.   PERIOD OF LIABILITY ......................................................................................42
4.   TIME ELEMENT EXCLUSIONS ........................................................................44
5.   TIME ELEMENT COVERAGE EXTENSIONS ...................................................45
     CYBER TIME ELEMENT COVERAGE EXTENSIONS .....................................45
     A.   DATA SERVICE PROVIDER TIME ELEMENT .........................................45
     B.   OWNED NETWORK INTERRUPTION .......................................................46
     SUPPLY CHAIN TIME ELEMENT COVERAGE EXTENSIONS .....................47
     A.   CIVIL OR MILITARY AUTHORITY ..........................................................47
     B.   CONTINGENT TIME ELEMENT EXTENDED ...........................................48
     C.   INGRESS/EGRESS ......................................................................................48
     D.   LOGISTICS EXTRA COST .........................................................................49
     E.   SERVICE INTERRUPTION TIME ELEMENT ...........................................51
     ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS ........................52
     A.   ATTRACTION PROPERTY .........................................................................52
     B.   CRISIS MANAGEMENT .............................................................................53
     C.   DELAY IN STARTUP ..................................................................................54
     D.   EXTENDED PERIOD OF LIABILITY ........................................................54
     E.   GOODWILL AND PUBLIC RELATIONS ...................................................54
     F.   INTERRUPTION BY COMMUNICABLE DISEASE ...................................55
     G.   ON PREMISES SERVICES ..........................................................................56
     H.   PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT ...56
     I.   RELATED REPORTED VALUES .................................................................57
     J.   RESEARCH AND DEVELOPMENT ............................................................57
     K.   SOFT COSTS ...............................................................................................57

**LOSS ADJUSTMENT AND SETTLEMENT**

1.   REQUIREMENTS IN CASE OF LOSS ...............................................................58
2.   CURRENCY FOR LOSS PAYMENT ..................................................................59
3.   PARTIAL PAYMENT OF LOSS SETTLEMENT ...............................................59
4.   COLLECTION FROM OTHERS .........................................................................59



# TABLE OF CONTENTS
## (Order In Which They Appear)

**Page No.**

| | | |
|---|---|---|
| 5. | SUBROGATION | 59 |
| 6. | COMPANY OPTION | 59 |
| 7. | ABANDONMENT | 59 |
| 8. | APPRAISAL | 60 |
| 9. | SUIT AGAINST THE COMPANY | 60 |
| 10. | SETTLEMENT OF CLAIMS | 61 |

## GENERAL PROVISIONS

| | | |
|---|---|---|
| 1. | CANCELLATION/NON-RENEWAL | 62 |
| 2. | INSPECTIONS | 62 |
| 3. | PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS | 62 |
| 4. | LIBERALIZATION | 63 |
| 5. | MISREPRESENTATION AND FRAUD | 63 |
| 6. | LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS | 63 |
| 7. | OTHER INSURANCE | 65 |
| 8. | POLICY MODIFICATION | 65 |
| 9. | REDUCTION BY LOSS | 66 |
| 10. | SUSPENSION | 66 |
| 11. | TITLES | 66 |
| 12. | ASSIGNMENT | 66 |
| 13. | DEFINITIONS | 66 |
| SCHEDULE OF LOCATIONS | | Appendix A |
| NAMED FLOOD LOCATIONS | | Appendix B |
| SERVICE ANIMALS | | Appendix C |
| CYBER OPTIMAL RECOVERY ENDORSEMENT, FORM FMG7558 | | |
| SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT, FORM FMG7308 | | |



**Account No.  1-35024**
**Policy No.  1064616**

# DECLARATIONS

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

## 1.   NAMED INSURED AND MAILING ADDRESS

Wynn Resorts, Limited and any subsidiary, and Wynn Resorts, Limited's interest in any partnership or joint venture in which Wynn Resorts, Limited has management control or ownership as now constituted or hereafter is acquired, as the respective interest of each may appear; all hereafter referred to as the "Insured," including legal representatives.

3720 Howard Hughes Pkwy
Suite 170
Las Vegas, Nevada, 89169-6016
United States of America

## 2.   POLICY DATES

The term of this Policy is:

FROM: 15 April 2020 at 12:01 a.m., Standard Time;
TO:     15 April 2021 at 12:01 a.m., Standard Time,

at the **location** of property involved as provided in this Policy.

## 3.   INSURANCE PROVIDED

The coverage under this Policy applies to property described on the Schedule of Locations or covered under the terms and conditions of the AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or MISCELLANEOUS PROPERTY provisions, unless otherwise provided.

Schedule of Locations are as listed on the Schedule of Locations attached to this Policy.

## 4.   PREMIUM

This Policy is issued in consideration of an initial premium.

## 5.   PREMIUM PAYABLE

Willis of Pennsylvania, Inc. (Radnor) pays the premium under this Policy, and any return of the paid premium accruing under this Policy will be paid to the account of Willis of Pennsylvania, Inc. (Radnor).



**Account No.   1-35024**
**Policy No.   1064616**

## 6.   LOSS ADJUSTMENT/PAYABLE

Loss, if any, will be adjusted with and payable to Wynn Resorts, Limited, or as may be directed by Wynn Resorts, Limited.

Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgagee and/or loss payee either on a Certificate of Insurance or other evidence of insurance on file with the Company or named below.

When named on a Certificate of Insurance or other evidence of insurance, such additional interests are automatically added to this Policy as their interests may appear as of the effective date shown on the Certificate of Insurance or other evidence of insurance.  The Certificate of Insurance or other evidence of insurance will not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

The following additional interest(s) is added to the Policy as Additional Named Insured as their interests may appear.  Such interests do not extend to any TIME ELEMENT coverage under this Policy.

Deutsche Bank AG New York Branch, as Collateral Agent
60 Wall Street
New York, New York 10005

As respects their interest in Real and Personal Property at all locations listed on the Schedule of Locations.

Adding such additional interest(s) does not amend, extend or alter the terms, conditions or provisions of this Policy.

## 7.   TERRITORY

Coverage as provided under this Policy applies in Canada, the United States of America and the Commonwealth of Puerto Rico.

## 8.   JURISDICTION

This Policy will be governed by the laws of the United States of America.

Any disputes arising hereunder will be exclusively subject to the jurisdiction of the United States of America.

## 9.   CURRENCY

All amounts, including deductibles, premiums and limits of liability, indicated in this Policy shall be in the currency represented by the three letter currency designation shown.  This three letter currency designator is defined in Table A.1-Currency and funds code list, International Organization for Standardization (ISO) 4217, edition in effect at the inception of this Policy.



**Account No.   1-35024**
**Policy No.   1064616**

## 10.   LIMITS OF LIABILITY

The Company's maximum limit of liability in an **occurrence**, including any insured TIME ELEMENT loss, will not exceed the Policy limit of liability of USD 2,250,000,000 subject to the following provisions:

A.   Limits of liability and time limits stated below or elsewhere in this Policy are part of, and not in addition to, the Policy limit of liability.

B.   Limits of liability apply per **occurrence**, unless otherwise stated.

C.   Limits of liability in an **occurrence** apply to the total loss or damage at all **locations** and for all coverages involved, including any insured TIME ELEMENT loss, subject to the following provisions:

    1)   when a limit of liability applies as an **annual aggregate**, the Company's maximum amount payable will not exceed such limit of liability during any policy year.

    2)   when a limit of liability applies to a **location** or other specified property, such limit of liability will be the maximum amount payable for all loss or damage at all **locations** arising from physical loss or damage at such **location** or to such other specified property.

D.   Should an **occurrence** result in liability payable under more than one policy issued to the Named Insured by the Company, or its **representative company(ies)**, the maximum amount payable in the aggregate under all such policies will be the applicable limit(s) of liability indicated in this Policy.

Applicable Limits of Liability/Time Limits:

| | |
|---|---|
| Location No. 0024 as described on the Schedule of Locations | USD 1,000,000,000 |
| ATTRACTION PROPERTY | 1.   30 days<br><br>2.   For McCarran International Airport:<br>    30 days, not to exceed USD 10,000,000 |
| AUTOMATIC COVERAGE | 90 days, not to exceed USD 100,000,000 per **location** |
| CIVIL OR MILITARY AUTHORITY | 30 days |
| CLAIMS PREPARATION COSTS | USD 250,000 plus 50% of the amount recoverable under this coverage in excess of USD 250,000 |



| | |
|---|---|
| COMMUNICABLE DISEASE RESPONSE | USD 10,000 **annual aggregate**<br><br>The Company's maximum limit of liability for INTERRUPTION BY COMMUNICABLE DISEASE and this coverage combined shall not exceed USD 10,000 **annual aggregate**. |
| CONTINGENT TIME ELEMENT EXTENDED | USD 50,000,000 |
| CRISIS MANAGEMENT | 30 days |
| **cyber event** | 1. USD 1,000,000 **annual aggregate** for DATA RESTORATION and OWNED NETWORK INTERRUPTION combined<br><br>2. USD 1,000,000 **annual aggregate** for DATA SERVICE PROVIDER PROPERTY DAMAGE and DATA SERVICE PROVIDER TIME ELEMENT combined<br><br>3. USD 25,000,000 **annual aggregate** for physical loss or damage to stock in process or finished goods manufactured by or for the Insured caused by or resulting from a **cyber event** that impacts the processing, manufacturing, or testing of such property or while it is otherwise being worked on |
| DATA RESTORATION | USD 10,000,000 **annual aggregate** |
| DATA SERVICE PROVIDER PROPERTY DAMAGE and DATA SERVICE PROVIDER TIME ELEMENT combined | USD 5,000,000 **annual aggregate** |
| **earth movement** | USD 500,000,000 **annual aggregate** |
| ERRORS AND OMISSIONS | USD 100,000,000 |
| EXPEDITING COSTS and EXTRA EXPENSE combined | USD 100,000,000 |
| EXTENDED PERIOD OF LIABILITY | 365 days |



Account No.  1-35024
Policy No.  1064616

| | |
|---|---|
| fill beneath car parks, parking lots, pavement, roadways, railways, transformer enclosures, walkways, or buildings and structures combined | USD 5,000,000 |
| **fine arts** | USD 100,000,000, not to exceed USD 10,000 per item for **irreplaceable fine arts** not on a schedule on file with the Company |
| fines or penalties for breach of contract or for late or noncompletion of orders combined | USD 100,000 |
| **flood** | USD 50,000,000 **annual aggregate**, except USD 500,000,000 **annual aggregate** for locations described on Named Flood Locations, Appendix B<br><br>The Company's maximum limit of liability shall not exceed USD 500,000,000 **annual aggregate**. |
| golf courses | USD 27,000,000 |
| GOODWILL AND PUBLIC RELATIONS | USD 1,000,000, not to exceed USD 500 per room per day |
| INGRESS/EGRESS | 30 days |
| INTERRUPTION BY COMMUNICABLE DISEASE | 365 days, not to exceed USD 10,000 **annual aggregate**<br><br>The Company's maximum limit of liability for COMMUNICABLE DISEASE RESPONSE and this coverage combined shall not exceed USD 10,000 **annual aggregate**. |
| LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL | USD 1,000,000 **annual aggregate** |
| LOGISTICS EXTRA COST | 180 days, not to exceed 200% of the **normal cost** |
| MISCELLANEOUS PROPERTY | 1.  USD 50,000,000 per **location** for property at a **location**<br><br>2.  USD 25,000,000 for property not at a **location** |
| Ordinary Payroll | 90 days |

 FM Global

| SERVICE ANIMALS | USD 100,000 **annual aggregate**, not to exceed USD 20,000 per animal |
|---|---|
| SERVICE INTERRUPTION PROPERTY DAMAGE and SERVICE INTERRUPTION TIME ELEMENT combined | USD 50,000,000 |
| TERRORISM | USD 5,000,000 **annual aggregate**, not to exceed the following:<br><br>1. USD 5,000,000 **annual aggregate** for AUTOMATIC COVERAGE, ERRORS AND OMISSIONS, MISCELLANEOUS PROPERTY and TEMPORARY REMOVAL OF PROPERTY combined<br><br>2. USD 5,000,000 **annual aggregate** for **flood** when caused by or resulting from **terrorism**<br><br>The limits for TERRORISM shall not include the **actual cash value** portion of fire damage caused by **terrorism**.<br><br>The limits for TERRORISM do not apply to the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S). |
| **valuable papers and records** | USD 100,000,000, not to exceed USD 10,000 per item for **irreplaceable valuable papers and records** not on a schedule on file with the Company |
| vehicles | USD 500,000 |

## 11.   DEDUCTIBLES

Subject to the deductible general provisions stated below, in each case of loss covered by this Policy the following deductibles apply per **occurrence**, for all coverages involved, unless otherwise stated:

| Location No. 0001 and 0024 as described on the Schedule of Locations | USD 500,000 |
|---|---|
| Location No. 0040 as described on the Schedule of Locations | USD 50,000 for Personal Property |



| CONTINGENT TIME ELEMENT EXTENDED | USD 250,000 per **location** |
|---|---|
| LOGISTICS EXTRA COST | USD 250,000 |
| TRANSPORTATION | USD 25,000 |
| **wind** | USD 250,000 per **location** for property located in **wind areas United States Northeast** |
| All Other Loss | USD 250,000 |

Deductible General Provisions:

In each case of loss covered by this Policy, the Company will be liable only if the Insured sustains a loss, including any insured TIME ELEMENT loss, in a single **occurrence** greater than the applicable deductible specified above, and only for its share of that greater amount.

A. For SERVICE INTERRUPTION loss, when a deductible is not specifically stated as applying to SERVICE INTERRUPTION, the deductible applied to the SERVICE INTERRUPTION loss will be the deductible that would apply if the cause of the interruption happened at the insured **location** that sustains the interruption of the specified services.

B. For CONTINGENT TIME ELEMENT EXTENDED loss, when a deductible is not specifically stated as applying to CONTINGENT TIME ELEMENT EXTENDED, the deductible for CONTINGENT TIME ELEMENT EXTENDED loss will be determined as though the **contingent time element location** was an insured **location** under this Policy.

C. The stated earthquake deductible will be applied to earthquake loss. The stated **flood** deductible will be applied to **flood** loss. The stated **wind** deductible will be applied to **wind** loss. The provisions of item E below will also be applied to each.

D. When this Policy insures more than one **location**, the deductible will apply against the total loss covered by this Policy in an **occurrence** except that a deductible that applies on a per **location** basis, if specified, will apply separately to each **location** where the physical damage happened regardless of the number of **locations** involved in the **occurrence**.

E. Unless stated otherwise, if two or more deductibles apply to an **occurrence**, the total to be deducted will not exceed the largest deductible applicable. For the purposes of this provision, when a separate Property Damage and a separate Time Element deductible apply, the sum of the two deductibles will be considered a single deductible. If two or more deductibles apply on a per **location** basis in an **occurrence**, the largest deductible applying to each **location** will be applied separately to each such **location**.



**Account No.   1-35024**
**Policy No.   1064616**

F.   When a % deductible is stated above, whether separately or combined, the deductible is calculated as follows:

Property Damage – % of the value, per the Valuation clause(s) of the PROPERTY DAMAGE section, of the property insured at the **location** where the physical damage happened.

Time Element – % of the full Time Element values that would have been earned in the 12 month period following the **occurrence** by use of the facilities at the **location** where the physical damage happened, plus that proportion of the full Time Element values at all other **locations** where TIME ELEMENT loss ensues that was directly affected by use of such facilities and that would have been earned in the 12 month period following the **occurrence**.

G.   For insured physical loss or damage:

1)   to insured fire protection equipment; or

2)   from water or other substance discharged from fire protection equipment of the type insured,

the applicable deductible applying to items 1 or 2 above only will be reduced by fifty percent (50%), per **occurrence**.  However, this provision will not apply to loss or damage resulting from fire or **earth movement** regardless of whether claim is made for such fire or **earth movement**.



## PROPERTY DAMAGE

1. **INSURED PROPERTY**

This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, to the extent of the interest of the Insured in such property:

A.   Real Property, including new buildings and additions under construction, in which the Insured has an insurable interest.

B.   Personal Property:

  1)   owned by the Insured.

  2)   consisting of the Insured's interest as a tenant in improvements and betterments.  In the event of physical loss or damage, the Company agrees to accept and consider the Insured as sole and unconditional owner of improvements and betterments, notwithstanding any contract or lease to the contrary.

  3)   of officers and employees of the Insured.

  4)   of others in the Insured's custody to the extent the Insured is under obligation to keep insured for physical loss or damage insured by this Policy.

  5)   of others in the Insured's custody to the extent of the Insured's legal liability for insured physical loss or damage to Personal Property.  The Company will defend that portion of any suit against the Insured that alleges such liability and seeks damages for such insured physical loss or damage.  The Company may, without prejudice, investigate, negotiate and settle any claim or suit as the Company deems expedient.

This Policy also insures the interest of contractors and subcontractors in insured property during construction at an insured **location** or within 1,000 feet/300 metres thereof, to the extent of the Insured's legal liability for insured physical loss or damage to such property.  Such interest of contractors and subcontractors is limited to the property for which they have been hired to perform work and such interest will not extend to any TIME ELEMENT coverage provided under this Policy.

2. **EXCLUDED PROPERTY**

The following exclusions apply unless otherwise stated in this Policy:

This Policy excludes:

A.   currency, money, notes or securities.

B.   precious metal in bullion form.



C.      land and any substance in or on land.  However, this exclusion does not apply to:

    1)    landscape gardening.

    2)    car parks, parking lots, pavement, roadways, railways, transformer enclosures or walkways.

    3)    fill beneath car parks, parking lots, pavement, roadways, railways, transformer enclosures, walkways, or buildings and structures.

D.      water.  However, this exclusion does not apply to:

    1)    water that is contained within any enclosed tank, piping system or any other processing equipment.

E.      animals, except as provided by the SERVICE ANIMALS coverage of this Policy, standing timber or growing crops.

F.      watercraft or aircraft, except when unfueled and manufactured by the Insured.

G.      vehicles of officers or employees of the Insured or vehicles otherwise insured for physical loss or damage.

H.      underground mines or mine shafts or any property within such mine or shaft.

I.      dams or dikes.

J.      property in transit, except as otherwise provided by this Policy.

K.      property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers, except as provided by the INSTALLMENT OR DEFERRED PAYMENTS coverage of this Policy.

L.      electronic data, programs or software, except when incorporated into physical goods intended to be sold as:

    1)    finished goods manufactured by the Insured; or

    2)    other merchandise not manufactured by the Insured,

or as otherwise provided by the DATA RESTORATION coverage of this Policy.

## 3.    EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply unless otherwise stated:

A.      This Policy excludes:



**Account No.   1-35024**
**Policy No.   1064616**

1)   indirect or remote loss or damage.

2)   interruption of business, except to the extent provided by this Policy.

3)   loss of market or loss of use.

4)   loss or damage or deterioration arising from any delay.

5)   mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss.

6)   loss from enforcement of any law or ordinance:

    a)   regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or

    b)   requiring the demolition of any property, including the cost in removing its debris;

    except as provided by the DECONTAMINATION COSTS and LAW AND ORDINANCE coverages of this Policy.

7)   loss resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretense.

B.   This Policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1)   nuclear reaction or nuclear radiation or radioactive contamination.  However:

    a)   if physical damage by fire or sprinkler leakage results, then only that resulting damage is insured; but not including any loss or damage due to nuclear reaction, radiation or radioactive contamination.

    b)   this Policy does insure physical damage directly caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the insured **location**, provided that on the date of loss, there is neither a nuclear reactor nor any new or used nuclear fuel on the insured **location**.  This coverage does not apply to any act, loss or damage excluded in item B2f of this EXCLUSIONS clause.

    This exclusion B1 and the exceptions in B1a and B1b do not apply to any act, loss or damage which also comes within the terms of exclusion B2b of this EXCLUSIONS clause.

2)   a)   hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any:

        (i)   government or sovereign power (de jure or de facto);



(ii) military, naval or air force; or

(iii) agent or authority of any party specified in i or ii above.

b)  discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

c)  insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

d)  seizure or destruction under quarantine or custom regulation, or confiscation by order of any governmental or public authority.

e)  risks of contraband, or illegal transportation or trade.

f)  **terrorism**, including action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**, except to the extent provided in the TERRORISM coverage of the Policy.  However, if direct loss or damage by fire results from any of these acts (unless committed by or on behalf of the Insured), then this Policy covers only to the extent of the **actual cash value** of the resulting direct loss or damage by fire to property insured.  This coverage exception for such resulting fire loss or damage does not apply to:

(i)  direct loss or damage by fire which results from any other applicable exclusion in the Policy, including the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

(ii)  any coverage provided in the TIME ELEMENT section of this Policy or to any other coverages provided in this Policy.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion, or any other risk of physical loss or damage covered elsewhere in this Policy.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2a of this EXCLUSIONS clause then item B2a applies in place of this item B2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2b of this EXCLUSIONS clause then item B2b applies in place of this item B2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2c of this EXCLUSIONS clause then item B2c applies in place of this item B2f exclusion.



If any act excluded herein involves nuclear reaction, nuclear radiation or radioactive contamination, this item B2f exclusion applies in place of item B1 of this EXCLUSIONS clause.

3) any dishonest act, including but not limited to theft, committed alone or in collusion with others, at any time:

   a) by an Insured or any proprietor, partner, director, trustee, officer, or employee of an Insured; or

   b) by any proprietor, partner, director, trustee, or officer of any business or entity (other than a common carrier) engaged by an Insured to do anything in connection with property insured under this Policy.

   This Policy does insure acts of direct insured physical damage intentionally caused by an employee of an Insured or any individual specified in b above, and done without the knowledge of the Insured.  This coverage does not apply to any act excluded in B2f of this EXCLUSIONS clause.  In no event does this Policy cover loss by theft by any individual specified in a or b above.

4) lack of the following services:

   a) incoming electricity, fuel, water, gas, steam or refrigerant;

   b) outgoing sewerage;

   c) incoming or outgoing voice, data or video,

   all when caused by an event off the insured **location**, except as provided in the DATA SERVICE PROVIDER and SERVICE INTERRUPTION coverages of this Policy.  But, if the lack of such a service directly causes insured physical damage on the insured **location**, then only that resulting damage is insured.

5) **earth movement** for property located in California.

C. This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

1) faulty workmanship, material, construction or design from any cause.

2) loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested, or otherwise worked on.

3) deterioration, depletion, rust, corrosion or erosion, wear and tear, inherent vice or latent defect.



4)   settling, cracking, shrinking, bulging, or expansion of:

    a)   foundations (including any pedestal, pad, platform or other property supporting machinery).

    b)   floors.

    c)   pavements.

    d)   walls.

    e)   ceilings.

    f)   roofs.

5)   a)   changes of temperature damage (except to machinery or equipment); or

    b)   changes in relative humidity damage,

all whether atmospheric or not.

6)   insect, animal or vermin damage.

7)   loss or damage to the interior portion of buildings under construction from rain, sleet or snow, whether or not driven by wind, when the installation of the roof, walls or windows of such buildings has not been completed.

D.   This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

1)   **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.  If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured.  This exclusion D1 does not apply to radioactive contamination which is excluded elsewhere in this Policy.

2)   shrinkage.

3)   changes in color, flavor, texture or finish.

## 4.   APPLICATION OF POLICY TO DATE OR TIME RECOGNITION

With respect to situations caused by any **date or time recognition** problem by **electronic data processing equipment or media** (such as the so-called Year 2000 problem), this Policy applies as follows.



A.  This Policy does not pay for remediation, change, correction, repair or assessment of any **date or time recognition** problem, including the Year 2000 problem, in any **electronic data processing equipment or media**, whether preventative or remedial, and whether before or after a loss, including temporary protection and preservation of property.  This Policy does not pay for any TIME ELEMENT loss resulting from the foregoing remediation, change, correction, repair or assessment.

B.  Failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000, is not insured physical loss or damage.  This Policy does not pay for any such incident or for any TIME ELEMENT loss resulting from any such incident.

Subject to all of its terms and conditions, this Policy does pay for physical loss or damage not excluded by this Policy that results from a failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000.  Such covered resulting physical loss or damage does not include any loss, cost or expense described in A or B above.  If such covered resulting physical loss or damage happens, and if this Policy provides TIME ELEMENT coverage, then, subject to all of its terms and conditions, this Policy also covers any insured Time Element loss directly resulting therefrom.

## 5.   VALUATION

Adjustment of the physical loss amount under this Policy will be computed as of the date of loss at the place of the loss, and for no more than the interest of the Insured.

Unless stated otherwise in an Additional Coverage, adjustment of physical loss to property will be subject to the following:

A.  On stock in process, the value of raw materials and labor expended plus the proper proportion of overhead charges.

B.  On finished goods manufactured by the Insured, the regular cash selling price, less all discounts and charges to which the finished goods would have been subject had no loss happened.

C.  On raw materials, supplies or other merchandise not manufactured by the Insured:

1)  if repaired or replaced, the actual expenditure incurred in repairing or replacing the damaged or destroyed property; or

2)  if not repaired or replaced, the **actual cash value**.

D.  On exposed films, records, manuscripts and drawings that are not **valuable papers and records**, the value blank plus the cost of copying information from back-up or from originals of a previous generation.  These costs will not include research, engineering or any costs of restoring or recreating lost information.



E.   On property that is damaged by fire and such fire is the result of **terrorism**, the **actual cash value** of the fire damage loss.  Any remaining fire damage loss shall be adjusted according to the terms and conditions of the Valuation clause(s) in this section of the Policy and shall be subject to the limit(s) of liability for TERRORISM, and if stated the limit of liability for SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S), as shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

F.   On all other property, the lesser of the following:

1)   The cost to repair.

2)   The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

3)   The cost in rebuilding, repairing or replacing on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

4)   The selling price of real property or machinery and equipment, other than stock, offered for sale on the date of loss.

5)   The cost to replace unrepairable electrical or mechanical equipment, including computer equipment, with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

6)   The increased cost of demolition, if any, directly resulting from insured loss, if such property is scheduled for demolition.

7)   The unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

8)   The **actual cash value** if such property is:

a)   useless to the Insured; or

b)   not repaired, replaced or rebuilt on the same or another site within two years from the date of loss, unless such time is extended by the Company.

The Insured may elect not to repair or replace the insured real or personal property lost, damaged or destroyed.  Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss.  As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at an insured **location** under this Policy.  This item does not extend to LAW AND ORDINANCE.



6.   **ADDITIONAL COVERAGES**

This Policy includes the following Additional Coverages for insured physical loss or damage.

These Additional Coverages:

1)   are subject to the applicable limit of liability;

2)   will not increase the Policy limit of liability; and

3)   are subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

**CYBER ADDITIONAL COVERAGES**

A.   **DATA RESTORATION**

This Policy covers insured **physical loss or damage to electronic data, programs or software**.

With respect to **physical loss or damage to electronic data, programs or software** caused by or resulting from a **cyber event**, this Additional Coverage will apply when the time to recreate or restore such data, programs or software with due diligence and dispatch is in excess of 48 hours.

For the purposes of this Additional Coverage, insured data, programs or software can be anywhere worldwide, including while in transit, except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

This Additional Coverage also covers:

1)   the cost of the following reasonable and necessary actions taken by the Insured provided such actions are taken due to actual insured **physical loss or damage to electronic data, programs or software**:

   a)   actions to temporarily protect and preserve insured electronic data, programs or software.

   b)   actions taken for the temporary repair of insured **physical loss or damage to electronic data, programs or software**.

   c)   actions taken to expedite the permanent repair or replacement of such damaged property.

2)   the reasonable and necessary costs incurred by the Insured to temporarily protect or preserve insured electronic data, programs or software against immediately impending insured **physical loss or damage to electronic data, programs or software**.  In the event that there is no physical loss or damage, the costs covered under this item will be



**Account No.   1-35024**
**Policy No.   1064616**

subject to the deductible that would have applied had there been such physical loss or damage.

Costs recoverable under this Additional Coverage are excluded from coverage elsewhere in this Policy.

This Additional Coverage excludes loss or damage to data, programs or software when incorporated into physical goods intended to be sold as:

1)   finished goods manufactured by the Insured; or

2)   other merchandise not manufactured by the Insured.

DATA RESTORATION Exclusions: As respects DATA RESTORATION, the following applies:

1)   the exclusions in the EXCLUSIONS clause of this section do not apply except for A1, A2, A6, B1, B2, B3a, B4 and B5.

2)   the following additional exclusions apply:

   This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

   a)   errors or omissions in processing or copying.

   b)   loss or damage to data, programs or software from errors or omissions in programming or machine instructions.

   c)   deterioration, inherent vice, vermin or wear and tear.

DATA RESTORATION Valuation: On property covered under this Additional Coverage the loss amount will not exceed:

1)   the cost to repair, replace or restore data, programs or software including the costs to recreate, research and engineer;

2)   if not repaired, replaced or restored within two years from the date of loss, the blank value of the media.

## B.   DATA SERVICE PROVIDER PROPERTY DAMAGE

This Policy covers insured physical loss or damage to insured property at an insured **location** when such physical loss or damage results from the interruption of **off-premises data processing or data transmission services** by reason of any accidental event at the facilities of the provider of such services that immediately prevents in whole or in part the delivery of such provided services.



For the purposes of this Additional Coverage:

1) facilities of the provider of **off-premises data processing or data transmission services** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine, and

2) an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This Additional Coverage will apply when the period of interruption of **off-premises data processing or data transmission services** as described below is in excess of 24 hours.

The period of interruption of **off-premises data processing or data transmission services** is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Provisions:

1) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

DATA SERVICE PROVIDER PROPERTY DAMAGE Exclusions: As respects DATA SERVICE PROVIDER PROPERTY DAMAGE, the following applies:

1) Items B4 and C5 of the EXCLUSIONS clause in this section do not apply except for B4 with respect to:

   a)  incoming electricity, fuel, water, gas, steam or refrigerant; and

   b)  outgoing sewerage.

2) The following additional exclusions apply:

   This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a)  **earth movement** for property located in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

   b)  **terrorism**.



## OTHER ADDITIONAL COVERAGES

### A.   ACCIDENTAL INTERRUPTION OF SERVICES

This Policy covers physical damage resulting from changes in temperature or relative humidity to insured property at an insured **location** when such changes in temperature or relative humidity result from the interruption of services consisting of electricity, gas, fuel, steam, water or refrigeration by reason of any accidental event, other than insured physical loss or damage, at the insured **location**.

This Additional Coverage will apply when the period of service interruption as described below is in excess of 24 hours.

The period of service interruption is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored.

### B.   ACCOUNTS RECEIVABLE

This Policy covers the following directly resulting from insured physical loss or damage to accounts receivable records while anywhere within this Policy's TERRITORY, including while in transit:

1)   any shortage in the collection of accounts receivable.

2)   the interest charges on any loan to offset such impaired collection pending repayment of such uncollectible sum.  Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts will be deducted in determining the amount recoverable.

3)   the reasonable and necessary cost incurred for material and time required to re-establish or reconstruct accounts receivable records excluding any costs covered by any other insurance.

4)   any other necessary and reasonable costs incurred to reduce the loss, to the extent the losses are reduced.

Accounts receivable records will include accounts receivable records stored as electronic data.

In the event of loss, the Insured will:

1)   use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding accounts receivable.

2)   reduce loss by use of any suitable property or service:

    a)   owned or controlled by the Insured; or



**Account No.  1-35024**
**Policy No.   1064616**

   b)  obtainable from other sources.

3)  reconstruct, if possible, accounts receivable records so that no shortage is sustained.

The settlement of loss will be made within 90 days from the date of physical loss or damage. All amounts recovered by the Insured on outstanding accounts receivable on the date of loss will belong and be paid to the Company up to the amount of loss paid by the Company.  All recoveries exceeding the amount paid will belong to the Insured.

ACCOUNTS RECEIVABLE Exclusions: As respects ACCOUNTS RECEIVABLE, the following additional exclusions apply:

This Policy does not insure against shortage resulting from:

1)  bookkeeping, accounting or billing errors or omissions; or

2)  a)  alteration, falsification, manipulation; or

   b)  concealment, destruction or disposal,

of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property; but only to the extent of such wrongful giving, taking, obtaining or withholding.

## C.   AUTOMATIC COVERAGE

This Policy covers insured physical loss or damage to insured property at any **location** purchased, leased or rented by the Insured after the inception date of this Policy.

This Additional Coverage applies:

1)  from the date of purchase, lease or rental,

2)  until the first of the following:

   a)  the **location** is bound by the Company.

   b)  agreement is reached that the **location** will not be insured under this Policy.

   c)  the time limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section has been reached.  The time limit begins on the date of purchase, lease or rental.

## D.   BRANDS AND LABELS

If branded or labeled insured property is physically damaged and the Company elects to take all or any part of that property, the Insured may at the Company's expense:



1)  stamp "salvage" on the property or its containers; or

2)  remove or obliterate the brands or labels,

if doing so will not damage the property.

The Insured must relabel such property or its containers to be in compliance with any applicable law.

## E.   CLAIMS PREPARATION COSTS

This Policy covers the actual costs incurred by the Insured:

1)  of reasonable fees payable to the Insured's: accountants, architects, auditors, engineers, or other professionals; and

2)  the cost of using the Insured's employees,

for producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Company resulting from insured loss payable under this Policy for which the Company has accepted liability.

This Additional Coverage will not cover the fees and costs of:

1)  attorneys, public adjusters, and loss appraisers, all including any of their subsidiary, related or associated entities either partially or wholly owned by them or retained by them for the purpose of assisting them,

2)  loss consultants who provide consultation on coverage or negotiate claims.

This Additional Coverage is subject to the deductible that applies to the loss.

## F.   COMMUNICABLE DISEASE RESPONSE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1)  an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2)  a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the reasonable and necessary costs incurred by the Insured at such **location** with the actual not suspected presence of **communicable disease** for the:

1)  cleanup, removal and disposal of the actual not suspected presence of **communicable diseases** from insured property; and



2)   actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of **communicable diseases** on insured property.

This Additional Coverage will apply when access to such **location** is limited, restricted or prohibited in excess of 48 hours.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to the actual not suspected presence of **communicable disease**.

COMMUNICABLE DISEASE RESPONSE Exclusions: As respects COMMUNICABLE DISEASE RESPONSE, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1)   **terrorism**.

## G.   CONSEQUENTIAL REDUCTION IN VALUE

This Policy covers the reduction in value of insured merchandise that is a part of pairs, sets, or components, directly resulting from insured physical loss or damage to other insured parts of pairs, sets or components of such merchandise.  If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such merchandise to the Company.

## H.   CONTROL OF DAMAGED PROPERTY

This Policy gives control of physically damaged property consisting of finished goods manufactured by the Insured as follows:

1)   the Insured will have full rights to the possession and control of damaged property in the event of insured physical damage to such property provided proper testing is done to show which property is physically damaged.

2)   the Insured using reasonable judgment will decide if the physically damaged property can be reprocessed or sold.

3)   property so judged by the Insured to be unfit for reprocessing or selling will not be sold or disposed of except by the Insured, or with the Insured's consent.

4)   any salvage proceeds received will go to the:

   a)   Company at the time of loss settlement; or

   b)   Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable accordingly.



## I.   DEBRIS REMOVAL

This Policy covers the reasonable and necessary costs incurred to remove debris from an insured **location** that remains as a direct result of insured physical loss or damage.

This Additional Coverage does not cover the costs of removal of:

1)   contaminated uninsured property; or

2)   the **contaminant** in or on uninsured property,

whether or not the **contamination** results from insured physical loss or damage.  This Additional Coverage covers the costs of removal of contaminated insured property or the **contaminant** in or on insured property only if the **contamination**, due to the actual not suspected presence of **contaminant(s)**, of the debris resulted directly from other physical damage not excluded by the Policy.

## J.   DECONTAMINATION COSTS

If insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating **contamination** due to the actual not suspected presence of **contaminant(s)**, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance.  This Additional Coverage applies only to that part of insured property so contaminated due to the actual not suspected presence of **contaminant(s)** as a direct result of insured physical damage.

The Company is not liable for the costs required for removing contaminated uninsured property or the **contaminant** therein or thereon, whether or not the **contamination** results from an insured event.

## K.   ERRORS AND OMISSIONS

If physical loss or damage is not payable under this Policy solely due to an error or unintentional omission:

1)   in the description of where insured property is physically located;

2)   to include any **location**:

    a)   owned, leased or rented by the Insured on the effective date of this Policy; or

    b)   purchased, leased or rented by the Insured during the term of this Policy; or

3)   that results in cancellation of the property insured under this Policy;



this Policy covers such physical loss or damage, to the extent it would have provided coverage had such error or unintentional omission not been made.

It is a condition of this Additional Coverage that any error or unintentional omission be reported by the Insured to the Company when discovered and corrected.

## L.   EXPEDITING COSTS

This Policy covers the reasonable and necessary costs incurred:

1)   for the temporary repair of insured physical damage to insured property;

2)   for the temporary replacement of insured equipment suffering insured physical damage; and

3)   to expedite the permanent repair or replacement of such damaged property.

This Additional Coverage does not cover costs recoverable elsewhere in this Policy, including the cost of permanent repair or replacement of damaged property.

## M.   FINE ARTS AND VALUABLE PAPERS AND RECORDS

This Policy covers insured physical loss or damage to **fine arts** and **valuable papers and records** while anywhere within this Policy's TERRITORY, including while in transit.

FINE ARTS AND VALUABLE PAPERS AND RECORDS Exclusions: As respects FINE ARTS AND VALUABLE PAPERS AND RECORDS, the following applies:

1)   the exclusions in the EXCLUSIONS clause of this section do not apply except for A1, A2, A6, A7, B1, B2, B3a, B4 and B5.

2)   the following additional exclusions apply:

This Policy excludes:

a)   currency, money, securities.

b)   errors or omissions in processing or copying of **valuable papers and records**, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured.

c)   deterioration, inherent vice, or wear and tear, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured.

d)   fungus, mold or mildew unless directly resulting from other physical damage not excluded by this Policy.

e)   loss or damage to **fine arts** from any repairing, restoration or retouching process.



FINE ARTS AND VALUABLE PAPERS AND RECORDS Valuation: On property covered under this Additional Coverage the loss amount will not exceed the lesser of the following:

1)   the cost to repair or restore such property to the physical condition that existed on the date of loss.

2)   the cost to replace.

3)   the value, if any, designated for the item on the schedule on file with the Company.

If a **fine arts** article is part of a pair or set, and a physically damaged article cannot be replaced, or repaired or restored to the condition that existed immediately prior to the loss, the Company will be liable for the lesser of the full value of such pair or set or the amount designated on the schedule.  The Insured agrees to surrender the pair or set to the Company.

## N.   INSTALLMENT OR DEFERRED PAYMENTS

This Policy covers insured physical loss or damage to personal property of the type insured sold by the Insured under a conditional sale or trust agreement or any installment or deferred payment plan and after such property has been delivered to the buyer.  Coverage is limited to the unpaid balance for such property.

In the event of loss to property sold under deferred payment plans, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding amounts due or to regain possession of the property.

There is no liability under this Policy for loss:

1)   pertaining to products recalled including, but not limited to, the costs to recall, test or to advertise such recall by the Insured.

2)   from theft or conversion by the buyer of the property after the buyer has taken possession of such property.

3)   to the extent the buyer continues payments.

4)   not within the TERRITORY of this Policy.

INSTALLMENT OR DEFERRED PAYMENTS Valuation: On property covered under this Additional Coverage the loss amount will not exceed the lesser of the following:

1)   total amount of unpaid installments less finance charges.

2)   **actual cash value** of the property at the time of loss.

3)   cost to repair or replace with material of like size, kind and quality.



### O.   LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL

This Policy covers the reasonable and necessary cost for the cleanup, removal and disposal of the actual not suspected presence of **contaminant(s)** from uninsured property consisting of land, water or any other substance in or on land at the insured **location** if the release, discharge or dispersal of such **contaminant(s)** is a direct result of insured physical loss or damage to insured property.

This Policy does not cover the cost to cleanup, remove and dispose of **contamination** from such property:

1)   at any **location** insured for Personal Property only.

2)   at any property insured under AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or MISCELLANEOUS PROPERTY coverage provided by this Policy.

3)   when the Insured fails to give written notice of loss to the Company within 180 days after inception of the loss.

### P.   LAW AND ORDINANCE

This Policy covers the costs as described herein resulting from the Insured's obligation to comply with a law or ordinance, provided that:

1)   such law or ordinance is enforced as a direct result of insured physical loss or damage at an insured **location**;

2)   such law or ordinance is in force at the time of such loss or damage; and

3)   such **location** was not required to be in compliance with such law or ordinance prior to the happening of the insured physical loss or damage.

Coverage A:

The reasonable and necessary costs incurred by the Insured to comply with the enforcement of the minimum requirements of any law or ordinance that regulates the demolition, construction, repair, replacement or use of buildings, structures, machinery or equipment.

As respects insured property, this Coverage A covers the reasonable and necessary costs to:

1)   demolish any physically damaged and undamaged portions of the insured buildings, structures, machinery or equipment.

2)   repair or rebuild the physically damaged and undamaged portions, whether or not demolition is required, of such insured buildings, structures, machinery or equipment.



The Company's maximum liability for this Coverage A at each insured **location** in any **occurrence** will not exceed the actual costs incurred in demolishing the physically damaged and undamaged portions of the insured property plus the lesser of:

1)   the reasonable and necessary cost, excluding the cost of land, to rebuild on another site; or

2)   the cost to rebuild on the same site.

Coverage B:

The reasonable estimated cost to repair, replace or rebuild insured property consisting of buildings, structures, machinery or equipment that the Insured is legally prohibited from repairing, replacing or rebuilding to the same height, floor area, number of units, configuration, occupancy or operating capacity, because of the enforcement of any law or ordinance that regulates the construction, repair, replacement or use of buildings, structures, machinery or equipment.

LAW AND ORDINANCE Coverage B Valuation: On property covered under this Coverage B that cannot legally be repaired or replaced**,** the loss amount will be the difference between:

1)   the **actual cash value**; and

2)   the cost that would have been incurred to repair, replace or rebuild such lost or damaged property had such law or ordinance not been enforced at the time of loss.

LAW AND ORDINANCE Exclusions: As respects LAW AND ORDINANCE, the following additional exclusions apply:

This Policy does not cover:

1)   any cost incurred as a direct or indirect result of enforcement of any law or ordinance regulating any form of **contamination**.

2)   any machinery or equipment manufactured by or for the Insured, unless used by the Insured in its operation at the **location** suffering the physical loss or damage.

**Q.   LOSS PAYMENT INCREASED TAX LIABILITY**

This Policy covers the increase in tax liability as described herein incurred by the Insured.

Coverage A:

The increase in tax liability from an insured loss at an insured **location** if the tax treatment of:

1)   the profit portion of a loss payment under this Policy involving finished stock manufactured by the Insured; and/or



2)   the profit portion of a TIME ELEMENT loss payment under this Policy;

is greater than the tax treatment of profits that would have been incurred had no loss happened.

### R.   MACHINERY OR EQUIPMENT STARTUP OPTION

After insured machinery or equipment that has sustained insured physical loss or damage is repaired or replaced and such machinery or equipment is undergoing startup, the following applies:

If physical loss or damage of the type insured directly results to such machinery or equipment from such startup, the Insured shall have the option of claiming such resulting insured damage as part of the original event of physical loss or damage or as a separate **occurrence**.

This Additional Coverage applies only:

1)   to the first startup event after the original repair or replacement; and

2)   when the first startup event happens during the term of this Policy or its renewal issued by the Company.

For the purposes of this Additional Coverage, startup means:

1)   the introduction into machinery or equipment of feedstock or other materials for processing or handling;

2)   the commencement of fuel or energy supply to machinery or equipment.

### S.   MISCELLANEOUS PROPERTY

This Policy covers insured physical loss or damage to:

1)   insured property;

2)   property of the type insured that is under contract to be used in a construction project at an insured **location**:

   a)   from the time such property is delivered to the Insured or their contractor (with respect to the property under construction) by the manufacturer or supplier;

   b)   while such property is located at a storage site; and

   c)   while such property is in transit from a storage site to another storage site or to a construction project at an insured **location**,

   that does not include any such property owned or rented by the contractor;



while anywhere within this Policy's TERRITORY, including while in transit.

This Additional Coverage excludes property covered elsewhere in this Policy.

MISCELLANEOUS PROPERTY Exclusions: As respects MISCELLANEOUS PROPERTY, the following additional exclusions apply:

1) This Policy excludes:

   a) **transmission and distribution systems** not at a **location**.

   b) property insured under import or export ocean marine insurance.

   c) property shipped between continents.

   d) airborne shipments unless by regularly scheduled passenger airlines or air freight carriers.

   e) property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

2) This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a) **earth movement** for property located in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

## T.   OPERATIONAL TESTING

This Policy covers insured physical loss or damage to insured property during the **period of operational testing**.

This Additional Coverage excludes property, including stock or material, manufactured or processed by the Insured.

## U.   PROTECTION AND PRESERVATION OF PROPERTY

This Policy covers:

1) reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

2) reasonable and necessary:

   a) fire department firefighting charges imposed as a result of responding to a fire in, on or exposing the insured property.



**Account No.   1-35024**
**Policy No.   1064616**

b) costs incurred of restoring and recharging fire protection systems following an insured loss.

c) costs incurred for the water used for fighting a fire in, on or exposing the insured property.

This Additional Coverage does not cover costs incurred for actions to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by TERRORISM coverage as provided in this section of the Policy.

This Additional Coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## V.   SERVICE ANIMALS

This Policy covers insured physical loss or damage to service animals as described on Service Animals, Appendix C.

SERVICE ANIMALS Exclusions:  As respects SERVICE ANIMALS, the following additional exclusions apply:

This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

1) death, destruction, or injury from natural causes.

2) escape.

3) sickness, disease, infection, infestation, or illness.

4) error or omission in processing and/ or failure on the part of the Insured to provide nourishment, medicine, or sanitary conditions.

5) contamination of animals, food, or medicine.

SERVICE ANIMALS Valuation:  On property covered under this Additional Coverage the loss amount will not exceed:

1) the purchase price of commercially available animals, including costs associated with training of the service animals.

## W.   SERVICE INTERRUPTION PROPERTY DAMAGE

This Policy covers insured physical loss or damage to insured property at an insured **location** when such physical loss or damage results from the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental event at the facilities of the supplier



**Account No.   1-35024**
**Policy No.   1064616**

of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable service.

This Additional Coverage will apply when the period of service interruption as described below is in excess of 24 hours.

The period of service interruption is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Provisions:

1) The Insured will immediately notify the suppliers of services of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

SERVICE INTERRUPTION PROPERTY DAMAGE Exclusions: As respects SERVICE INTERRUPTION PROPERTY DAMAGE, the following applies:

1) The exclusions in the EXCLUSIONS clause in this section do not apply except for:

   a) A1, A2, A3, A6, B1, B2, and

   b) B4 with respect to incoming or outgoing voice, data or video, and

   c) D1 except with respect to fungus, mold or mildew.

2) The following additional exclusions apply:

   This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a) **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

   b) **terrorism**.

## X.   TEMPORARY REMOVAL OF PROPERTY

When insured property is removed from an insured **location** for the purpose of being repaired or serviced or in order to avoid threatened physical loss or damage of the type insured by this Policy, this Policy covers such property:

1) while at the premises to which such property has been moved; and



2) for physical loss or damage as provided at the insured **location** from which such property was removed.

This Additional Coverage does not apply to property:

1) insured, in whole or in part, elsewhere in this Policy.

2) insured, in whole or in part, by any other insurance policy.

3) removed for normal storage, processing or preparation for sale or delivery.

## Y.   TERRORISM

This Policy covers physical loss or damage to property as described in the INSURANCE PROVIDED provision caused by or resulting from **terrorism**.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion, or any other risk of physical loss or damage covered elsewhere in this Policy.

Amounts recoverable under this Additional Coverage are excluded from coverage elsewhere in this Policy.

This Additional Coverage does not cover loss or damage which also comes within the terms of either item B2a or B2c of the EXCLUSIONS clause in this section of the Policy.

This Additional Coverage does not in any event cover loss or damage directly or indirectly caused by or resulting from any of the following, regardless of any other cause or event, whether or not insured under this Policy contributing concurrently or in any other sequence to the loss:

1) that involves the use, release or escape of nuclear materials, or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination or that involves the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion, or radioactive force, whether in time of peace or war and regardless of who commits the act; or

2) that is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

3) in which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials; or

4) that involves action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**.



### Z.    TRANSPORTATION

This Policy covers the following personal property, except as excluded by this Policy, while in transit within the TERRITORY of this Policy:

1)  owned by the Insured.

2)  shipped to customers under F.O.B., C & F or similar terms.  The Insured's contingent interest in such shipments is admitted.

3)  of others in the actual or constructive custody of the Insured to the extent of the Insured's interest or legal liability.

4)  of others sold by the Insured, that the Insured has agreed prior to the loss to insure during course of delivery including:

   a)  when shipped by the Insured's direct contract service provider or by the Insured's direct contract manufacturer to the Insured or to the Insured's customer.

   b)  when shipped by the Insured's customer to the Insured or to the Insured's contract service provider or to the Insured's contract manufacturer.

Coverage Attachment and Duration:

1)  This Additional Coverage covers from the time the property leaves the original point of shipment for transit until the property arrives at the destination.

2)  However, coverage on export shipments not insured under ocean cargo policies ends when the property is loaded on board overseas vessels or aircraft.  Coverage on import shipments not insured under ocean cargo policies begins after discharge from overseas vessels or aircraft.

This Additional Coverage:

1)  covers general average and salvage charges on shipments covered while waterborne.

2)  insures physical loss or damage caused by or resulting from:

   a)  unintentional acceptance of fraudulent bills of lading, shipping or messenger receipts.

   b)  improper parties having gained possession of property through fraud or deceit.

Additional General Provisions:

1)  This Additional Coverage will not inure directly or indirectly to the benefit of any carrier or bailee.



2)   The Insured has permission, without prejudicing this insurance, to accept:

   a)   ordinary bills of lading used by carriers;

   b)   released bills of lading;

   c)   undervalued bills of lading; and

   d)   shipping or messenger receipts.

3)   The Insured may waive subrogation against railroads under side track agreements.

Except as otherwise stated, the Insured will not enter into any special agreement with carriers releasing them from their common law or statutory liability.

TRANSPORTATION Exclusions: As respects TRANSPORTATION, the following applies:

1)   the exclusions in the EXCLUSIONS clause of this section do not apply except for A1 through A4, B1 through B5, C1, C3, C5, C6, D1 through D3.

2)   the following additional exclusions apply:

   This Policy excludes:

   a)   samples in the custody of salespeople or selling agents.

   b)   property insured under import or export ocean marine insurance.

   c)   waterborne shipments, unless:

      (i)   by inland water; or

      (ii)   by coastal shipments.

   d)   waterborne shipments via Panama Canal or to and from Alaska, the Commonwealth of Puerto Rico, and Hawaii.

   e)   airborne shipments unless by regularly scheduled passenger airlines or air freight carriers.

   f)   property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

   g)   any transporting vehicle.



**Account No.   1-35024**
**Policy No.   1064616**

TRANSPORTATION Valuation: On property covered under this Additional Coverage the loss amount will not exceed:

1) Property shipped to or for the account of the Insured will be valued at actual invoice to the Insured. Included in the value are accrued costs and charges legally due. Charges may include the Insured's commission as selling agent.

2) Property sold by the Insured and shipped to or for the purchaser's account will be valued at the Insured's selling invoice amount. Prepaid or advanced freight costs are included.

3) Property not under invoice will be valued:

   a) for property of the Insured, at the valuation provisions of this Policy applying at the place from which the property is being transported; or

   b) for other property, at the actual cash market value at the destination point on the date of loss,

   less any charges saved which would have become due and payable upon arrival at destination.



**Account No.   1-35024**
**Policy No.   1064616**

## TIME ELEMENT

TIME ELEMENT loss as provided in the TIME ELEMENT COVERAGES and TIME ELEMENT COVERAGE EXTENSIONS of this section of the Policy:

A.   is subject to the applicable limit of liability that applies to the insured physical loss or damage but in no event for more than any limit of liability that is stated as applying to the specific TIME ELEMENT COVERAGE and/or TIME ELEMENT COVERAGE EXTENSION; and

B.   will not increase the Policy limit of liability; and

C.   is subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

## 1.   LOSS INSURED

A.   This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured:

   1)   to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;

   2)   used by the Insured, or for which the Insured has contracted use;

   3)   while located as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, or as described in the TEMPORARY REMOVAL OF PROPERTY provision; or

   4)   while in transit as provided by this Policy, and

   5)   during the Periods of Liability described in this section,

   provided such loss or damage is not at a **contingent time element location**.

B.   This Policy insures TIME ELEMENT loss only to the extent it cannot be reduced through:

   1)   the use of any property or service owned or controlled by the Insured;

   2)   the use of any property or service obtainable from other sources;

   3)   working extra time or overtime; or

   4)   the use of inventory,

   all whether at an insured **location** or at any other premises. The Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the TIME ELEMENT loss.



**Account No.   1-35024**
**Policy No.   1064616**

C.   This Policy covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy.  The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.

D.   In determining the amount of loss payable, the Company will consider the experience of the business before and after and the probable experience during the PERIOD OF LIABILITY. The probable experience will consider any increase or decrease in demand for the Insured's goods or services during the PERIOD OF LIABILITY, even if such increase or decrease is from the same event that caused physical loss or damage starting the PERIOD OF LIABILITY.

## 2.   TIME ELEMENT COVERAGES

### A.   GROSS EARNINGS

Measurement of Loss:

1)   The recoverable GROSS EARNINGS loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

   a)   Gross Earnings;

   b)   less all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services;

   c)   less ordinary payroll; and

   d)   plus all other earnings derived from the operation of the business.

   e)   Ordinary Payroll, including taxes and charges dependent on the payment of wages:

      (i)   for a period of time of not more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section immediately following the interruption of production or suspension of business operations or services, and

      (ii)   only to the extent such payroll continues following the loss and would have been earned had no such interruption happened.

     However, if an Insured reduces the daily loss payable under Ordinary Payroll, either by:

      (i)   providing gainful employment for, or

      (ii)   paying less than the normal salary rate to,

     all or part of its employees, then the number of consecutive days of Ordinary Payroll may be extended.  However, this provision will not increase the total liability of this



Company beyond the amount it would have been liable for Ordinary Payroll costs without this provision. Ordinary Payroll does not cover any portion of salaries or wages included in Gross Earnings.

2) For the purposes of the Measurement of Loss, Gross Earnings is:

for manufacturing operations: the net sales value of production less the cost of all raw stock, materials and supplies used in such production; or

for mercantile or non-manufacturing operations: the total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured.

Any amount recovered under property damage coverage at selling price will be considered to have been sold to the Insured's regular customers and will be credited against net sales.

3) In determining the indemnity payable as the Actual Loss Sustained, the Company will consider the continuation of only those normal charges and expenses that would have been earned had there been no interruption of production or suspension of business operations or services.

4) If the Insured would have operated at a deficit had no interruption of production or suspension of business operations or services happened, the following applies:

a) for Gross Earnings, the extent to which charges and expenses would have been earned will be determined by subtracting the operating deficits from the charges and expenses that necessarily continue.

b) for Ordinary Payroll, the extent payroll would have been earned will be determined by subtracting the excess, if any, of the operating deficit over the fixed charges that need to continue from such payroll.

5) There is recovery hereunder to the extent that the Insured is:

a) wholly or partially prevented from producing goods or continuing business operations or services;

b) unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;

c) unable to continue such operations or services during the PERIOD OF LIABILITY; and

d) able to demonstrate a loss of sales for the operations, services or production prevented.



## B.   EXTRA EXPENSE

Measurement of Loss:

The recoverable EXTRA EXPENSE loss will be the reasonable and necessary extra costs incurred by the Insured of the following during the PERIOD OF LIABILITY:

1)   extra expenses to temporarily continue as nearly **normal** as practicable the conduct of the Insured's business;

2)   extra costs of temporarily using property or facilities of the Insured or others; and

3)   costs to purchase finished goods from third parties to fulfill orders when such orders cannot be met due to physical loss or damage to the Insured's finished goods, less payment received for the sale of such finished goods.

less any value remaining at the end of the PERIOD OF LIABILITY for property obtained in connection with the above.

EXTRA EXPENSE Exclusions: As respects EXTRA EXPENSE, the following applies:

1)   TIME ELEMENT EXCLUSIONS C does not apply to item 3 above.

2)   The following additional exclusions apply:

This Policy does not insure:

a)   any loss of income.

b)   costs that usually would have been incurred in conducting the business during the same period had no physical loss or damage happened.

c)   costs of permanent repair or replacement of property that has been damaged or destroyed.  However, this exclusion does not apply to item 3 above.

d)   any expense recoverable elsewhere in this Policy.

## C.   LEASEHOLD INTEREST

Measurement of Loss:

The recoverable LEASEHOLD INTEREST incurred by the Insured of the following:

1)   If the lease agreement requires continuation of rent; and if the property is wholly untenantable or unusable, the actual rent payable for the unexpired term of the lease; or if the property is partially untenantable or unusable, the proportion of the rent payable for the unexpired term of the lease.



2)  If the lease is cancelled by the lessor pursuant to the lease agreement or by the operation of law; the Lease Interest for the first three months following the loss; and the Net Lease Interest for the remaining unexpired term of the lease.

3)  As used above, the following terms mean:

Net Lease Interest:
That sum which placed at 6% interest rate compounded annually would equal the Lease Interest (less any amounts otherwise payable hereunder).

Lease Interest:
The excess rent paid for the same or similar replacement property over actual rent payable plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the Insured's lease.

LEASEHOLD INTEREST Exclusions: As respects LEASEHOLD INTEREST, the following applies:

1)  This Policy does not insure loss directly resulting from physical loss or damage to Personal Property.

2)  TIME ELEMENT EXCLUSIONS A, B and C do not apply and the following applies instead:

This Policy does not insure any increase in loss resulting from the suspension, lapse or cancellation of any license, or from the Insured exercising an option to cancel the lease; or from any act or omission of the Insured that constitutes a default under the lease.

## D.   RENTAL INSURANCE

Measurement of Loss:

The recoverable RENTAL INSURANCE loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

1)  the fair rental value of any portion of the property occupied by the Insured;

2)  the income reasonably expected from rentals of unoccupied or unrented portions of such property; and

3)  the rental income from the rented portions of such property according to bona fide leases, contracts or agreements in force at the time of loss,

all not to include noncontinuing charges and expenses.



**Account No.  1-35024**
**Policy No.  1064616**

RENTAL INSURANCE Exclusions: As respects RENTAL INSURANCE, TIME ELEMENT EXCLUSIONS A does not apply and the following applies instead:

This Policy does not insure any loss of rental income during any period in which the insured property would not have been tenantable for any reason other than an insured loss.

## 3.   PERIOD OF LIABILITY

A.   The PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES, except LEASEHOLD INTEREST and as shown below or if otherwise provided under any TIME ELEMENT COVERAGE EXTENSION, and subject to any Time Limit provided in the LIMITS OF LIABILITY clause in the DECLARATIONS section, is as follows:

   1)   For building and equipment, the period:

      a)   starting from the time of physical loss or damage of the type insured; and

      b)   ending when with due diligence and dispatch the building and equipment could be:

         (i)   repaired or replaced; and

         (ii)  made ready for operations,

         under the same or equivalent physical and operating conditions that existed prior to the damage.

      c)   not to be limited by the expiration of this Policy.

   2)   For building and equipment under construction:

      a)   the equivalent of the above period of time will be applied to the level of business that would have been reasonably achieved after construction and startup would have been completed had no physical damage happened; and

      b)   due consideration will be given to the actual experience of the business compiled after completion of the construction and startup.

   3)   For stock-in-process and mercantile stock, including finished goods not manufactured by the Insured, the time required with the exercise of due diligence and dispatch:

      a)   to restore stock in process to the same state of manufacture in which it stood at the inception of the interruption of production or suspension of business operations or services; and

      b)   to replace physically damaged mercantile stock.

   This item does not apply to RENTAL INSURANCE.



**Account No.   1-35024**
**Policy No.   1064616**

4)   For raw materials and supplies, the period of time:

    a)   of actual interruption of production or suspension of operations or services resulting from the inability to get suitable raw materials and supplies to replace similar ones damaged; but

    b)   limited to that period for which the damaged raw materials and supplies would have supplied operating needs.

5)   If water:

    a)   used for any manufacturing purpose, including but not limited to as a raw material or for power;

    b)   stored behind dams or in reservoirs; and

    c)   on any insured **location**,

is released as the result of physical damage of the type insured to such dam, reservoir or connected equipment, the Company's liability for the actual interruption of production or suspension of operations or services due to inadequate water supply will not extend beyond 30 consecutive days after the damaged dam, reservoir or connected equipment has been repaired or replaced.

This item does not apply to RENTAL INSURANCE.

6)   For physically damaged exposed films, records, manuscripts and drawings, the time required to copy from backups or from originals of a previous generation.  This time does not include research, engineering or any other time necessary to restore or recreate lost information.

This item does not apply to RENTAL INSURANCE.

7)   For physically damaged or destroyed property covered under DATA RESTORATION, the period:

    a)   starting from the time of **physical loss or damage to electronic data, programs or software**; and

    b)   ending when with due diligence and dispatch the electronic data, programs or software could have been recreated or restored under the same or equivalent physical and operating conditions that existed prior to the physical loss or damage.

This item does not apply to RENTAL INSURANCE.



B.  The PERIOD OF LIABILITY does not include any additional time due to the Insured's inability to resume operations for any reason, including but not limited to:

1)  making changes to the buildings, structures, machinery or equipment except as provided in the LAW AND ORDINANCE clause in the PROPERTY DAMAGE section.

2)  restaffing or retraining employees.  However, this item does not apply to additional time needed to train staff to use new machinery or equipment that replaces machinery or equipment that suffered insured physical loss or damage, provided such training is completed within 90 consecutive days after the new machinery or equipment has been installed.

If two or more Periods of Liability apply such periods will not be cumulative.

**4.  TIME ELEMENT EXCLUSIONS**

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to TIME ELEMENT loss:

This Policy does not insure:

A.  Any loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

1)  physical loss or damage not insured by this Policy on or off of the insured **location**.

2)  planned or rescheduled shutdown.

3)  strikes or other work stoppage.

4)  any other reason other than physical loss or damage insured under this Policy.

B.  Any increase in loss due to:

1)  suspension, cancellation or lapse of any lease, contract, license or orders.

2)  damages for breach of contract or for late or noncompletion of orders.

3)  fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

4)  any other consequential or remote loss.

C.  Any loss resulting from physical loss or damage to finished goods manufactured by the Insured, or the time required for their reproduction.

D.  Any loss resulting from the **actual cash value** portion of direct physical loss or damage by fire caused by or resulting from **terrorism**.



**Account No.  1-35024**
**Policy No.  1064616**

E.    Any loss resulting from loss or damage to SERVICE ANIMALS.

**5.    TIME ELEMENT COVERAGE EXTENSIONS**

This Policy also insures TIME ELEMENT loss, as provided by the TIME ELEMENT COVERAGES of this Policy, for the TIME ELEMENT COVERAGE EXTENSIONS described below.

### CYBER TIME ELEMENT COVERAGE EXTENSIONS

### A.    DATA SERVICE PROVIDER TIME ELEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of interruption at an insured **location** of **off-premises data processing or data transmission services**, when the interruption is caused by any accidental event at the facilities of the provider of such services that immediately prevents in whole or in part the delivery of such provided services.

For the purposes of this Extension:

1)    facilities of the provider of **off-premises data processing or data transmission services** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine, and

2)    an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This Extension will apply when the period of interruption of **off-premises data processing or data transmission services** is in excess of 24 hours.

Additional General Provisions:

1)    The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2)    The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Coverage provided in this Extension is excluded from coverage elsewhere in this Policy.

This Extension does not cover Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured covered by OWNED NETWORK INTERRUPTION coverage as provided in this section of the Policy.



DATA SERVICE PROVIDER TIME ELEMENT Exclusions: As respects DATA SERVICE PROVIDER TIME ELEMENT, the following applies:

1) Item B4 of the EXCLUSIONS clause in the PROPERTY DAMAGE section does not apply except for B4 with respect to:

   a) incoming electricity, fuel, water, gas, steam or refrigerant; and

   b) outgoing sewerage.

2) The following additional exclusions apply:

   This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a) **earth movement** for property located in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

   b) **terrorism**.

As used above, the period of interruption of **off-premises data processing or data transmission services**:

1) is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.

2) is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

3) does not extend to include the interruption of operations caused by any reason other than interruption of the provided service(s).

## B.   OWNED NETWORK INTERRUPTION

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of interruption directly resulting from:

1) the failure of the Insured's **electronic data processing equipment or media** to operate, provided that such failure is the direct result of a **cyber event** directed at the NAMED INSURED; or

2) the Insured's reasonable action to temporarily protect the Insured's **electronic data processing equipment or media** against an actual or immediately impending **cyber event** directed at the NAMED INSURED, provided such action is necessary to prevent failure of the Insured's **electronic data processing equipment or media** to operate.



For the purposes of this Extension, the Insured's **electronic data processing equipment or media** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

As respects item 1 above, this Extension will apply when the period of interruption is in excess of 48 hours.

As used above, the period of interruption:

1) is the period starting when the Insured's **electronic data processing equipment or media** fails to operate and ending when with due diligence and dispatch, the Insured's **electronic data processing equipment or media** could be restored to the same or equivalent operating condition that existed prior to the failure.

2) does not include the additional time to make changes to the Insured's **electronic data processing equipment or media**.

## SUPPLY CHAIN TIME ELEMENT COVERAGE EXTENSIONS

### A.    CIVIL OR MILITARY AUTHORITY

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location** provided such order is the direct result of physical damage of the type insured at the insured **location** or within five statute miles/eight kilometres of it.

For the purpose of this Extension only, State Gaming Control Board or Nevada Gaming Commission will also be considered a civil authority.

This Extension does not apply to LEASEHOLD INTEREST.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of such physical damage; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.



**Account No.   1-35024**
**Policy No.   1064616**

**B.   CONTINGENT TIME ELEMENT EXTENDED**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured at **contingent time element locations** located within the TERRITORY of this Policy.

As respects CONTINGENT TIME ELEMENT EXTENDED:

1)   Time Element loss recoverable under this Extension is extended to include the following TIME ELEMENT COVERAGE EXTENSIONS:

>   CIVIL OR MILITARY AUTHORITY
>   CONTINGENT TIME ELEMENT EXTENDED
>   DATA SERVICE PROVIDER TIME ELEMENT
>   DELAY IN STARTUP
>   EXTENDED PERIOD OF LIABILITY
>   INGRESS/EGRESS
>   ON PREMISES SERVICES
>   SERVICE INTERRUPTION TIME ELEMENT

2)   The Insured will influence and cooperate with the **contingent time element location** in every way and take any reasonable and necessary action to mitigate the loss payable hereunder.

3)   TIME ELEMENT EXCLUSIONS C does not apply.

CONTINGENT TIME ELEMENT EXTENDED Exclusions: As respects CONTINGENT TIME ELEMENT EXTENDED, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1)   lack of incoming or outgoing transmission of voice, data or video.

2)   **earth movement** as respects a direct or indirect customer, supplier, contract manufacturer or contract service provider located in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

3)   physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence of loss.

**C.   INGRESS/EGRESS**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured **location**, whether or not the premises or property of the Insured is damaged,



**Account No.   1-35024**
**Policy No.   1064616**

provided that such prevention is a direct result of physical damage of the type insured to property of the type insured.

INGRESS/EGRESS Exclusions: As respects INGRESS/EGRESS, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1) lack of incoming or outgoing service consisting of electric, fuel, gas, water, steam, refrigerant, sewerage and voice, data or video.

2) picketing or other action by strikers except for physical damage not excluded by this Policy.

3) physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of such physical damage; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

### D.   LOGISTICS EXTRA COST

This Policy covers the extra cost incurred by the Insured during the PERIOD OF LIABILITY due to the disruption of the **normal** movement of goods or materials:

1) directly between insured **locations**; or

2) directly between an insured **location** and a **location** of a direct customer, supplier, contract manufacturer or contract service provider to the Insured,

provided that such disruption is a direct result of physical loss or damage of the type insured to property of the type insured located within the TERRITORY of this Policy.



**Account No.   1-35024**
**Policy No.   1064616**

Measurement of Loss:

The recoverable extra cost loss will be the reasonable and necessary extra costs incurred by the Insured of the following:

1)  extra costs to temporarily continue as nearly **normal** as practicable the movement of goods or materials.

This Extension will apply when the PERIOD OF LIABILITY is in excess of 48 hours except 168 hours applies for **earth movement** and/or **flood** and/or **wind**.

LOGISTICS EXTRA COST Exclusions: As respects LOGISTICS EXTRA COST, the following additional exclusions apply:

This Policy does not insure:

1)  any loss resulting from disruption in the movement of goods or materials between **contingent time element locations**.

2)  any loss resulting from disruption of incoming or outgoing services consisting of electricity, gas, fuel, steam, water, refrigeration, sewerage and voice, data or video.

3)  any loss of income.

4)  costs that usually would have been incurred in conducting the business during the same period had there been no disruption of **normal** movement of goods or materials.

5)  costs of permanent repair or replacement of property that has been damaged or destroyed.

6)  any expense recoverable elsewhere in this Policy.

7)  any loss resulting from disruption caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

8)  any loss resulting from disruption caused by loss or damage from **earth movement** in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

9)  any loss resulting from disruption caused by physical loss or damage to personal property of the Insured while in transit.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)  starting at the time of physical loss or damage causing the disruption of the **normal** movement of goods or materials directly between insured **locations**; or directly between



**Account No.   1-35024**
**Policy No.   1064616**

the insured **location** and the **location** of the direct customer, supplier, contract manufacturer or contract service provider to the Insured, and

2) ending not later than:

   a) when with due diligence and dispatch the **normal** movement of goods or materials directly between insured **locations**; or directly between the insured **location** and the **location** of the direct customer, supplier, contract manufacturer or contract service provider to the Insured could be resumed; or

   b) the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

### E.   SERVICE INTERRUPTION TIME ELEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of service interruption at an insured **location** when the loss is caused by the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental event at the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable services.

This Extension will apply when the period of service interruption is in excess of 24 hours.

Additional General Provisions:

1) The Insured will immediately notify the suppliers of services of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

SERVICE INTERRUPTION TIME ELEMENT Exclusions: As respects SERVICE INTERRUPTION TIME ELEMENT, the following applies:

1) The exclusions in the EXCLUSIONS clause in the PROPERTY DAMAGE section do not apply except for:

   a) A1, A2, A3, A6, B1, B2, and

   b) B4 with respect to incoming or outgoing voice, data or video, and

   c) D1 except with respect to fungus, mold or mildew.



2) The following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

a) **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

b) **terrorism**.

As used above, the period of service interruption:

1) is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.

2) is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

3) does not extend to include the interruption of operations caused by any reason other than interruption of the specified service(s).

## ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS

### A.   ATTRACTION PROPERTY

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to an insured **location** and is within 1 statute mile/1.6 kilometres of the insured **location**, except this coverage will apply to the McCarran International Airport.

ATTRACTION PROPERTY Exclusions: As respects ATTRACTION PROPERTY, the following additional exclusion applies:

This Policy does not insure loss resulting from:

1) physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.



The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)  starting at the time of such physical damage; and

2)  ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

## B.  CRISIS MANAGEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location**, provided such order is a direct result of:

1)  a violent crime, suicide, attempted suicide, or armed robbery; or

2)  a death or bodily injury caused by a workplace accident;

at such insured **location**.

For the purposes of this Extension only, a workplace accident shall be considered a sudden, fortuitous event that happens during working hours and arises out of work performed in the course and the scope of employment.

This Extension of coverage will apply when the PERIOD OF LIABILITY is in excess of 4 hours.

CRISIS MANAGEMENT Exclusions: As respects CRISIS MANAGEMENT, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1)  **terrorism**.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)  starting with the time the civil or military authority prohibits access; and

2)  ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.



**Account No.   1-35024**
**Policy No.   1064616**

### C.   DELAY IN STARTUP

GROSS EARNINGS and EXTRA EXPENSE are extended to cover the Actual Loss Sustained incurred by the Insured during the PERIOD OF LIABILITY due to the reasonable and necessary delay in startup of business operations directly resulting from physical loss or damage of the type insured to insured property under construction at an insured **location**.

### D.   EXTENDED PERIOD OF LIABILITY

The GROSS EARNINGS coverage is extended to cover the reduction in sales resulting from:

1)  the interruption of business as covered by GROSS EARNINGS;

2)  for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss happened; and

3)  commencing with the date on which the liability of the Company for loss resulting from interruption of business would terminate if this Extension had not been included in this Policy.

However, this Extension does not apply to GROSS EARNINGS loss resulting from physical loss or damage caused by or resulting from **terrorism**.

EXTENDED PERIOD OF LIABILITY Exclusions: As respects EXTENDED PERIOD OF LIABILITY, the TIME ELEMENT EXCLUSIONS B of this section does not apply and the following applies instead:

This Policy does not insure against any increase in loss due to damages for breach of contract or for late or noncompletion of orders, or fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

Coverage under this Extension for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the extended period of liability.

Coverage under this Extension does not apply for more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

### E.   GOODWILL AND PUBLIC RELATIONS

This Policy covers the reasonable and necessary extra cost incurred by the Insured to compensate or accommodate guests as a direct result of actual or immediately impending physical loss or damage of the type insured by this Policy at the insured **location** where the costs are incurred.



This Additional Coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

Measurement of Loss:

The recoverable extra cost loss will be the reasonable and necessary extra costs or loss incurred by the Insured of the following:

1) extra costs or loss to transport and temporarily relocate guests, payments to guests for inconvenience or annoyance, removing or forgiving guest charges, and providing complimentary room, dining, shows, spa services, or other amenities, not to exceed the limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

GOODWILL AND PUBLIC RELATIONS Exclusions:  As respects GOODWILL AND PUBLIC RELATIONS, the following additional exclusions apply:

This Policy does not insure:

1) any loss resulting from disruption of incoming or outgoing services consisting of electricity, gas, fuel, steam, water, refrigeration, sewerage and voice, data or video.

2) any loss of income.

3) costs that usually would have been incurred in conducting the business during the same period had there been no disruption of **normal** guest services.

4) any expense recoverable elsewhere in this Policy.

5) any loss resulting from disruption caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

## F.   INTERRUPTION BY COMMUNICABLE DISEASE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1) an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2) a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such **location** with the actual not suspected presence of **communicable disease**.



**Account No.   1-35024**
**Policy No.   1064616**

This Extension will apply when access to such **location** is limited, restricted, or prohibited in excess of 48 hours.

INTERRUPTION BY COMMUNICABLE DISEASE Exclusions: As respects INTERRUPTION BY COMMUNICABLE DISEASE, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1) the enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.

2) loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any sequence of loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of the order of the authorized governmental agency or the Officer of the Insured; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

## G.   ON PREMISES SERVICES

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to the following property located within 1,000 feet/300 metres of the insured **location**:

1) Electrical equipment and equipment used for the transmission of voice, data or video.

2) Electrical, fuel, gas, water, steam, refrigeration, sewerage, voice, data or video transmission lines.

## H.   PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT

This Policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.



**Account No.   1-35024**
**Policy No.   1064616**

This Extension does not cover the Actual Loss Sustained by the Insured to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by TERRORISM coverage as provided in the PROPERTY DAMAGE section.

This Extension is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## I.   RELATED REPORTED VALUES

If reported TIME ELEMENT values include:

1)   **locations** used by the Insured (such as branch stores, sales outlets and other plants) but not listed on a schedule under this Policy; and

2)   a TIME ELEMENT loss would result at such **locations**,

3)   from insured physical loss or damage at an insured **location**,

then this Policy provides coverage for such resulting TIME ELEMENT loss in accordance with the coverage applicable at such insured **location**.

## J.   RESEARCH AND DEVELOPMENT

The GROSS EARNINGS coverage is extended to insure the Actual Loss Sustained by the Insured of continuing fixed charges and Ordinary Payroll directly attributable to the interruption of research and development activities that in themselves would not have produced income during the PERIOD OF LIABILITY.

The PERIOD OF LIABILITY for this Extension will be the period from the time of direct physical loss or damage of the type insured to the time when the property could be repaired or replaced and made ready for operations, except Ordinary Payroll shall not exceed the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.  Such period of time shall not be limited by the date of expiration of this Policy.

## K.   SOFT COSTS

This Policy covers the Actual Loss Sustained incurred by the Insured of **soft costs** during the PERIOD OF LIABILITY arising out of the delay of completion of buildings and additions under construction directly resulting from physical loss or damage of the type insured to insured property under construction at an insured **location**.



**Account No.  1-35024**
**Policy No.   1064616**

## LOSS ADJUSTMENT AND SETTLEMENT

**1.  REQUIREMENTS IN CASE OF LOSS**

The Insured will:

1)   give immediate written notice to the Company of any loss.

2)   protect the property from further loss or damage.

3)   promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, **actual cash value**, replacement value and amount of loss claimed.

4)   give a signed and sworn proof of loss to the Company within 90 days after the loss, unless that time is extended in writing by the Company.  The proof of loss must state the knowledge and belief of the Insured as to:

   a)   the time and origin of the loss.

   b)   the Insured's interest and that of all others in the property.

   c)   the **actual cash value** and replacement value of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property.

   d)   any changes in the title, use, occupation, location, possession or exposures of the property since the effective date of this Policy.

   e)   by whom and for what purpose any **location** insured by this Policy was occupied on the date of loss, and whether or not it then stood on leased ground.

5)   include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged.

6)   further, the Insured, will as often as may be reasonably required:

   a)   exhibit to any person designated by the Company all that remains of any property;

   b)   submit to examination under oath by any person designated by the Company and sign the written records of examinations; and

   c)   produce for examination at the request of the Company:

      (i)  all books of accounts, business records, bills, invoices and other vouchers; or

      (ii) certified copies if originals are lost,



**Account No.  1-35024**
**Policy No.  1064616**

at such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made.

## 2.    CURRENCY FOR LOSS PAYMENT

Losses will be adjusted and paid in the currency of the United States of America, except in Canada where losses will be paid in Canadian currency, unless directed otherwise by the Insured.

## 3.    PARTIAL PAYMENT OF LOSS SETTLEMENT

In the event of insured physical loss or damage determined by the Company's representatives to be in excess of the applicable Policy deductible, the Company will advance mutually agreed upon partial payment(s), subject to the Policy's provisions.  To obtain such partial payments, the Insured will submit a signed and sworn Proof of Loss as described in this Policy, with adequate supporting documentation.

## 4.    COLLECTION FROM OTHERS

The Company will not be liable for any loss to the extent that the Insured has collected for such loss from others.

## 5.    SUBROGATION

The Insured is required to cooperate in any subrogation proceedings.  The Company may require from the Insured an assignment or other transfer of all rights of recovery against any party for loss to the extent of the Company's payment.

The Company will not acquire any rights of recovery that the Insured has expressly waived prior to a loss, nor will such waiver affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by the Company in such proceedings, will be payable to the Insured in the proportion that the amount of:

1)    any applicable deductible; and/or

2)    any provable uninsured loss,

bears to the entire provable loss amount.

## 6.    COMPANY OPTION

The Company has the option to take all or any part of damaged property at the agreed or appraised value.  The Company must give notice to the Insured of its intention to do so within 30 days after receipt of Proof of Loss.

## 7.    ABANDONMENT

There may be no abandonment of any property to the Company.



**Account No.   1-35024**
**Policy No.   1064616**

8.    **APPRAISAL**

If the Insured and the Company fail to agree on the amount of loss, each will, on the written demand of either, select a competent and disinterested appraiser after:

1)    the Insured has fully complied with all provisions of this Policy, including REQUIREMENTS IN CASE OF LOSS; and

2)    the Company has received a signed and sworn Proof of Loss from the Insured.

Each will notify the other of the appraiser selected within 20 days of such demand.

The appraisers will first select a competent and disinterested umpire.  If the appraisers fail to agree upon an umpire within 30 days then, on the request of the Insured or the Company, the umpire will be selected by a judge of a court of record in the jurisdiction in which the appraisal is pending.  The appraisers will then appraise the amount of loss, stating separately the **actual cash value** and replacement cost value as of the date of loss and the amount of loss, for each item of physical loss or damage or if, for TIME ELEMENT loss, the amount of loss for each TIME ELEMENT coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire.  An award agreed to in writing by any two will determine the amount of loss.

The Insured and the Company will each:

1)    pay its chosen appraiser; and

2)    bear equally the other expenses of the appraisal and umpire.

A demand for APPRAISAL shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under REQUIREMENTS IN CASE OF LOSS.

The Company will not be held to have waived any of its rights by any act relating to appraisal.

9.    **SUIT AGAINST THE COMPANY**

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless:

1)    the Insured has fully complied with all the provisions of this Policy; and

2)    legal action is started within twelve months after inception of the loss.

If under the insurance laws of the jurisdiction in which the property is located, such twelve months' limitation is invalid, then any such legal action must be started within the shortest limit of time permitted by such laws.



**Account No.   1-35024**
**Policy No.   1064616**

### 10.   SETTLEMENT OF CLAIMS

The amount of loss for which the Company may be liable will be paid within 30 days after:

A.      proof of loss as described in this Policy is received by the Company; and

B.      when a resolution of the amount of loss is made either by:

   1)   written agreement between the Insured and the Company; or

   2)   the filing with the Company of an award as provided in the APPRAISAL clause of this
        section.



**Account No.  1-35024**
**Policy No.  1064616**

# GENERAL PROVISIONS

## 1.    CANCELLATION/NON-RENEWAL

This Policy may be:

A.    cancelled at any time at the request of the Insured by surrendering this Policy to the Company or by giving written notice to the Company stating when such cancellation will take effect; or

B.    cancelled by the Company by giving the Insured not less than:

    1)    60 days' written notice of cancellation; or

    2)    10 days' written notice of cancellation if the Insured fails to remit, when due, payment of premium for this Policy; or

C.    non-renewed by the Company by giving the Insured not less than 60 days' written notice of non-renewal.

Return of any unearned premium will be calculated on the customary short rate basis if the Insured cancels and on a pro-rata basis if the Company cancels this Policy.  Return of any unearned premium will be made by the Company as soon as practicable.

## 2.    INSPECTIONS

The Company, at all reasonable times, will be permitted, but will not have the duty, to inspect insured property.  The Company does not address life, safety or health issues.

The Company's:

A.    right to make inspections;

B.    making of inspections; or

C.    providing recommendations or other information in connection with any inspections,

will not constitute an undertaking, on behalf of or for the benefit of the Insured or others.  The Company will have no liability to the Insured or any other person because of any inspection or failure to inspect.

When the Company is not providing jurisdictional inspections, the Owner/Operator has the responsibility to assure that jurisdictional inspections are performed as required, and to assure that required jurisdictional Operating Certificates are current for their pressure equipment.

## 3.    PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS

A.    If the provisions of this Policy conflict with the laws of any jurisdictions in which this Policy applies, and if certain provisions are required by law to be stated in this Policy, this Policy



will be read so as to eliminate such conflict or deemed to include such provisions for insured **locations** within such jurisdictions.

B.   The Company will provide to the Insured copies of endorsements mandated for use by the laws of states in the United States of America.  The endorsements modify this Policy with respect to any insured property located in the state in which the endorsement applies.

C.   As respects the United States, its territories and possessions and the Commonwealth of Puerto Rico, the definition of **terrorism** is declared null and void and it is agreed that an event defined as a Certified Act of Terrorism under the terms of the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) attached to this Policy shall be considered an act of **terrorism** within the terms of this Policy.  Coverage recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) is excluded from any other coverage under this Policy. Any difference in limit between loss recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) and this Policy is not recoverable under this Policy.

## 4.   LIBERALIZATION

If during the period that insurance is in force under this Policy, any filed rules or regulations affecting the same are revised by statute so as to broaden the insurance without additional premium charge, such extended or broadened insurance will inure to the benefit of the Insured within such jurisdiction, effective the date of the change specified in such statute.

## 5.   MISREPRESENTATION AND FRAUD

This entire Policy will be void if, whether before or after a loss, an Insured has:

A.   willfully concealed or misrepresented any material fact or circumstance concerning this insurance, the subject thereof, any insurance claim, or the interest of an Insured.

B.   made any attempt to defraud the Company.

C.   made any false swearing.

## 6.   LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS

A.   The Company will pay for loss to specified property insured under this Policy to each specified Lender Loss Payee (hereinafter referred to as Lender) as its interest may appear, and to each specified Mortgagee as its interest may appear, under all present or future mortgages upon such property, in order of precedence of the mortgages.

B.   The interest of the Lender or Mortgagee (as the case may be) in property insured under this Policy will not be invalidated by:

1)   any act or neglect of the debtor, mortgagor, or owner (as the case may be) of the property.



**Account No.   1-35024**
**Policy No.   1064616**

2)   foreclosure, notice of sale, or similar proceedings with respect to the property.

3)   change in the title or ownership of the property.

4)   change to a more hazardous occupancy.

The Lender or Mortgagee will notify the Company of any known change in ownership, occupancy, or hazard and, within 10 days of written request by the Company, may pay the increased premium associated with such known change. If the Lender or Mortgagee fails to pay the increased premium, all coverage under this Policy will cease.

C.   If this Policy is cancelled at the request of the Insured or its agent, the coverage for the interest of the Lender or Mortgagee will terminate 10 days after the Company sends to the Lender or Mortgagee written notice of cancellation, unless:

1)   sooner terminated by authorization, consent, approval, acceptance, or ratification of the Insured's action by the Lender or Mortgagee, or its agent.

2)   this Policy is replaced by the Insured, with a policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement policy, notwithstanding any other provision of this Policy.

D.   The Company may cancel this Policy and/or the interest of the Lender or Mortgagee under this Policy, by giving the Lender or Mortgagee written notice 60 days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment. If the debtor, mortgagor, or owner has failed to pay any premium due under this Policy, the Company may cancel this Policy for such non-payment, but will give the Lender or Mortgagee written notice 10 days prior to the effective date of cancellation. If the Lender or Mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this Policy will cease.

E.   The Company has the right to invoke this Policy's SUSPENSION clause. The suspension of insurance will apply to the interest of the Lender or Mortgagee in any machine, vessel, or part of any machine or vessel, subject to the suspension. The Company will provide the Lender or Mortgagee at the last known address a copy of the suspension notice.

F.   If the Company pays the Lender or Mortgagee for any loss, and denies payment to the debtor, mortgagor or owner, the Company will, to the extent of the payment made to the Lender or Mortgagee be subrogated to the rights of the Lender or Mortgagee under all securities held as collateral to the debt or mortgage. No subrogation will impair the right of the Lender or Mortgagee to sue or recover the full amount of its claim. At its option, the Company may pay to the Lender or Mortgagee the whole principal due on the debt or mortgage plus any accrued interest. In this event, all rights and securities will be assigned and transferred from the Lender or Mortgagee to the Company, and the remaining debt or mortgage will be paid to the Company.



G.    If the Insured fails to render proof of loss, the Lender or Mortgagee, upon notice of the Insured's failure to do so, will render proof of loss within 60 days of notice and will be subject to the provisions of this Policy relating to APPRAISAL, SETTLEMENT OF CLAIMS, and SUIT AGAINST THE COMPANY.

H.    Other provisions relating to the interests and obligations of the Lender or Mortgagee may be added to this Policy by agreement in writing.

## 7.   OTHER INSURANCE

A.    If there is any other insurance that would apply in the absence of this Policy, this Policy will apply only after such insurance whether collectible or not.

B.    In no event will this Policy apply as contributing insurance.

C.    The Insured is permitted to have other insurance over any limits or sublimits of liability specified elsewhere in this Policy without prejudice to this Policy.  The existence of any such insurance will not reduce any limit or sublimit of liability in this Policy.  Any other insurance that would have provided primary coverage in the absence of this Policy will not be considered excess.

D.    The Insured is permitted to have other insurance for all, or any part, of any deductible in this Policy.  The existence of such other insurance will not prejudice recovery under this Policy.  If the limits of liability of such other insurance are greater than this Policy's applicable deductible, this Policy's insurance will apply only after such other insurance has been exhausted.

E.    If this Policy is deemed to contribute with other insurance, the limit of liability applicable at each **location**, for the purposes of such contribution with other insurers, will be the latest amount described in this Policy or the latest **location** value on file with the Company.

## 8.   POLICY MODIFICATION

This Policy contains all of the agreements between the Insured and the Company concerning this insurance.  The Insured and the Company may request changes to this Policy.  This Policy can be changed only by endorsements issued by the Company and made a part of this Policy.

Notice to any agent or knowledge possessed by any agent or by any other person will not:

A.    create a waiver, or change any part of this Policy; or

B.    prevent the Company from asserting any rights under the provisions of this Policy.



**Account No.   1-35024**
**Policy No.   1064616**

### 9.   REDUCTION BY LOSS

Claims paid under this Policy will not reduce its limit of liability, except claims paid will reduce any **annual aggregate** limit.

### 10.   SUSPENSION

On discovery of a dangerous condition, the Company may immediately suspend this insurance on any machine, vessel or part thereof by giving written notice to the Insured.  The suspended insurance may be reinstated by the Company.  Any unearned premium resulting from such suspension will be returned by the Company.

### 11.   TITLES

The titles in this Policy are only for reference.  The titles do not in any way affect the provisions of this Policy.

### 12.   ASSIGNMENT

Assignment of this Policy will not be valid except with the written consent of the Company.

### 13.   DEFINITIONS

The following terms when appearing in **boldface** in this Policy mean:

**actual cash value**:
the amount it would cost to repair or replace insured property, on the date of loss, with material of like kind and quality, with proper deduction for obsolescence and physical depreciation.

**annual aggregate**:
the Company's maximum amount payable during any policy year.

**communicable disease**:
disease which is:

A.   transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or

B.   Legionellosis.

**contaminant**:
anything that causes **contamination**.

**contamination**:
any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.



**contingent time element location**:

A.    any **location**:

    1)   of a direct customer, supplier, contract manufacturer or contract service provider to the Insured;

    2)   of any company under a royalty, licensing fee or commission agreement with the Insured;

B.    any **location** of a company that is a direct or indirect customer, supplier, contract manufacturer or contract service provider to a **location** described in A1 above,

not including **locations** of any company directly or indirectly supplying to, or receiving from, the Insured, electricity, fuel, gas, water, steam, refrigeration, sewage, voice, data or video.

**cyber event**:
any act involving the malicious or unauthorized access to, operation of, or use of **electronic data processing equipment or media**, regardless of any other cause or event contributing concurrently or in any other sequence of loss.  However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **cyber event** will not be considered to be loss by **cyber event** within the terms and conditions of this Policy.

**date or time recognition**:
the recognition, interpretation, calculation, comparison, differentiation, sequencing, accessing or processing of data involving one or more dates or times, including the Year 2000.

**earth movement**:
any natural or man-made earth movement including, but not limited to earthquake or landslide, regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical loss or damage by fire, explosion, sprinkler leakage, or **flood** resulting from **earth movement** will not be considered to be loss by **earth movement** within the terms and conditions of this Policy.

**electronic data processing equipment or media**:
any computer, computer system or component, hardware, network, microprocessor, microchip, integrated circuit or similar devices or components in computer or non-computer equipment, operating systems, data, programs or other software stored on electronic, electro-mechanical, electro-magnetic data processing or production equipment, whether the property of the Insured or not.

**fine arts**:
paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft, money, securities.

**flood**:
flood; surface waters; rising waters; storm surge, sea surge, wave wash; waves; tsunami; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or

Advantage - TE Select - US North America - 2016 (2019 update) ©2019 FM Global. All rights reserved



man-made bodies of water; or the spray therefrom; all whether driven by wind or not; or sewer back-up resulting from any of the foregoing; regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss.  Physical loss or damage from **flood** associated with a storm or weather disturbance whether or not identified by name by any meteorological authority, is considered to be **flood** within the terms of this Policy.  However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **flood** is not considered to be loss by **flood** within the terms and conditions of this Policy.

**irreplaceable**:
an item which cannot be replaced with other of like kind and quality.

**location**:
A.    as specified in the Schedule of Locations, or

B.    if not so specified in the Schedule of Locations:

    1)    a building, yard, dock, wharf, pier or bulkhead (or any group of the foregoing),

        a)    bounded on all sides by public streets, clear land space or open waterways, each not less than 50 feet/15 metres wide.  Any bridge or tunnel crossing such street, space or waterway will render such separation inoperative for the purpose of this definition.

**New Madrid Seismic Zone**:
Arkansas, United States of America, counties of:
Arkansas, Clay, Craighead, Crittenden, Cross, Fulton, Greene, Independence, Izard, Jackson, Lawrence, Lee, Lonoke, Mississippi, Monroe, Phillips, Poinsett, Prairie, Randolph, Sharp, St. Francis, White, Woodruff

Illinois, United States of America, counties of:
Alexander, Bond, Clay, Clinton, Crawford, Edwards, Effingham, Fayette, Franklin, Gallatin, Hamilton, Hardin, Jackson, Jasper, Jefferson, Johnson, Lawrence, Madison, Marion, Massac, Monroe, Perry, Pope, Pulaski, Randolph, Richland, Saline, St. Clair, Union, Wabash, Washington, Wayne, White, Williamson

Indiana, United States of America, counties of:
Gibson, Knox, Pike, Posey, Spencer, Vanderburgh, Warrick

Kentucky, United States of America, counties of:
Ballard, Caldwell, Calloway, Carlisle, Christian, Crittenden, Daviess, Fulton, Graves, Henderson, Hickman, Hopkins, Livingston, Lyon, Marshall, McCracken, McLean, Muhlenberg, Todd, Trigg, Union, Webster

Mississippi, United States of America, counties of:
Alcorn, Benton, Coahoma, De Soto, Lafayette, Marshall, Panola, Quitman, Tate, Tippah, Tunica

Missouri, United States of America, counties of:
Bollinger, Butler, Cape Girardeau, Carter, Dunklin, Iron, Jefferson, Madison, Mississippi, New Madrid, Oregon, Pemiscot, Perry, Reynolds, Ripley, Scott, Shannon, St. Francois, St. Louis, City of St. Louis, Ste. Genevieve, Stoddard, Washington, Wayne



**Account No.   1-35024**
**Policy No.   1064616**

Tennessee, United States of America, counties of:
Benton, Carroll, Chester, Crockett, Decatur, Dyer, Fayette, Gibson, Hardeman, Hardin, Haywood, Henderson, Henry, Houston, Humphreys, Lake, Lauderdale, Madison, McNairy, Montgomery, Obion, Perry, Shelby, Stewart, Tipton, Weakley

**normal**:
the condition that would have existed had no physical loss or damage happened.

**normal cost**:
the cost associated with the movement of goods or materials suffering the disruption that the Insured would have incurred had no physical loss or damage causing disruption happened.

**occurrence**:
the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by one discrete event of physical loss or damage, except as respects the following:

A.     **terrorism**: **occurrence** shall mean the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by all acts of **terrorism** during a continuous period of seventy-two (72) hours.

B.     **earth movement**: **occurrence** shall mean the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by all **earth movement(s)** during a continuous period of seventy-two (72) hours.

**off-premises data processing or data transmission services**:
the storage or processing of data performed off-premises of the Insured's property, including the transmission of voice, data or video over a single, or combination of, computer or communication networks.

**Pacific Northwest Seismic Zone**:
Oregon, United States of America, counties of:
Benton, Clackamas, Clatsop, Columbia, Coos, Curry, Douglas, Hood River, Jackson, Josephine, Klamath, Lane, Lincoln, Linn, Marion, Multnomah, Polk, Tillamook, Washington, Yamhill

Washington, United States of America, counties of:
Chelan, Clallam, Clark, Cowlitz, Grays Harbor, Island, Jefferson, King, Kitsap, Kittitas, Lewis, Mason, Pacific, Pierce, San Juan, Skagit, Skamania, Snohomish, Thurston, Wahkiakum, Whatcom

British Columbia (includes Vancouver Island), Canada:
South of 50° N latitude and west of 120° W longitude

**period of operational testing**:
the period of time beginning 24 hours prior to the earlier of the following:

A.     introduction, into a system, of feedstock or other materials for processing or handling;

B.     commencement of fuel or energy supply to a system,



and ending with the earlier of the following:

A.     the expiration date or cancellation date of this Policy.

B.     if specified, the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

**physical loss or damage to electronic data, programs or software**:
the destruction, distortion or corruption of electronic data, programs or software.

**representative company(ies)**:
Factory Mutual Insurance Company, FM Insurance Company Limited or FM Insurance Europe S.A.; Affiliated FM Insurance Company; Appalachian Insurance Company or any other company issuing a local policy at the direction of the Company.

**soft costs**:
costs over and above those that are **normal** at an insured **location** undergoing renovation or in the course of construction, limited to the following:

A.     construction loan fees - the additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction including; the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, charges by the lenders for the extension or renewal of loans necessary.

B.     commitment fees, leasing and marketing expenses - the cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of re-leasing and marketing due to loss of tenant(s) or purchaser(s).

C.     additional fees for architects, engineers, consultants, attorneys and accountants needed for the completion of construction, repairs or reconstruction.

D.     property taxes, building permits, additional interest on loans, realty taxes and insurance premiums.

**terrorism**:
any act, involving the use or threat of: force, violence, dangerous conduct, interference with the operations of any business, government or other organization or institution, or any similar act,

when the effect or apparent purpose is:

A.     to influence or instill fear in any government (de jure or de facto) or the public, or any segment of either; or

B.     to further or to express support for, or opposition to, any political, religious, social, ideological or similar type of objective or position.



**transmission and distribution systems**:
transmission and distribution systems including but not limited to electricity, gas, fuel, steam, water, refrigeration, sewerage, voice, data, and video.  Such systems shall include poles, towers and fixtures, overhead conductors and devices, underground and underwater conduit, underground and underwater conductors and devices, line transformers, service meters, street lighting and signal systems.

**valuable papers and records**:
written, printed or otherwise inscribed documents and records, including books, maps, films, drawings, abstracts, deeds, mortgages and manuscripts, all of which must be of value to the Insured.

**wind**:
direct action of wind including substance driven by wind.  **Wind** does not mean or include anything defined as **flood** in this Policy.

**wind areas United States Northeast**:
Connecticut, United States of America, counties of:
Fairfield, Hartford, Middlesex, New Haven, New London, Tolland, Windham

Delaware, United States of America, county of:
Kent, New Castle, Sussex

Maine, United States of America, counties of:
Androscoggin, Cumberland, Hancock, Knox, Lincoln, Sagadahoc, Waldo, Washington, York

Maryland, United States of America, counties of:
Calvert, Charles, Dorchester, St. Mary's, Somerset, Wicomico, Worcester

Massachusetts, United States of America, counties of:
Barnstable, Bristol, Dukes, Essex, Middlesex, Nantucket, Norfolk, Plymouth, Suffolk

New Hampshire, United States of America, counties of:
Rockingham, Strafford

New Jersey, United States of America, counties of:
Atlantic, Bergen, Burlington, Cape May, Cumberland, Essex, Hudson, Middlesex, Monmouth, Ocean, Salem, Union

New York, United States of America, counties of:
Bronx, Kings, Nassau, New York, Queens, Richmond, Suffolk, Westchester

Rhode Island, United States of America, counties of:
Bristol, Kent, Newport, Providence, Washington

Virginia, United States of America, counties and independent cities of:
the counties of Accomack, Gloucester, Isle of Wight, James City, Lancaster, Mathews, Middlesex, Northampton, Northumberland, Surry, York



**Account No.   1-35024**
**Policy No.   1064616**

the independent cities of Chesapeake, Hampton, Newport News, Norfolk, Poquoson, Portsmouth, Suffolk, Virginia Beach, Williamsburg



Account No. 1-35024
Policy No. 1064616

## SCHEDULE OF LOCATIONS, APPENDIX A

| Location No. | Index No. | Location Description |
|---|---|---|
| 0001 | 079312.84 | 3121 & 3131 Las Vegas Boulevard S<br>Las Vegas, Nevada, 89109-1967<br>United States of America<br>Clark<br><br>Wynn Las Vegas/Encore at Wynn Las Vegas |
| 0005 | 079311.62 | 3720 Howard Hughes Parkway<br>Las Vegas, Nevada, 89169-6016<br>United States of America<br>Clark<br><br>Office |
| 0009 | 001383.42 | 3661 West Martin Avenue<br>Las Vegas, Nevada, 89118-4556<br>United States of America<br>Clark<br><br>Warehouse - Off-site - Retail Operations<br>(WDD/Angel Fragoso/Laura Herzog) |
| 0012 | 079301.53 | 181 East Reno Avenue, Hanger G-7<br>Las Vegas, Nevada, 89119-1138<br>United States of America<br>Clark<br><br>Hangar G-7 |
| 0015 | 002073.25 | 225 West Valley Boulevard, Suite H-188<br>San Gabriel, California, 91776-3724<br>United States of America<br>Los Angeles<br><br>Marketing Office |
| 0016 | 002220.67 | 734 Pilot Road<br>Las Vegas, Nevada, 89119-4416<br>United States of America<br>Clark<br><br>Office, Wynn Design and Development |

WR_FM Policies_175
175



Account No. 1-35024
Policy No. 1064616

## SCHEDULE OF LOCATIONS, APPENDIX A

| Location No. | Index No. | Location Description |
|---|---|---|
| 0017 | 002220.67 | 736 Pilot Road<br>Las Vegas, Nevada, 89119-4416<br>United States of America<br>Clark<br><br>Wynn Design and Development files, fabric samples, and offices/cubicles - Off-site |
| 0018 | 002220.67 | 740 Pilot Road<br>Las Vegas, Nevada, 89119-4416<br>United States of America<br>Clark<br><br>Office, Information Technology |
| 0020 | 002635.50 | 3848 Koval Lane<br>Las Vegas, Nevada, 89109<br>United States of America<br>Clark<br><br>Wynn Design & Development - Flex Building |
| 0022 | 003080.45 | 101 Station Landing<br>Medford, Massachusetts, 02155-5134<br>United States of America<br>Middlesex<br><br>Office Space |
| 0023 | 079301.53 | 177 East Reno Avenue, Suite G6<br>Las Vegas, Nevada, 89119-1162<br>United States of America<br>Clark<br><br>Hangar G-6 |
| 0024 | 002995.48 | 1 Broadway<br>Everett, Massachusetts, 02149-2432<br>United States of America<br>Middlesex<br><br>Encore Boston Harbor |

WR_FM Policies_176
176



Account No. 1-35024
Policy No. 1064616

## SCHEDULE OF LOCATIONS, APPENDIX A

| Location No. | Index No. | Location Description |
|---|---|---|
| 0025 | 003288.59 | 3 Charlton Street<br>Everett, Massachusetts, 02149-2405<br>United States of America<br>Middlesex<br><br>Office Space |
| 0034 | 002220.67 | 740 Pilot Road<br>Las Vegas, Nevada, 89119-4416<br>United States of America<br>Clark<br><br>Information Technology Equipment |
| 0039 | | 10801 W Charleston Boulevard Ste 440<br>Las Vegas, Nevada, 89135-1206<br>United States of America<br>Clark<br><br>TAL Stuido |
| 0040 | | 1201 Searles Avenue<br>Las Vegas, Nevada, 89101-1199<br>United States of America<br>Clark<br><br>Las Vegas Cold Storage (Temp storage space) |

WR_FM Policies_177
177



Account No. 1-35024
Policy No. 1064616

## NAMED FLOOD LOCATIONS, APPENDIX B

| Location No. | Index No. | Location Description |
|---|---|---|
| 0001 | 079312.84 | 3121 & 3131 Las Vegas Boulevard S<br>Las Vegas, Nevada, 89109-1967<br>United States of America<br>Clark<br><br>Wynn Las Vegas/Encore at Wynn Las Vegas |
| 0005 | 079311.62 | 3720 Howard Hughes Parkway<br>Las Vegas, Nevada, 89169-6016<br>United States of America<br>Clark<br><br>Office |
| 0009 | 001383.42 | 3661 West Martin Avenue<br>Las Vegas, Nevada, 89118-4556<br>United States of America<br>Clark<br><br>Warehouse - Off-site - Retail Operations<br>(WDD/Angel Fragoso/Laura Herzog) |
| 0012 | 079301.53 | 181 East Reno Avenue, Hanger G-7<br>Las Vegas, Nevada, 89119-1138<br>United States of America<br>Clark<br><br>Hangar G-7 |
| 0015 | 002073.25 | 225 West Valley Boulevard, Suite H-188<br>San Gabriel, California, 91776-3724<br>United States of America<br>Los Angeles<br><br>Marketing Office |
| 0016 | 002220.67 | 734 Pilot Road<br>Las Vegas, Nevada, 89119-4416<br>United States of America<br>Clark<br><br>Office, Wynn Design and Development |



Account No. 1-35024
Policy No. 1064616

## NAMED FLOOD LOCATIONS, APPENDIX B

| Location No. | Index No. | Location Description |
|---|---|---|
| 0017 | 002220.67 | 736 Pilot Road<br>Las Vegas, Nevada, 89119-4416<br>United States of America<br>Clark<br><br>Wynn Design and Development files, fabric samples, and offices/cubicles - Off-site |
| 0018 | 002220.67 | 740 Pilot Road<br>Las Vegas, Nevada, 89119-4416<br>United States of America<br>Clark<br><br>Office, Information Technology |
| 0020 | 002635.50 | 3848 Koval Lane<br>Las Vegas, Nevada, 89109<br>United States of America<br>Clark<br><br>Wynn Design & Development - Flex Building |
| 0022 | 003080.45 | 101 Station Landing<br>Medford, Massachusetts, 02155-5134<br>United States of America<br>Middlesex<br><br>Office Space |
| 0023 | 079301.53 | 177 East Reno Avenue, Suite G6<br>Las Vegas, Nevada, 89119-1162<br>United States of America<br>Clark<br><br>Hangar G-6 |
| 0024 | 002995.48 | 1 Broadway<br>Everett, Massachusetts, 02149-2432<br>United States of America<br>Middlesex<br><br>Encore Boston Harbor |

WR_FM Policies_179
179



**Account No. 1-35024**
**Policy No. 1064616**

## NAMED FLOOD LOCATIONS, APPENDIX B

| Location No. | Index No. | Location Description |
|---|---|---|
| 0025 | 003288.59 | 3 Charlton Street<br>Everett, Massachusetts, 02149-2405<br>United States of America<br>Middlesex<br><br>Office Space |
| 0034 | 002220.67 | 740 Pilot Road<br>Las Vegas, Nevada, 89119-4416<br>United States of America<br>Clark<br><br>Information Technology Equipment |
| 0039 | | 10801 W Charleston Boulevard Ste 440<br>Las Vegas, Nevada, 89135-1206<br>United States of America<br>Clark<br><br>TAL Stuido |
| 0040 | | 1201 Searles Avenue<br>Las Vegas, Nevada, 89101-1199<br>United States of America<br>Clark<br><br>Las Vegas Cold Storage (Temp storage space) |

WR_FM Policies_180
180



**Account No. 1-35024**
**Policy No. 1064616**

## SERVICE ANIMALS, APPENDIX C

Rocket: Male, Labrador Retriever: DOB 8/7/14
Bob: Male, Springer Spaniel: DOB 11/21/12
Umit: Male, Belgian Malinois/German Shepard: DOB 4/24/15
Buddy: Male, German Shepard: DOB 1/5/15
Maxx: Male, English Springer Spaniel: DOB 11/29/13
Astor: Male, German Shepherd: DOB 8/26/12
Scamp: Male, Labrador Retriever: DOB 1/1/15
Mint: Female, Springer Spaniel: DOB 2/10/15
Rocky: Male, Labrador Retriever: DOB: 1/11/15
Robbie: Male, German Shepherd Mix: DOB 10/20/15
Marko: Male, German Shepherd: DOB 9/12/17
Tika: Dutch Shepherd, Female, DOB: 4/7/17
Simms: Labrador Retriever, Male DOB: 5/10/16
Tessie: Weimaraner, Female DOB: 11/10/16
Paddy: Labrador Retriever, Male DOB: 2/17/17
Mystic: German Shepherd, Male DOB: 10/15/16
Liberty: German Shepherd, Female DOB: 5/17/16
Lotto: German Shorthaired Pointer, Male, DOB: 2/19/18

WR_FM Policies_181
181

Account No. 1-35024
Policy No. 1064616

## SUPPLEMENTAL UNITED STATES
## CERTIFIED ACT OF TERRORISM ENDORSEMENT

**This Endorsement is applicable to all insured property in the United States, its territories and possessions and the Commonwealth of Puerto Rico.**

**Coverage for "Certified Act of Terrorism" Under The Terrorism Risk Insurance Act of 2002, as amended.**

In consideration of a premium charged of **USD 359,000**, this Policy, subject to the terms and conditions therein and in this Endorsement, covers direct physical loss or damage to insured property and any resulting TIME ELEMENT loss, as provided in the TIME ELEMENT section of the Policy, caused by or resulting from a Certified Act of Terrorism as defined herein.

Notwithstanding anything contained elsewhere in this Policy, any exclusion or limitation of terrorism in this Policy and any endorsement attached to and made a part of this Policy, is hereby amended to the effect that such exclusion or limitation does not apply to a "Certified Act of Terrorism" as defined herein. This amendment does not apply to any limit of liability for a Certified Act of Terrorism, if any, stated under the LIMITS OF LIABILITY clause of the DECLARATIONS section of this Policy.

With respect to any one or more Certified Act(s) of Terrorism, this Company will not pay any amounts for which the Company is not responsible under the terms of the Terrorism Risk Insurance Act of 2002 (including subsequent action of Congress pursuant to the Act) which includes a provision stating that if the aggregate insured losses exceed USD 100,000,000,000 during any calendar year, neither the United States Government nor any insurer that has met its insurer deductible shall be liable for the payment of any portion of the amount of such losses that exceed USD 100,000,000,000.  If the aggregate insured losses for all insurers exceed USD 100,000,000,000, your coverage may be reduced.

The coverage provided under this Endorsement for "Certified" losses caused by acts of terrorism will be partially reimbursed by the United States Government under a formula established by Federal Law. Under this formula, the United States pays 80% of covered terrorism losses exceeding a statutorily established retention by the insurer referenced in this Policy.  The premium charged for this coverage is provided above.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Endorsement or the Policy.

The coverage provided by this Endorsement only applies to a Certified Act of Terrorism.

For the purposes of this Endorsement, a "Certified Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002 as amended and extended.  The criteria contained in that Act for a "Certified Act of Terrorism" include the following:

A.    The act resulted in aggregate losses in excess of USD 5,000,000; and

B.    The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of

the United States or to influence the policy or affect the conduct of the United States Government by coercion.



**Account No. 1-35024**
**Policy No. 1064616**

## CYBER OPTIMAL RECOVERY ENDORSEMENT

It is agreed that this Endorsement is a part of the Policy and that the terms and conditions of the Policy are amended as described herein.  All other terms and conditions of the Policy remain unchanged.

INSURED OPTION:

The Insured acknowledges having purchased a cyber policy.

As respects loss or damage that is covered by both this Policy and the cyber policy, and notwithstanding anything contained in the OTHER INSURANCE clause in the GENERAL PROVISIONS section of this Policy, the Insured may elect, within 180 days of notifying this Company of the loss, to apportion the loss between this Policy and the cyber policy and to designate this Policy as primary, excess or contributing insurance to the cyber policy with respect to each portion of the loss, provided designating it as such is necessary to maximize the total indemnity available for the loss under both this Policy and the cyber policy.

This election option shall be subject to the following additional conditions:

ADDITIONAL CONDITIONS

1)   The Insured will provide this Company with a copy of any cyber policy in force at the time of loss.

2)   Any coverage provided by the cyber policy that is not provided by this Policy does not extend to this Policy.

3)   The insolvency, inability or unwillingness to pay of the company issuing the cyber policy shall in no event increase this Company's liability or delay settlement under this Policy.

## GENERAL CHANGE ENDORSEMENT NO.  001

**Account No.  1-35024**
**Policy No.  1064616**

**Insured:  Wynn Resorts, Limited**

**This Endorsement is attached to and forms a part of the above stated Policy.  Premium for this Endorsement, if any, and the future installment amount are stated elsewhere.**

Effective: 29 June 2020

1)      The following service animal is removed from Service Animals, Appendix C:

Mystic: German Shepherd, Male DOB: 10/15/16

**Factory Mutual Insurance Company**

**Dated   12 October 2020**            **By**_____

**Authorized Signature**

# EXHIBIT 3

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| FACTORY MUTUAL INSURANCE COMPANY (as Assignee of ALBANY MOLECULAR RESEARCH, INC. and OSO BIOPHARMACEUTICALS MANUFACTURING, LLC) | ) ) ) ) ) ) | |
| Plaintiff, | ) | **CASE NO.: 1:17-cv-00760-GJF-LF** |
| vs. | ) ) | |
| FEDERAL INSURANCE COMPANY and DOES 1-10, | ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF FACTORY MUTUAL INSURANCE COMPANY'S MOTION *IN LIMINE* NO. 5 RE PHYSICAL LOSS OR DAMAGE

### I.   INTRODUCTION

Plaintiff Factory Mutual Insurance Company ("FM Global") hereby moves this court for an order excluding any and all evidence, references to evidence, testimony and argument that the mold infestation, as well as the costs incurred to remediate and return the facility to its pre-loss condition, is not physical loss under the Federal Insurance Company policy.  Plaintiff further moves the court to instruct defendant and defendant's counsel to advise all witnesses accordingly.

Evidence and argument that mold is not physical damage have no tendency to prove or disprove disputed facts relevant to the determination of this action and are contrary to the law in this regard.  Accordingly, such assertions cannot lead to proper evidentiary inferences, i.e., a deduction of *fact* logically and reasonable drawn from another established *fact*.  It will consume unnecessary

time and create an extreme danger of confusing and misleading the jury about what is physical loss

or damage for purposes of establishing coverage under the Federal policy.

## II.      ARGUMENT

### A.      Legal Standard.

The Court has the inherent authority to control trial proceedings, including ruling on  motions

*in limine.* See, e.g., *Luce v. United States,* 469 U.S. 38, 40, n.2 and 4 (1984). In addition, a motion *in*

*limine*:

> affords an opportunity to the court to rule on the admissibility of evidence in
> advance, and prevents encumbering the record with immaterial or prejudicial matter,
> as well as providing a means of ensuring that privileged material as to which
> discovery has been allowed by the court will not be used at trial if it is found to be
> inadmissible.

75 Am.Jur.2d, *Trial* § 94 (1991) (footnotes omitted).

Federal Rule of Evidence Rule 401 states that evidence is relevant if: (a) it has any tendency

to make a fact more or less probable than it would be without the evidence; and (b) the fact is of

consequence in determining the action. *Sprint/United Mgmt. Co. v. Medelsohn*, 552 U.S. 379, 388

(2008). Rule 402 specifically prohibits irrelevant evidence. The Advisory Committee has stated that

"relevance is not an inherent characteristic of any item of evidence but exists only as a relation

between an item of evidence and a matter properly provable in the case." *Fed. R. Evid.* 401. In

addition, the Court may exclude otherwise relevant evidence "if its probative value is substantially

outweighed by the danger of unfair prejudice." *Fed. R. Evid.* 403. Further, evidence may be excluded

when there is a significant danger that the jury might base its decision on emotion, or when non-

party events would distract reasonable jurors from the real issues in the case. *Tennison v. Circus*

*Circus Enterprises, Inc*., 244 F.3d 684, 690 (9th Cir. 2001). With this in mind, "motion[s] in limine

allow[] the parties to resolve evidentiary disputes before trial and avoid[] potentially prejudicial

evidence being presented in front of the jury, thereby relieving the trial judge from the formidable

task of neutralizing the taint of prejudicial evidence." *Brodit v. Cambra*, 350 F.3d 985, 1004-05 (9th Cir. 2003).

### B.    The Mold Infestation Is Physical Loss or Damage Under the Federal Policy.

FM Global anticipates that Federal will argue and attempt to introduce evidence that the mold infestation is not "physical loss or damage" under its policy and thus, not covered. In addition, Federal has indicated it will assert that the costs to remediate and return the facility to its pre-loss condition are not "physical loss or damage." These arguments are contrary to the facts of this loss and the case law which broadly interprets the term "physical loss or damage" in property insurance policies.[1]

It is undisputed that the mold infestation destroyed the aseptic environment and rendered Room 152 unfit for its intended use – manufacturing injectable pharmaceutical products. Numerous courts have concluded that loss of functionality or reliability under similar circumstances constitutes physical loss or damage. *See, e.g., Western Fire Insurance Co. v. First Presbyterian Church*, 437 P.2d 52 (Colo. 1968) (church building sustained physical loss or damage when it was rendered uninhabitable and dangerous due to gasoline under the building); *Gregory Packaging, Inc. v. Travelers Property and Casualty Company of America*, Civ. No. 2:12-cv-04418 2014 U.S. Dist. LEXIS 165232**,** 2014 WL 6675934 (D. N.J. 2014) (unsafe levels of ammonia in the air inflicted "direct physical loss of or damage to" the juice packing facility "because the ammonia physically rendered the facility unusable for a period of time."); *Port Authority of N.Y. and N.J. v. Affiliated FM Ins. Co*., 311 F.3d 226, 236 (3d Cir. 2002) (asbestos fibers); *Essex v. BloomSouth Flooring Corp*., 562 F.3d 399, 406 (1st Cir. 2009) (unpleasant odor in home); *TRAVCO Ins. Co. v. Ward*, 715

---

[1] At best for Federal, 'physical loss or damage,' which is undefined, is susceptible of more than one reasonable interpretation and is therefore ambiguous and must be construed against Federal. See Memorandum and Order, docket 118, p. 9, citing *United Nuclear Corp. v. Allstate Ins. Co*., 285 P.3d 644, 647 & 649 (N.M. 2012); *Battishill v. Farmers All. Ins. Co*., 127 P.3d 1111, 1115 (N.M. 2006).

F.Supp.2d 699, 709 (E.D.Va. 2010), aff'd, 504 F. App'x. 251 (4th Cir. 2013) ("toxic gases" released by defective drywall).

Loss of functionality and/or reliability is especially significant where, as here, the property covered involves a product to be consumed by humans.  Courts have concluded that the product is damaged where its "function and value have been seriously impaired, such that the product cannot be sold." *Pepsico, Inc. v. Winterthur International America Insurance Co*., 806 N.Y.S.2d 709, 744 (App. Div. 2005),  citing *General Mills, Inc. v. Gold Medal Insurance Co*., 622 N.W.2d 147 (Minn. Ct.App. 2001); *Pillsbury Co. v. Underwriters at Lloyd's, London*, 705 F Supp 1396 (D. Minn. 1989); *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Terra Indus*., 216 F Supp 2d 899 (N.D. Iowa 2002), aff'd 346 F3d 1160 (8th Cir. 2003), cert denied 541 US 939 (2004); *Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc*., 93 Cal Rptr. 2d 364 (Cal.App. 2000); *Zurich Am. Ins. Co. v. Cutrale Citrus Juices USA, Inc*., 2002 WL 1433728, 2002 US Dist LEXIS 26829 (M.D. Fla. 2002). These courts' rationale regarding food products applies equally, if not more so, to the injectable pharmaceuticals OSO manufactured which were exposed to mold and no longer met industry safety standard.  *See*, *General Mills v. Gold Medal Insurance*, 622 N.W.2d at 152 (food product which no longer met FDA safety standard sustained property damage.); *Motorists Mutual Ins. Co. v. Hardinger*, 131 F.Appx. 823 (3d Cir. 2005) (E coli in water well was physical loss or damage to insured's home.)[2]

The period of time as well as costs required to bring OSO's facility to the level of cleanliness following the mold infestation required by OSO's customers is also physical loss or damage covered by the Federal policy. The facility was damaged by stringent requirements of OSO's customers regarding production to the same extent it was damaged from the mold infestation itself as the facility was unusable as the result of a covered loss. See, e.g., *Western Fire v. First Presbyterian*,

_____

[2] The Court appears to agree that the mold infestation at the OSO facility was "physical loss or damage" as that term is used in property insurance policies such as the one issued by Federal.  See Memorandum and Order, docket 118, p. 9.

437 P.2d  at 55 (insured was awarded costs to remediate infiltration and contamination when gasoline rendered church unusable); *Farmers Insurance Co. v. Trutanich,* 858 P.2d 1332, 1335 (Ore.App. 1993) (costs of rectifying methamphetamine odor covered as direct physical loss or damage.)

The case of *Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co*., 256 Minn. 404, 98 N.W.2d 280 (1959 Minn.) is instructive.  There, the insured manufactured food products for the army pursuant to a contract that required the manufacturing plant be smoke free.  When smoke from a fire on a neighbor's property permeated the insured's plant for some period of time, the army refused to accept any of the products, rendering them worthless.  The Minnesota Supreme Court rejected the insurer's argument that there was no physical loss or damage.  According to the court, the food was damaged because of army regulations that set forth stringent requirements for the manufacturing environment.  The court also noted that the impairment of value, not the physical damage, was the measure of damages. *Id.* 98 N.W. 2d at 293.

Here, Federal was familiar with OSO's manufacturing process and the contracts which required OSO to maintain an aseptic manufacturing standards at its facilities.  Federal was also aware that a mold infestation could cause significant damage not only to the products exposed to the mold, but also because of the time and cost to clean the mold to the standards required by the manufacturing contracts. Without the customers' approval of the restored aseptic conditions following the mold infestation, OSO's facility remained unusable. Indeed, had OSO manufactured products without the customers' approval of the facility, the customers could have properly refused to accept the  products and they would have been as worthless as the food products at issue in *Marshall Produce v. St. Paul.*  See also, *General Mills, Inc. v. Gold Medal Insurance Co*., 622 N.W.2d 147 (Minn. Ct.App. 2001) (The function and value of food products was impaired where the

5

FDA prevented the insured from selling them.); *Pepsico, Inc. v. Winterthur International America Insurance Co.*, 806 N.Y.S.2d 709, 744 (App. Div. 2005) (Insured sustained property damage where its beverages had become "unmerchantable," i.e., the product's function and value were seriously impaired, such that the product could not be sold.)

Accordingly, evidence or argument that the mold infestation or the time and costs to remediate the infestation are not physical loss or damage does not create a reasonable inference as to the probability or lack of probability of a fact. *Fed. R. Evid.* 401; *A.I. Credit Corp v. Legion Insurance Co.*, 265 F.3d 630, 638 (7th Cir. 2001). There being no legal basis to require FM Global to prove demonstrable structural damage or alteration to property or products, evidence or argument in this regard does not involve or establish a controverted fact and should be barred from trial. Allowing Federal to argue or elicit testimony that the loss did not create structural damage or alteration to property or products, so is not covered is inconsistent the law, prejudicial to FM Global and will only confuse the jury. See *Fed. R. Evid.* 403.

## III.   CONCLUSION

Based on the foregoing, FM Global respectfully requests that the Court grant this motion *in limine* to preclude questions, testimony or argument that the mold infestation and costs to remediate the infestation are not physical loss or damage under the Federal policy.

Respectfully submitted,

/s/*Maureen A. Sanders*
MAUREEN A. SANDERS
Email: mas@sanwestlaw.com
SANDERS & WESTBROOK, PC
102 Granite Ave. NW
Albuquerque, NM 87102
Tel.: (505) 243-2243

Joyce C. Wang (California Bar No. 121139)
Email:  jwang@ccplaw.com
Colin C. Munro (California Bar No. 195520)
Email:  cmunro@ccplaw.com
CARLSON CALLADINE & PETERSON LLP
353 Sacramento Street, 16th Floor
San Francisco, CA 94111
Tel:  (415) 391-3911
Fax:  (415) 391-3898

Attorneys for Plaintiff
FACTORY MUTUAL INSURANCE COMPANY
(individually, and as Assignee of ALBANY
MOLECULAR RESEARCH, INC. and OSO
BIOPHARMACEUTICALS MANUFACTURING,
LLC)

## CERTIFICATE OF SERVICE

This is to certify that on November 19, 2019, a true and correct copy of the foregoing was

delivered to all counsel of record in accordance with the Federal Rules of Civil Procedure and the

Local Rules of this Court.

/s/Maureen A. Sanders
Maureen A. Sanders
Email:  mas@sanwestlaw.com
SANDERS & WESTBROOK, PC

**PLAINTIFF'S MIL NO. 5**

**CASE NO. 1:17-CV-00760-GJF-LF**

# EXHIBIT 4

Talking Points on the 2019 Novel Coronavirus (2019-nCoV)

"2019 Novel Coronavirus (2019-nCoV) is a virus (more specifically, a coronavirus) identified as the cause of an outbreak of respiratory illness first detected in Wuhan, China. Early on, many of the patients in the outbreak in Wuhan, China reportedly had some link to a large seafood and animal market, suggesting animal-to-person spread. However, a growing number of patients reportedly have not had exposure to animal markets, indicating person-to-person spread is occurring. At this time, it's unclear how easily or sustainably this virus is spreading between people.  The latest situation summary updates are available on CDC's web page 2019 Novel Coronavirus, Wuhan, China."[1]

Several of our clients have inquired as to whether there is coverage for losses they have or expect to incur as a result of the virus, which has spread outside of China. As one might expect, we have a wide range of clients who may be affected in a variety of ways by this outbreak. This document will not deal with all the issues associated with this matter, but will be helpful in providing responses to basic questions as it relates to the coverage provided by our policies.

The standard FM Global Advantage and AFM proVision forms provide a specific coverage for Communicable Disease. The Advantage policy provides Communicable Disease Response under Property Damage and Interruption by Communicable Disease under Time Element. The proVision policy provides coverage for Communicable Disease – Property Damage and Communicable Disease – Business Interruption. This memo addresses the standard policy language (cited below).

**Lead in policy language policy language is noted below:**
Property Damage
   The 2019Advantage Policy states in part:
      If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such location is limited, restricted or prohibited by:
      1) an order of an authorized governmental agency regulating the actual not suspected presence of communicable disease; or
      2) a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

   The proVision states:
      If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:
      **a)** An order of an authorized governmental agency regulating or as result of such presence of **communicable disease**; or
      **b)** A decision of an Officer of the Insured as a result of such presence of **communicable disease**

This same initial lead in language also appears under the Advantage Time Element coverage and the proVision Business Interruption coverage.

Q. What is the trigger of coverage for Property Damage?

   A. Under each policy there must be the actual presence of a **communicable disease** at a location owned, leased or rented by the Insured and the access must be limited by either 1) or 2) under the Advantage, or a) or b) under proVision

Q. When does this coverage apply?

      A.  Advantage Policy – under both Property Damage and Time Element each state:
        • This Additional Coverage will apply when access to such location is limited, restricted or prohibited in excess of 48 hours
      A.  AFM proVision Policy - under both Property Damage and Business Interruption each state:
        • This coverage is subject to the Qualifying Period in the Declarations section of this Policy

Q. Would an employee at a **location** who is affected with the **communicable disease** be considered the "actual presence" of a **communicable disease?**

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/about/index.html

A. Yes - if it can be confirmed the employee actually has the **communicable disease** and that the presence of the **communicable disease** is the basis for the decision limiting access as noted in sub-sections 1) and 2) under the Advantage Policy or a) and b) under proVision Policy.

Q. How can we determine whether an employee has the **communicable disease**

A. In some jurisdictions, access to medical records is not possible without employee consent. However, the Insured can ask the employee for the necessary medical diagnosis.

Q. If an Insured closes one or more locations because they suspect the presence of the **communicable disease** or does so in an abundance of caution, would that trigger coverage.

A. No. Coverage is only triggered if there is the actual presence of a **communicable disease.**

Q. What deductible would apply in the event of a covered loss?

A. If a coverage-specific deductible is not specified, the largest applicable deductible would apply. For example, if the location deductible is $1,000,000 combined and the All Other Loss deductible is $250,000, the $1,000,000 would apply.

Q. Would an outbreak of a different virus be considered part of the same occurrence?

A. No

Q. Does coverage under Civil or Military Authority apply?

A. No
The Advantage form states:
"This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to the insured location provided such order is the direct result of physical damage of the type insured at the insured location or within five statute miles/eight kilometres of it…."

The proVision form states:
"This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **location** provided such order is the direct result of physical damage of the type insured at a **location** or within five (5) statute miles of it…"

A virus will typically not cause physical damage. Under either policy, the presence of a communicable disease does not constitute physical damage and is not of the type insured against as a virus falls within the definition of **contamination,** which is excluded.

Q. Does coverage under Contingent Time Element Extended (Advantage) or Supply Chain (ProVision) or Ingress/Egress apply?

A. No
These coverages require physical loss or damage to property of the type insured under either policy. The presence of a communicable disease does not constitute physical damage and is not of the type insured against as a virus falls within the definition of **contamination,** which is excluded.

Q. Is there any activity to consider prior to confirming coverage or issuing a payment?

A. Yes - keep in mind that most policies issued have a specific limit for this coverage and an annual aggregate applies. Check with the Claims Manager Written as well as the DSGA Written prior to confirming coverage and prior to issuing any payment to determine the status of the annual aggregate.

While the FM Global Advantage offers some of the broadest property coverage available, there are still events for which there may be no coverage. The Advantage and AFM policies insure against physical damage and require that there be insured physical loss or damage to property before its coverages become available. The Communicable Disease coverage provides for a specific trigger of coverage under these Additional Coverages. If there is a report of loss, FM Global stands ready to provide all the coverage available under the terms and conditions of its policies.